## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **RICHARD VASQUEZ,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | |
| | § | **NO. C-05-59** |
| **DOUGLAS DRETKE, DIRECTOR,** | § | **(Death Penalty Case)** |
| **TEXAS DEPARTMENT OF CRIMINAL** | § | |
| **JUSTICE, CORRECTIONAL** | § | |
| **INSTITUTIONS DIVISION,** | § | |
| | | |
| **Respondent.** | | |

## PETITION FOR WRIT OF HABEAS CORPUS
## IN A CAPITAL CASE

Andrew M. Edison
State Bar No. 00790029

Eric B. Storm
State Bar No. 24033244

BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
(713) 221-1371 (Telephone)
(713) 221-2144 (Facsimile)

# TABLE OF CONTENTS

Page

I.      JURISDICTION ...............................................................................................1

II.     PROCEDURAL HISTORY................................................................................2

III.    STANDARD OF REVIEW ...............................................................................3

IV.     CLAIM ONE: INEFFECTIVE ASSISTANCE OF COUNSEL – FAILURE TO
        INVESTIGATE AND PRESENT AVAILABLE MITIGATION EVIDENCE ................4

        A.      Argument Summary..................................................................................4

        B.      Relevant Facts .........................................................................................5

        C.      Argument and Authorities.......................................................................14

V.      CLAIM TWO: INEFFECTIVE ASSISTANCE OF COUNSEL – FAILURE TO
        INVESTIGATE AND COUNTER THE STATE'S EVIDENCE OF SEXUAL ASSAULT29

        A.      Argument Summary..................................................................................29

        B.      Relevant Facts .........................................................................................33

        C.      Argument and Authorities.......................................................................40

VI.     CLAIM THREE: INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL –
        CONFLICT OF INTEREST ...............................................................................65

        A.      Argument Summary..................................................................................65

        B.      Relevant Facts .........................................................................................65

        C.      Argument and Authorities.......................................................................66

VII.    PRAYER FOR RELIEF ...................................................................................75

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Atkins v. Virginia,*
536 U.S. 304 (2002)........................................................................ 23

*Baxter v. Thomas,*
45 F.3d 1501 (11th Cir. 1995) ........................................................ 15

*Castillo v. Estelle,*
504 F.2d 1243 (5th Cir. 1974) .................................................... 68, 69

*Cuyler v. Sullivan,*
446 U.S. 335 (1980).......................................................... 66, 67, 71, 72

*Ellason v. State,*
815 S.W.2d 656, n.5
(Tex. Crim. App. 1991)................................................................... 74

*Evitts v. Lucey,*
469 U.S. 387 (1985)........................................................................ 66

*Glasser v. United States,*
315 U.S. 60 (1942)......................................................................... 71

*Hernandez v. Johnson,*
1997 U.S. App. Lexis
12686, *15 (5th Cir 1997) ............................................................. 70

*Holloway v. Arkansas,*
435 U.S. 475 (1978)............................................................. 66, 72, 73

*Jones v. State,*
843 S.W.2d 487
(Tex. Crim. App. 1992)............................................................. 65, 74

*Ladd v. Cockrell,*
311 F.3d 349 (5th Cir. 2002) .......................................................... 4

*Lockett v. Anderson,*
230 F.3d 695 (5th Cir. 2000) ..................................... 15, 16, 19, 63

*Mickens v. Taylor,*
535 U.S. 162 (2002)........................................................................ 67

*Mitchell v. Maggio,*
679 F.2d 77 (5th Cir. 1982) ........................................................... 69

*Moreland v. Scott,*
175 F.3d 347 (5th Cir. 1999) .......................................................... 70

*People v. Cooper,*
156 Misc.2d 483,
93 N.Y.S.2d 733 (1992).................................................................. 70

*Perillo v. Johnson,*
205 F.3d 775 (5th Cir. 2000) .......................................................... 67

**TABLE OF AUTHORITIES**

(continued)

**Page**

*Rompilla v. Beard,*
    125 S.Ct. 2456 (2005) ............................................................................................. 15

*State v. Kelly,*
    824 S.W.2d 568
    (Tex. Crim. App. 1992) ............................................................... 31, 39, 40, 48

*Stephens v. United States,*
    595 F.2d 1066 (5th Cir. 1979) ................................................................................. 68

*Stoker v. State,*
    788 S.W.2d 1
    (Tex. Crim. App. 1989) ............................................................................................. 74

*Strickland v. Washington,*
    466 U.S. 668 (1984) ..................................... 5, 14, 15, 16, 22, 33, 40, 62, 66, 67

*Tennard v. Dretke,*
    542 U.S. 274 (2004) ................................................................................................. 24

*United States v. Drones,*
    218 F.3d 496 (5th Cir. 2000) ................................................................................. 15

*United States v. Martinez,*
    630 F.2d 361 (5th Cir. 1980) ................................................................................. 68

*Wiggins v. Smith,*
    539 U.S. 510 (2003) ................................................... 3, 14, 15, 16, 19, 24

*Williams v. Taylor,*
    529 U.S. 362 (2000) ......................................................................................... 3, 16

*Zuck v. State of Alabama,*
    588 F.2d 436 (5th Cir. 1979) ............................................................. 67, 68, 69

**Statutes**

28 U.S.C. § 2241 ........................................................................................................... 1

28 U.S.C. § 2254 ................................................................... 1, 2, 3, 4, 30, 34

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **RICHARD VASQUEZ,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | |
| | § | **NO. C-05-59** |
| **DOUGLAS DRETKE, DIRECTOR,** | § | **(Death Penalty Case)** |
| **TEXAS DEPARTMENT OF CRIMINAL** | § | |
| **JUSTICE, CORRECTIONAL** | § | |
| **INSTITUTIONS DIVISION,** | § | |
| | § | |
| **Respondent.** | | |

## PETITION FOR WRIT OF HABEAS CORPUS
## IN A CAPITAL CASE

Petitioner, Richard Vasquez, is currently in the custody of the Texas Department of Criminal Justice, Correctional Institutions Division, confined on death row at the Polunsky Unit, Prison Number 999319, in Livingston, Texas.  Through undersigned counsel and pursuant to the Constitution of the United States and 28 U.S.C. § 2254, Richard Vasquez petitions this Court to issue a Writ of Habeas Corpus and order his release from confinement or a new trial on grounds that his custody violates the Constitution and laws of the United States.

## I.
## JURISDICTION

This Court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because Richard Vasquez was convicted in the 148th Judicial District Court in Nueces County, Texas.  Nueces County is within the Southern District of Texas.  Subject matter jurisdiction is conferred by 28 U.S.C. § 2254.

## II.
## PROCEDURAL HISTORY

On June 22, 1999, Richard Vasquez was convicted and sentenced to death for murder of a child under the age of six.   TEX. PENAL CODE ANN. § 19.03(a)(8).   On August 30, 2000, Petitioner filed a direct appeal of his capital murder conviction and death penalty sentence in the Texas Court of Criminal Appeals.   On October 3, 2001, the Texas Court of Criminal Appeals issued its opinion in the direct appeal affirming the conviction and sentence.

On June 27, 2001, while the direct appeal was still pending, Petitioner filed his post conviction application for writ of habeas corpus in state court pursuant to Article 11.071 of the Texas Code of Criminal Procedure seeking relief from his conviction and death sentence and seeking an evidentiary hearing.   The Nueces County District Court granted Petitioner's request for an evidentiary hearing, which commenced on March 31, 2003.   On January 7, 2004, the state filed its proposed findings of fact and conclusions of law.[1]   On February 12, 2004, Petitioner likewise filed proposed findings and conclusions.   On May 19, 2004, the district judge, without ruling on Petitioner's proposed findings of fact and conclusions of law, adopted every single finding and conclusion proposed by the State and recommended that Petitioner's application for writ of habeas corpus be denied. *See* Exhibit A.

On January 26, 2005, the Texas Court of Criminal Appeals, in an unpublished decision, adopted the trial judge's findings and conclusions and denied Petitioner's application for writ of habeas corpus.   Petitioner has exhausted the remedies available in state court.   28 U.S.C. § 2254(b)(1).

On April 13, 2005, this Court granted Petitioner's application to proceed in forma pauperis and motions for appointment of counsel to represent him in filing a petition in federal

---

[1] A true and correct copy of the State's Proposed Findings and Conclusions and Order is attached hereto as Exhibit A.

court pursuant to 28 U.S.C. § 2254. That same day the Court appointed the undersigned attorneys to represent Mr. Vasquez in filing his § 2254 petition.

On June 27, 2005, Mr. Vasquez filed his first unopposed motion for extension of time to file his federal habeas corpus petition, which was granted by the Court on June 28, 2005. On October 17, 2005, the Court granted Petitioner's second unopposed motion for extension of time for filing his petition extending the deadline to file until January 26, 2006. Mr. Vasquez timely files his petition pursuant to 28 U.S.C. § 2254.

### III.
### STANDARD OF REVIEW

The standard of review in federal habeas cases is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a habeas petitioner may obtain relief with respect to any claim adjudicated on the merits in a state court proceeding if he demonstrates that the prior adjudication resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). A writ may be granted under this "unreasonable application" standard when a state court identifies the correct governing legal principle but unreasonably applies it to the facts of a petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). To warrant habeas relief, a state court's application of precedent must have been more than incorrect or erroneous; it must have been "objectively unreasonable." *See id.*; *see also Williams v. Taylor*, 529 U.S. 362, 409 (2000).

Alternatively, habeas relief is justified when a petitioner demonstrates that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2). Pursuant to 28 U.S.C. § 2254(e)(1), the state court's factual determinations are presumed correct unless a petitioner

rebuts that presumption by clear and convincing evidence. *Ladd v. Cockrell*, 311 F.3d 349, 352 (5th Cir. 2002).

## IV.
## CLAIM ONE: INEFFECTIVE ASSISTANCE OF COUNSEL – FAILURE TO INVESTIGATE AND PRESENT AVAILABLE MITIGATION EVIDENCE

**A.    Argument Summary**

Richard Vasquez was denied his Sixth Amendment right to effective assistance of counsel due to his trial attorneys' failure to investigate and present readily available mitigation evidence during the sentencing phase of his trial.  Trial counsel did not conduct a basic investigation of Richard's family, social, and medical history as required by the American Bar Association standards a nd other professional standards of practice.  Trial counsel failed to employ a mitigation investigator even though they had sufficient funding to do so.  Trial counsel failed to discover Richard's complete school records and medical records.  Counsel also failed to interview critical family members and others who had relevant information for mitigation, including Richard's father, mother, babysitter and cousins.  Trial counsel failed to ask their retained psychiatrist to evaluate Richard for mental deficiencies or other medical or social history which might have been used for purposes of mitigation.  Finally, they disregarded the opinion of their own experts who suggested that further testing was required to rule out damage to Richard's brain.

Consequently, trial counsel was completely unaware that Richard's father, Ricardo Vasquez, introduced his son Richard to drug use and drug trafficking at an early age, that before Richard was 12 years old the elder Vasquez taught his son how to steal, burglarize houses, and fence stolen property, or that his father gave Richard his first dose of heroin when Richard was only 12 years old.  Because trial counsel did not even attempt to interview Richard's mother, Marta Vasquez, trial counsel failed to discover that she drank heavily during her pregnancy and

that she was despondent, depressed and neglectful.  They also failed to learn the full extent of Richard's learning disabilities and difficulties in school.

The appropriate testing and discovery, which was performed in preparation for the state habeas proceeding, revealed that Richard suffers from post traumatic stress disorder, attention deficit disorder, poly-substance dependence, fetal alcohol syndrome, brain dysfunction, learning disabilities, and a borderline IQ.  All of this evidence would have been admissible and would have informed the jury of important and compelling mitigating circumstances.  Trial counsel's failure to present this evidence deprived Richard of his right to a reliable and individualized sentencing determination in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.  Moreover, had all of the available mitigation evidence been presented to the jury, there is a reasonable probability that the jury's sentence would have been different.

The state court's attempt to label trial counsels' failure to discover and present this available mitigation evidence a "strategic decision" when trial counsel lacked sufficient information to rationally formulate and follow such a strategy is an objectively unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984) and subsequent Supreme Court precedent.  Accordingly, because trial counsels' substandard performance deprived the jury of compelling, substantial mitigation evidence and undermined confidence in the jury's death penalty verdict, Richard is entitled to habeas corpus relief.

**B.    Relevant Facts**

Richard Vasquez was 18 at the time of the events at issue in this case.  (RR 41: State's Ex. 1).  He was living at the home of his aunt and uncle, Olivia and Juan Vasquez, who informally adopted Richard when he was approximately three and a half years old.  (RR 34:56;

39:77, 86; SH Petitioner's Ex. 22 ¶ 11).[2]  Richard's girlfriend, Brenda Lopez, their four month old daughter, Megan Vasquez, and Brenda's four year old daughter from a prior relationship, Miranda Lopez, also lived in the home with Richard and his adoptive parents.  (RR 34:56).

Richard was seriously addicted to drugs, having used heroin, cocaine, and marijuana since he was as young as 11 years old.  (RR 39:100).  On March 5, 1998, after a long night of drug abuse and arguing with Brenda about issues related to their common addiction to drugs, Richard awoke at about 10:30 a.m. in a bad mood, thinking he had missed a court date.  (RR 37:80-82).  He immediately injected himself with a large dose of heroin, drove his aunt to work, and returned home to inject himself and Brenda with more drugs.  (RR 36: 83-85).  Richard then took Brenda to work and, after stopping at McDonald's for lunch, returned home with the children.  (RR 37:85-89).  He testified in his own defense at trial that he was angry, depressed and frustrated because he had to watch the children and could not go out to steal things to sell for money to buy more drugs.  (RR 37:77, 89-91).  He testified that he transferred his anger to the children.  (RR 37:126).  While he was still high on drugs and in this angry and depressed state of mind, Richard hit Miranda repeatedly in the head with his hand.  (RR 34:57-59; 37:92-93, 146).  When Miranda later fell down and became unconscious, Richard called 911 and attempted to administer first aid.  (RR 34:59; 37:95-99, 102).  Miranda was transported to the hospital where she eventually died.  (RR 41: State's Ex. 45).

---

[2] Throughout this Petition references to the Reporter's Record from the trial court will be cited in the following format: (RR Volume #: Page #).  References to the exhibits from the trial court will be cited as (RR Volume #: State's/Defendant's Ex. #).  References to the Clerk's Record from the trial court will be cited as (CR Volume #: Page #).  References to the Reporter's Record from the state habeas corpus evidentiary hearing will be cited as (SH Volume #: Page #).  References to the exhibits from the state habeas evidentiary hearing will be cited as (SH Petitioner's/State's Ex. #).  Exhibits attached to the state habeas application will be cited as (SH App. Ex. #).

During the sentencing phase of the trial, Richard's trial counsel put three of Richard's family members -- his aunt, uncle, and sister -- on the witness stand to beg the jury for mercy. (*See* RR 39:77-92).  Richard's aunt and uncle testified how Richard's generally friendly behavior changed when he became addicted to drugs.  (RR 39:79, 87).  Richard's aunt also testified that Richard was involved in a train accident which killed one of his friends and caused Richard to be hospitalized with a head injury.  (RR 39:88).  The accident occurred when Richard was 15 years old.  She stated that Richard had become severely depressed following that accident.  (*Id.*).

However, the three members of the Vasquez family who testified were not asked to discuss many important details of Richard's background, including his relationship with his natural parents.  Richard's aunt, Olivia Vasquez, submitted an affidavit during the state habeas proceeding in which she testified that "[n]one of Richard's lawyers at the trial ever talked to me about any of the information about our family's and Richard's dealings with his father."  (SH Petitioner's Ex. 22 ¶ 32).  She also stated that "[n]one of [Richard's] lawyers prepared me before I testified, I didn't know what to say, and all they told me was just answer the questions I was asked and to ask for mercy."  (*Id.*).  Richard's uncle likewise filed an affidavit stating that Richard's trial attorneys did not interview him or meet with him to prepare him for his trial testimony.  (SH Petitioner's Ex. 21 ¶ 33).  Speaking generally regarding the preparation of witnesses for the penalty phase of the trial, Robert Bujanos, the trial attorney who questioned Richard's family members during that phase of the trial, said: "it didn't seem to me that there was enough advance preparation, in my mind."[3]  (SH 7:11).  He recalled that counsel interviewed the Vasquez family for mitigation purposes in the hallway during the trial.  (SH 7:13).

---

[3] When asked about what the trial attorneys did after each day of trial during the case in chief and penalty phase, Mr. Bujanos answered as follows:

Trial counsel admitted during the state habeas evidentiary hearing that they did not hire a mitigation specialist to assist them in their investigation of mitigation evidence. (SH 3:54; 7:11). Instead, they hired Jan Davis, a semi-retired former probation officer purportedly to conduct some witness interviews. (SH 3:21). Mr. Davis had absolutely no prior experience investigating mitigation in a capital murder case. (SH 3:34). He spent a total of 8.5 hours working on the case, including time spent traveling a total of 110 miles. (*See* SH Petitioner's Exhibit 13). The trial court approved a $1000 allotment for the services of Mr. Davis, but defense counsel only used $448.22 of that amount for his time and expenses. (*Id.*).

Trial counsel testified that they did not attempt to interview Richard's natural father, Ricardo Vasquez, or Richard's natural mother, Marta Vasquez, to find out their roles in Richard's life. (SH 3:37-38). Likewise, they failed to interview Richard's sister, Brenda Vasquez, Richard's cousins, and Richard's childhood caretaker, each of whom were available and willing to testify regarding Richard's social history. (*See* Petitioner's Exs. 25-29; SH 3:35). Counsel also failed to interview Miranda's mother and Richard's girlfriend, Brenda Lopez, even though she indicated she was willing to talk to defense counsel if prosecutors and legal aid representatives could be present. (SH 3:36-37).

Trial counsel acknowledged that because they did not do the necessary investigation, there were many things in Richard's background that they never knew, and thus could not convey to the jury. (SH 3:55). Among the information trial counsel did not know was that Richard's

---

. . . during the case in chief, very little outside of adjourning for court for the day. Very little planning that I was aware of happened. A stark recollection I have is that the Spurs were in the playoffs. And I asked Mr. Gilmore if we were going to do anything to get ready, and he laughed and told me he was going to watch the Spurs.

(SH 7:20).

mother drank beer and hard liquor during her pregnancy with Richard, causing Richard to suffer from fetal alcohol syndrome.  (SH 3:40, 127; 4:136-37; Petitioner's Exs. 20, 21, 22, 23).  They were not aware that Richard's family had a long history of drug abuse and depression.  (SH 4:43; SH Petitioner's Exs. 21, 22, 23, 24).  They had no idea that Richard's natural father often interacted with Richard during Richard's childhood and early teenage years and had a profound negative and corrupting impact on Richard's life.  (SH 3:120-28).

Richard's father, Ricardo Vasquez, was a drug addict.  Ricardo testified at the state habeas evidentiary hearing that he began using heroin and cocaine when he was approximately 14 years old and has been addicted for about 25 years.  (SH 3:116-17).  He stated that he has been in and out of prison most of his life for drug abuse and drug-related crimes.  (SH 3:117, SH Petitioner's Ex. 24).  From the time Richard was an infant, Ricardo took him to places to buy and use drugs.  (SH 3:120).  From a very young age, Richard saw his father using and dealing heroin, which Ricardo sold off the front porch of his home.  (SH 3:121).  Even after Richard moved in with Juan and Olivia, Ricardo frequently visited Richard and took him with him whenever he wanted to.  (SH 3:127).  Richard liked to be with his father and frequently hung out with Ricardo when he was out of prison.  (SH 3:124, 127).  As Richard grew older, Ricardo took him with him when he would rob houses to fund his drug habit.  (SH 3:121-22; SH Petitioner's Ex. 24 ¶ 13).  Ricardo taught Richard how to prepare and use heroin, which Richard began using when he was approximately 11 or 12 years old.  (RR 39:100; SH 3:124).  Ricardo also taught Richard how to deal drugs.  (SH 3:125).  About that same time when Richard was visiting his grandmother's house, Richard witnessed his father's arrest for heroin possession.  (SH Petitioner's Ex. 22 ¶ 17).  The event upset Richard so much he cried for days afterwards.  (*Id.*).

Trial counsel was also not aware of the many other bad influences in Richard's family life. Both of Richard's grandfathers were alcoholics and one abused drugs. (SH Petitioner's Ex. 22 ¶ 19). Richard's sister's live-in boyfriend, Steve Velasquez, often used hard drugs with Richard. (SH Petitioner's Ex. 22 ¶ 22). Richard's natural mother's live-in boyfriend, Joe Lopez, was a drug dealer and provided Richard with heroin. (SH Petitioner's Ex. 23 ¶ 22). Richard's paternal uncle, Arnulfo Vasquez, died of a heroin overdose; his paternal uncle, Cleto Vasquez, also abused drugs and was shot in the head by drug dealers; and his paternal aunt's husband was shot and his body set on fire in a drug-related killing. (SH Petitioner's Exs. 22, 23, 24). Richard's maternal uncle, Arturo Ramirez, is a drug addict and also has served time in jail. (SH Petitioner's Ex. 23 ¶ 19). Richard's cousins, Robert Mungia and Chris Ramirez, are also drug addicts who used to hang around with Richard. (*Id.*).

Richard's former babysitter, Herlinda Rangel, knew Richard's parents before he was born and had knowledge of their contentious relationship and Richard's difficult home life as a young child. (SH Petitioner's Ex. 26). She stated at the state habeas proceeding, that even after Richard moved in with his aunt and uncle, Richard was frequently left alone after school while his parents worked. (*Id.*). She described how on one occasion she discovered a 10 year old Richard at home by himself smoking pot. (*Id.*). Because trial counsel did not conduct the requisite investigation, they had no knowledge of these facts and were simply unable to inform the jury of them.

The only expert testimony offered by the defense during the trial was that of a psychiatrist, Dr. Carlos Estrada. Dr. Estrada's mitigation testimony was basically limited to Richard's history of drug abuse and Dr. Estrada's opinion that Richard would not be a future danger to society if he remained institutionalized and free of drugs. (*See* RR 37:95-109).

Dr. Estrada testified during the state habeas proceeding that trial counsel never provided him with any medical records, school records or interviews with family members to assist him in his evaluation of Mr. Vasquez.  (SH 7:66, 71, 79).  In fact, trial counsel admitted that they did not request any medical records from any hospital reflecting any kind of treatment on Mr. Vasquez.  (SH 3:34-35).  They failed to request these records despite their knowledge that Richard had suffered a head injury in an auto-train accident.  (*Id.*).  Trial counsel also admitted that they did not independently request Richard's school records, instead relying on the limited records provided by the State in discovery.  (SH 3:33-34).  Dr. Estrada testified that, because he was not given any of this information, he was unable to evaluate Mr. Vasquez for learning disabilities or to detect symptoms of attention deficit hyperactivity disorder.  (SH 7:79-80).

Dr. Estrada also stated that he was not trained to perform neuropsychological testing on Mr. Vasquez and that he was not asked to measure Mr. Vasquez's IQ (SH 7:81-82).  Dr. Estrada testified that defense counsel did not provide him with any information about Mr. Vasquez's natural mother or ask him to explore the possibility that Mr. Vasquez suffered from fetal alcohol syndrome.  (SH 7:81-82).  He testified that all of this information would have been helpful to his evaluation and would have been important mitigation evidence.  (SH 7: 71, 79, 82-84).

Dr. Bonikowski, a neurologist, was retained by the defense to render a neurological opinion.  Dr. Bonikowski recommended that Mr. Vasquez undergo an MRI of his brain, neuropsychological testing, and a Quantitative Electroencephalogram (QEEG).  (SH Petitioner's Ex. 12).  Dr Estrada concurred with Dr. Bonikowski and recommended those tests in order to rule out the possibility of brain damage.  (SH 7:95).  Dr. Estrada wrote the following on Dr. Bonikowski's report: "Impression:  Further testing as recommended needed to rule out brain damage, quantity and quality."  (SH Petitioner's Ex. 61).  Dr. Estrada also wrote a note to Dr.

Bonikowski stating, "To Dr. Bonikowski, regarding Richard Vasquez.   Prescription, neuropsychological and electroencephalogram to rule out organicity.  I agree with further tests." (SH Petitioner's Ex. 62).

Despite their knowledge of these recommendations from their retained experts, trial counsel did not have Richard undergo the proscribed testing.  (SH 3:45-48).   Trial counsel Joseph Collina admitted that because of his experience with other death penalty cases, he was aware that psychiatrists typically do not perform neuropsychological testing and that neuropsychological tests are usually performed by a clinical psychologist.   (SH 3:48). Nevertheless, defense counsel failed to retain a clinical psychologist to evaluate Mr. Vasquez for possible brain damage.  (SH 2:249-50).

State habeas counsel, with the assistance of a mitigation specialist and a clinical psychologist, did perform the basic investigation of Richard's social and medical history that trial counsel failed to do.   The clinical psychologist, Dr. Ricardo Weinstein, visited with and examined Richard on May 21, 2001, May 22, 2001, January 7, 2003, and again at the beginning of April 2003.  (SH 4:13).   As part of his evaluation of Richard, Dr. Weinstein personally interviewed people who had the most contact with Richard during his life and developmental years including Richard's aunt and uncle, Olivia and Juan Vasquez, Richard's natural mother and father, Marta Ramirez Vasquez and Ricardo Vasquez, Sr., and Richard's caretaker Herlinda Rangel.  (SH 4:23).  He also reviewed multiple affidavits from those same individuals as well as affidavits from Richard's sister, niece, cousins, and maternal aunt.   (SH 4:14-16; *see also* Petitioner's Exs. 20-29, 32).  He reviewed the death certificates of three of Richard's uncles, Columbia Hospital records from Richard's August 1996 heroin overdose, Riverside Hospital records regarding Richard's head injury from the auto-train accident, Richard's school records,

hospital records from Richard's birth and early childhood, an MRI report from Dr. Wayne Laster, and various documents and evidence from this case. (SH 4:15-17).

Dr. Weinstein then performed multiple diagnostic tests on Richard to determine his brain function, language ability, and medical and social condition, including the neuropsychological testing and  QEEG that was prescribed by trial counsel's experts but never requested by trial counsel. (SH 4:29-33).  Dr. Weinstein determined that Richard suffers from long-term poly-substance dependence, which means he is addicted to a variety of drugs. (SH 4:33).  Richard also suffers from cumulative post-traumatic stress disorder resulting from violent experiences and exposure to violence throughout his life. (SH 4:33-34).  This condition causes Richard's "fight or flight" reaction to be in a constant state of arousal which makes him more prone to viceral reactions, irritability and poor judgment. (SH 4:35-36).  Richard has learning disabilities that were not properly addressed in his early years. (SH 4:36).  Additionally, Richard suffers from brain dysfunction with multiple causes, including Fetal Alcohol Syndrome, actual trauma to the brain, drug abuse, problems during the brain's development, and potential other causes. (SH 4:37).  Dr. Weinstein tested Richard's IQ which measured in the low normal range of 83.  Dr. Weinstein explained that this IQ level is borderline. (SH 4:59).  Dr. Weinstein testified that Richard's brain dysfunction affects the frontal lobes of Richard's brain causing problems with impulse control, problems with abstract reasoning, problems with the ability to plan and organize his behavior in a goal-directed manner.  Consequently Richard has a tendency to act and behave before he thinks and, even when he does think, he has difficulty controlling his behavior. (SH 4:61).  A true and correct copy of Dr. Weinstein's complete report is attached hereto for the Court's convenience as Exhibit B. (*See also* Petitioner's Ex. 20).

C.     **Argument and Authorities**

1.     *Standard for Sixth Amendment Ineffective Assistance of Counsel Claims.*

The United States Supreme Court established a two-pronged test for assessing claims of

ineffective assistance of counsel claims pursuant to the Sixth Amendment in *Strickland v.*

*Washington*, 466 U.S. at 687-88. Under the first prong, a petitioner for habeas corpus must show

that counsel's performance was deficient by demonstrating that counsel's representation "fell

below an objective standard of reasonableness." *Id.* at 687-88. "The proper measure of attorney

performance remains simply reasonableness under prevailing professional norms." *Id.* at 688.

Prevailing norms of practice are reflected in American Bar Association standards, which serve as

guides to determining what is reasonable. *Id.* at 688-89.

ABA Guidelines provide that investigations into mitigating evidence "should comprise

efforts to discover all reasonably available mitigating evidence and evidence to rebut any

aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the

appointment and Performance of Counsel in Death Penalty Cases 11.4.1(c), p. 93 (1989); *See*

*also Wiggins,*, 539 U.S. at 524 (applying the ABA Guidelines in force at the time of the

defendant's trial).

Thus, preeminent among an attorney's duties in representing a client charged with a

capital crime is the duty to conduct a reasonable investigation of the law and the facts.

> Strategic choices made after thorough investigation of law and
> facts relevant to plausible options are virtually unchallengeable;
> and strategic choices made after less than complete investigation
> are reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation. In other words,
> counsel has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations
> unnecessary. In any ineffectiveness case, a particular decision not
> to investigate must be directly assessed for reasonableness in all
> the circumstances, applying a heavy measure of deference to
> counsel's judgments.

*Strickland*, 466 U.S. at 690-91.   "*Strickland* does not require any deference to decisions of counsel that are uninformed by an adequate investigation into the controlling facts and law." *Lockett v. Anderson*, 230 F.3d 695, 714 (5th Cir. 2000) (quoting *United States v. Drones*, 218 F.3d 496, 500 (5th Cir. 2000).   Indeed, case law expressly rejects the notion that a "strategic" decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice among them.  *Baxter v. Thomas*, 45 F.3d 1501, 1514 (11th Cir. 1995)(failure to present mitigating psychiatric evidence not tactical when caused by misunderstanding on the part of counsel).   The heart of the analysis is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was *itself reasonable*." *Id.* at 523 (emphasis in original); *see also Williams*, 529 U.S. at 396 (instructing that trial counsel has an "obligation to conduct a thorough investigation of defendant's background").   In assessing the reasonableness of an attorney's investigation, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.  *Wiggins,* 539 U.S. at 527.

Once a Petitioner establishes that his counsel's performance fell below the objective standard of reasonableness, the second prong of *Strickland* requires a Petitioner to demonstrate that his counsel's deficient representation prejudiced the defense.  *Strickland*, 466 U.S. at 692. When considering prejudice a court should not consider whether it may be possible that a jury could have heard all of the evidence and still have decided on the death penalty, that is not the test.  *Rompilla v. Beard*, 125 S.Ct. 2456, 2469 (2005).   Instead, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S at 694.  In

assessing prejudice, a court must reweigh the evidence in aggravation against the totality of

available mitigating evidence and consider whether the "mitigating evidence, taken as a whole,

'might well have influenced the jury's appraisal' of [the defendant's] moral culpability." *Wiggins*,

539 U.S. at 538 (quoting *Williams,* 529 U.S. at 398).  If the Court can conclude "that a juror

could have *reasonably* concluded that the death penalty was not an appropriate penalty in this

case based on the mitigating evidence, prejudice will have been established." *Lockett v.

Anderson*, 230 F.3d 695, 716 (5th Cir. 2000) (emphasis added).

   2.   ***Failure to Investigate Mitigation Evidence of Richard's Background.***

   Here, clear and convincing evidence of trial counsels' failure to investigate Richard's

troubled background and social history, (evidence Richard's state habeas counsel presented

during the state evidentiary hearing), rebuts the state court's findings of fact supporting the Texas

Court of Criminal Appeals' decision to deny habeas relief.  The state court's somewhat redundant

findings three to six each relate to trial counsel's failure to investigate mitigation evidence of

Richard's social history as follows:

> 3.   The Court finds that, Vasquez's trial attorneys reasonably
> determined that pursuing further evidence of Vasquez's
> social history was unnecessary to make an informed choice
> among possible defenses, and their failure to investigate
> further the negative influence that Vasquez's biological
> parents played in his early years resulted from a reasoned
> strategic judgment and not from inattention.

> 4.   The court (sic) finds that all of Vasquez's trial attorneys
> were aware of his biological parents and his family history
> involving drug abuse and violence, but that they made a
> reasonable strategic decision to portray Vasquez as coming
> from a good home, as far as his adoptive parents, and that it
> would have been inconsistent with that strategy to present
> evidence concerning Vasquez's exposure to drugs and
> violence at an early age.

5.    The Court finds that Vasquez's trial attorney Joseph Collina gathered sufficient information about Vasquez's social background through meetings with Vasquez and his adoptive parents, that his decision not to interview the biological parents because they could not provide additional information and would not have been good witnesses was reasonable under the circumstances, and that his decision not to hire an independent mitigation expert was reasonable because he already had sufficient evidence.

6.    The Court finds that Vasquez's trial attorney Joseph Collina was aware that Vasquez's biological parents had an influence on him at a very young age, but made a reasonable strategic decision to portray Vasquez as coming from a good home without adverse influences and to bring out all that his adoptive parents had done for him, and not to say much about the biological parents at trial for fear of "throw[ing] mud" at the good impression Vasquez's adoptive family made.

These factual and legal findings are objectively unreasonable because they contradict the undisputed evidence presented during the state evidentiary hearing.

### a.    Trial Counsel Was Not Aware of Richard's Social and Family History.

First, trial counsel were clearly not all "aware of [Richard's] biological parents and his family history involving drug abuse and violence," as finding four concludes.  They could not have been because they failed to interview anyone concerning this family history.  Olivia Vasquez, Richard's aunt, testified that "[n]one of Richard's lawyers at the trial ever talked to me about any of the information about our family's and Richard's dealings with his father." (SH Petitioner's Ex. 22 ¶ 32).  Richard's uncle, Juan Vasquez, likewise filed an affidavit stating that Richard's trial attorneys did not interview him except to ask if he observed bruises on Richard when he was first arrested and prior to his confession.  (SH Petitioner's Ex. 21 ¶ 33).

Trial counsels' recollections of investigating Richard's family history are sketchy at best.  Regarding Olivia's statement that she was never interviewed about Richard's relationship with

his natural father, Mr. Bujanos, the lawyer who questioned both Olivia and Juan during the

sentencing phase of the trial, answered as follows:

> I don't know.  I was aware that there was some strife with the
> father, that there was a tumultuous relationship.  And it's very, very
> difficult to recall.  I want to be honest here and truthful, but it's
> very difficult to recall exactly what was said.  And if that's her
> recollection, then I believe she is telling the truth.  I just don't
> know for certain.

(SH 7:13).  When asked later if he knew that Richard's father was in and out of prison most of

Richard's life he stated that he heard that Richard's father "had some problems" but conceded that

he didn't know if he "ran across" that fact until after the trial was over.  (SH 7:16).  He freely

admitted that he did not know that Richard's father taught Richard to shoot heroin at age 12.

(*Id.*).  He said he did not know that Ricardo taught Richard to steal and rob and sell drugs.  (*Id.*).

He also was not informed that when Richard was 11 years old he witnessed his father's arrest at

his grandmother's house or that the event had a serious emotional impact on Richard.  (SH 7:17).

He stated that he did not know that three of Richard's uncles died violent deaths.  (SH 7:18).

Mr. Bujanos also admitted he was not aware of the fact that Richard's mother drank beer

and hard liquor during her pregnancy with Richard.  (SH 7:14).  He acknowledged that he never

met Richard's mother and that he did not even know her name.  (SH 7:14).  He stated that he did

not know about her drinking habit and that such information would have been "extremely

helpful" mitigation evidence.  (*Id.*).

Mr. Gilmore, another one of Richard's trial lawyers, likewise could not remember most of

the specific details regarding his investigation of Richard's social history.  (*See* SH 2:217-20,

226-27).  He stated that he did not recall what he did personally to investigate mitigation in

Richard's case and he did not recall speaking with Richard's mother or father.  (SH 2:219-20).

As noted above, Mr. Bujanos testified that defense counsel did little advance preparation for trial and interviewed the Vasquez family members for mitigation purposes in the hallway outside the courtroom.   (SH 7:11, 13).   A last-minute interview conducted in such a public setting simply could not have been sufficient to inform trial counsel of Richard's extensive and horrific family history.   Nevertheless, even if we assume, as Mr. Bujanos suggested, that trial counsel had some awareness of a "tumultuous relationship" with Richard's father, such an awareness does not justify trial counsel's failure to investigate further.   To the contrary, viewed from trial counsels' perspective at the time, if they did have some idea that there was "strife" and "tumult" related to Richard's natural parents, they had all the more reason to conduct a thorough investigation to find out if that conflict might have affected Richard.   *See Wiggins,* 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

> **b.**     **Trial Counsel's Failure to Investigate Richard's Family and Social History was Not an Informed Strategic Decision.**

The conclusion of the state court that trial counsels' failure to investigate Richard's background was somehow the product of a strategic decision is also unreasonable.   This is true because *Strickland* demands more than the mere decision of a strategic choice by counsel.   It requires "informed strategic choices." *Lockett,* 230 F.3d at 714.   As noted above, defense counsel here was not in possession of sufficient information to make an informed strategy decision. Because trial attorney Joseph Collina never met Richard's biological parents and did not know anything about the information they might possess, he had no idea that they "could not provide additional information and would not have been good witnesses" as finding number five concludes.   For this same reason it is unreasonable to assume that trial counsel made a strategic

decision to portray Richard as "coming from a good home" instead of presenting evidence concerning Richard's natural parents as findings four and six suggest.  Trial counsel could not have made such a "strategic" choice because they simply were not aware of one of the strategic alternatives -- namely the option of presenting evidence that Richard's natural parents exposed him to drugs and violence at an early age.

c. <strong>Investigation of Richard's Family History and Social History is Consistent with Trial Counsel's strategy.</strong>

Incredibly, Mr. Collina suggested that "[Richard's] adoptive parents, who were closely related, brother and sister to the to the natural parents, were to testify <u>and did testify</u> that he was maltreated, ignored, and even -- his natural parents even contributed to his delinquency.  And the jury was made aware of that."  (SH 3:37) (emphasis added).  This is simply not true.  A theory in review of the trial record demonstrates that no such testimony was introduced at trial.  (*See* RR 39:77-92).  However, Mr. Collina's testimony underscores two important points.  First, we see clearly that by the time of the state habeas evidentiary hearing, Mr. Collina's memory of the mitigation investigation and the sentencing hearing was not reliable.  We also see that at least one trial attorney believed that the defense actually did not follow a rigid "good home" strategy at the expense of evidence of Richard's troubled family history as the state court assumed they did.

In fact, the state court's premise that an argument that Richard's adoptive parents tried to provide Richard with a good home was somehow mutually exclusive of an argument showing that Richard is the victim of negative influences from Richard's natural parents and extended family is fundamentally flawed.  It is not hard to see how counsel could argue that Richard's aunt and uncle did their best to provide a loving home and thus deserve the jury's sympathy and at the same time argue that Richard was victimized by influences outside that loving home, including

-20-

his natural mother and father.  Mr. Bujanos tried to make this very point in response to the State's

questioning in the state habeas proceeding.

> Q.    A little bit ago you said "Richard is a redeemable human
>        being, how nice the family was might sway the jury."  So
>        I'm going to ask you a question about that now, about that
>        comment.  Wouldn't it be -- wouldn't it not be inconsistent
>        with sound trial strategy to present both evidence of a good
>        family and bad family environment?  Would those not be
>        mutually exclusive trial strategies?
>
> A.    To show that --
>
> Q.    Good family versus bad family environment.
>
> A     Yeah. You'd have to do one or the other.
>
>           MS. GLEIMER:      That's all I have.
>
>           THE WITNESS:      Wait, wait.
>
> Q.    (By Ms. Gleimer)     Excuse me?
>
> A.    Now, let me -- there may be -- in families there's different
>        members of families. Some may be good and some may be
>        bad.  And I think that's a part of an entire family.  So I'd
>        have to say that saying that they're mutually exclusive
>        might be an oversimplification.  I mean, for example, with
>        Richard's father, that was a bad family situation; whereas –
>
> Q.    The aunt and uncle would be good?
>
> A.    -- Juan and Olivia Vasquez, from what I saw, that would
>        have been -- you know, they were trying to be good
>        parents. . . .

(SH 7:39-40).

A review of defense counsels' closing argument in the sentencing phase of this case

reveals that trial counsel actually advanced a version of both these arguments simultaneously in

Richard's defense.  Trial counsel clearly tried to generate sympathy for Richard's family  (*See* RR

40:27-28).  However, they also argued that Richard was a victim of individuals from the "dark underside of our society."  Mr. Collina argued:

> The dark underside of our society is the society of drugs, particularly when it impacts on children.  Richard Vasquez, as you have determined, is a criminal.  He is also a crime victim.
>
> . . .
>
> It is also mitigating that he has to grow up in a society where we have this dark side to our society and where he got involved in drugs and crime.

(RR 40:17, 24).  Investigation of Richard's family background including his parents' and extended family's history of drug abuse and violence is completely consistent with Mr. Collina's closing argument in which he blames outside influences for Richard's involvement in drugs and crime.  It is also consistent with the argument made throughout the trial that despite Richard's good home he became entangled in the wrong crowd and could not free himself of the influence of drugs. (*See, e.g.*, RR 37:21-22, 70-78).  Focusing on the pervasive and corrupting influence of Richard's natural parents' and his extended family's addictions to liquor and hard drugs from before he was even born provides additional explanation for Richard's own addictions, and reinforces the idea that Richard had little or no chance to escape that destructive influence.

Because trial counsels' "good home" strategy does not contradict with a mitigation strategy emphasizing Richard's early introduction to drugs by his natural parents and extended family, the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. 2254(d)(2).  Additionally, the state court's application of *Strickland* was objectively unreasonable because trial counsel's failure to investigate and present this mitigating evidence cannot be justified as an informed strategic decision.

**d.    Trial Counsel's Failure to Investigate Richard's Family and Social History was Prejudicial to Richard.**

As a result of trial counsels' failure to perform the necessary investigation regarding Richard's social history, the jury never knew about Richard's family's disturbing history of hard drug abuse, crime, depression, and violent death.  The jury was also not informed that Richard was exposed to these profoundly negative influences and experiences at a very young age by multiple individuals he cared about and looked up to in his life.    This available but uninvestigated social history relates directly to the cause of Richard's own heroin addiction, criminal behavior, and depression -- the very things that contributed to Richard's attitude and behavior on the day Miranda Lopez was killed.  If these mitigating facts had been investigated and presented to the jury during the sentencing phase of the trial, it is probable that the result of that trial phase would have been different.

**3.    *Failure to Investigate Mitigation Evidence of Richard's Mental Deficiency.***

**a.    Relevance and Admissibility of Mental Impairment Mitigation Evidence.**

The Supreme Court has repeatedly recognized the significance of mental impairments in determining the appropriate sentence for a capital defendant.    In the extreme case, when a defendant's mental deficiency is substantial enough for the defendant to be diagnosed with mental retardation, the Supreme Court has drawn a bright line and declared the death penalty unconstitutional.    *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).    However, even when a defendant's mental impairment is above the level of mental retardation,[4] the Supreme Court has held that impaired intellectual functioning has a mitigating dimension beyond the impact it has

---

[4] The American Psychiatric Association reports that the term "mild" mental retardation is typically used to describe people with an IQ level from 50 to approximately 70.  *See Atkins*, 536 U.S. at 308 n.3 (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 42-43 (4th ed. 2000)).  Richard's full scale IQ score is borderline, measured at 83.  (SH 4:59).

on the defendant's ability to act deliberately.  *Tennard v. Dretke*, 542 U.S. 274, 288 (2004).

Consequently, a defendant's low IQ is relevant mitigating evidence which "might serve 'as a

basis for a sentence less than death.'"  *Id.* (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5

(1986)); *see also Wiggins*,  539 U.S. at 535 (evidence that the defendant had an IQ of 79 is

relevant to and augmented his mitigation case); *Smith v. Texas*, 547 U.S. 37, 44 (2004)  ("There

is no question that a jury might well have considered petitioner's IQ scores and history of

participation in special-education classes as a reason to impose a sentence more lenient than

death.").

### b.    Trial Counsels' Failure to Assist Dr. Estrada.

Despite the relevance and important mitigating effect of a defendant's diminished mental

capacity, trial counsel failed to make sure that Mr. Vasquez received the appropriate tests to

assess any mental deficiencies or impairment.   Trial counsel hired Dr. Carlos Estrada, a

psychiatrist to evaluate Richard.  However, as noted above, because trial counsel failed to do the

necessary investigation of Richard's medical and social history, Dr. Estrada was never given any

medical records, school records or interviews with family members to assist him in his

evaluation of Mr. Vasquez.  (SH 7:66, 71, 79).  Trial counsel admitted that they did not request

any of Mr. Vasquez's medical records despite their knowledge that Richard had suffered a closed

head injury in an auto-train accident.  (SH 3:34-35; 7:70).  Trial counsel also admitted that they

did not independently request Richard's school records, but instead relied on the limited records

provided to them by the State.  (SH 3:33-34).  Dr. Estrada testified that he was not given any of

this information, including the school records trial counsel did obtain in discovery.

Consequently, he had insufficient information to evaluate Mr. Vasquez for learning disabilities

or to detect symptoms of attention deficit hyperactivity disorder.  (SH 7:79-80).

Defense counsel also did not provide Dr. Estrada with any information about Mr. Vasquez's natural mother or ask him to explore the possibility that Mr. Vasquez suffered from fetal alcohol syndrome. (SH 7:81-82). He testified that all of this information would have been helpful to his evaluation and would have been important mitigation evidence. (SH 7: 71, 79, 82-84).

Dr. Estrada was basically limited to the information he could glean on his own during two face-to-face interviews with Richard. (SH 7:72). He testified that this arrangement was less than ideal because obtaining information from the defendant himself does not always produce the most accurate medical and social history. (SH 7:71).

Trial counsel's failure to provide Dr. Estrada with accurate medical, educational, and social history information proved to be prejudicial to Richard. Armed with the necessary background information, Dr. Ricardo Weinstein, the neurophysiologist hired to evaluate Richard during the state habeas proceeding, was able to determine that Richard suffered from post traumatic stress disorder, attention deficit disorder, poly-substance dependence, fetal alcohol syndrome, brain dysfunction, learning disabilities, and a borderline IQ. (*See* SH Petitioner's Ex. 20). All of this evidence would have been admissible and would have informed the jury of important and compelling mitigating circumstances. Had the jury been apprised of these circumstances there is a reasonable probability they would found him to be less culpable for Miranda's death and would have reached a different result.

### c.    Trial Counsels' Failure to Follow Their Experts' Advice.

In spite of his limited information from trial counsel, Dr. Estrada did learn of Richard's train accident and resulting head injury and referred Richard to Dr. Bonikowski, a neurologist. (SH 7:76). Dr. Bonikowski recommended that Mr. Vasquez undergo an MRI of his brain, neuropsychological testing, and a Quantitative Electroencephalogram (QEEG). (SH 7:77; SH

Petitioner's Ex. 12).  Dr Estrada concurred with Dr. Bonikowski and recommended those tests in order to rule out the possibility of brain damage.  (SH 7:95).  Dr. Estrada wrote the following on Dr. Bonikowski's report: "Impression:  Further testing as recommended needed to rule out brain damage, quantity and quality."  (SH Petitioner's Ex. 61).  Dr. Estrada also wrote a note to Dr. Bonikowski stating,  "To  Dr.  Bonikowski,  regarding  Richard  Vasquez.    Prescription, neuropsychological and electroencephalogram to rule out organicity.  I agree with further tests." (SH Petitioner's Ex. 62).  Dr. Estrada testified that neuropsychological testing can assist in determining the type and severity of brain damage.  (SH 7:78).  Despite trial counsels' knowledge of these recommendations from their retained experts, trial counsel failed to have Richard undergo the proscribed testing.  (SH 3:45-48).

### d.  State Court Finding and Conclusions Are Objectively Unreasonable.

Viewed as a whole, trial counsel did almost nothing to investigate Richard's mental and learning disabilities.   They retained an "absolutely" inexperienced investigator, Jan Davis, ostensibly to conduct witness interviews, but then they only utilized him for 8.5 hours, much of which was consumed in meetings with counsel and travel time.  (SH 3:34; SH Petitioner's Ex. 13).  They did not request any of Richard's medical records or school records.  (SH 3:34-35). The only school record's they did receive were provided to them by the state.  (SH 3:33-34). They failed to interview Richard's natural parents and most of Richard's family.  (SH 3:35-38). To the extent they interviewed anyone, they did it hastily in the courtroom hallway during the trial.  (SH 7:11, 13).

The only medical experts trial counsel retained were a psychiatrist,  Dr. Estrada, and at Dr. Estrada's recommendation, a neurologist, Dr. Bonikowski.  However, they did not provide either of them with sufficient background information on Richard's medical, educational, and social history to inform the experts' evaluation of Richard.  (SH 7:66, 71, 79).  Finally, after the

limited expert evaluation by Dr. Estrada and Dr. Bonikowski was conducted, trial counsel failed to see that the additional testing those experts recommended to rule out brain damage was performed on Richard. (SH 3:45-48).

In spite of these facts, at the conclusion of the state habeas evidentiary hearing the State proposed several findings related to trial counsels' investigation of Richard's cognitive and learning disabilities, including the suggestion that Richard's trial counsel was reasonable to rely upon psychiatrist  Dr. Estrada, "as their expert to examine Vasquez's mental status, explore mitigating circumstances, and determine what psychological testing needed to be done." (Ex. A, No. 9). The state court adopted this conclusion. (*Id.*).

Effectively, the state court concluded that trial counsel did not need to conduct any independent investigation of mitigation evidence concerning Richard's mental status and was reasonable to hand their duty to investigate evidence of mitigation over to their retained expert psychologist.  This conclusion defies Supreme Court and Fifth Circuit precedent and established standards of practice for capital defense practitioners.  ABA Guideline 11.4.1 makes clear that "Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial."  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1, p 93 (1989) (emphasis added).  Counsel is required to among other things present evidence of medical history, educational history, employment, family and social history, including physical, sexual or emotional abuse, neighborhood surroundings and peer influence, professional intervention (by medical personnel, social workers, law enforcement personnel, clergy or others) or lack thereof. *Id.* at 11.8.6.  Moreover the Supreme Court criticized counsel who in light of the ABA's "well-defined norms . . . abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his

history from a narrow set of sources." *Wiggins*, 539 U.S. at 524.  Trial counsel performance is subject to this very same critique.  Because trial counsel failed to perform more than a rudimentary investigation of Richard's background to assist and inform Dr. Estrada's evaluation, the state court's conclusion is objectively unreasonable.

Furthermore, the state court's conclusion is also unreasonable in light of the facts established in the state habeas proceeding.  It is apparent from the record of that proceeding that trial counsel retained Dr. Estrada in only a limited role to analyze Richard related to three distinct issues.  The referral questions to Dr. Estrada were limited to the following: (1) whether Richard was capable to waive his Miranda rights, (2) whether Richard was competent to stand trial, and (3) whether Richard was insane at the time of the offense.  (SH 7:94).  Dr. Estrada stated that he was not trained to perform neuropsychological testing on Mr. Vasquez and that he was not asked to measure Mr. Vasquez's IQ.  (SH 7:81-82).  Dr. Estrada was simply not given the task of serving as trial counsel's general mitigation specialist and they were unreasonable to rely on him as such.

Trial counsel had no misconceptions about Dr. Estrada's limited role.  Joseph Collina admitted that because of his experience with other death penalty cases, he was aware that psychiatrists typically do not perform neuropsychological testing and that neuropsychological tests are usually performed by a clinical psychologist.  (SH 3:48).  Nevertheless, defense counsel failed to retain a clinical psychologist to evaluate Mr. Vasquez for possible brain damage.  (SH 2:249-50).

Based on the clear and convincing evidence presented during the state habeas proceeding the findings of fact and conclusions of law adopted by the Texas court of Criminal Appeals are objectively unreasonable and should be disregarded.

e.   **Trial Counsel's Failure to Investigate Richard's Family and Social History was Prejudicial to Richard.**

The appropriate testing and discovery, which was performed by Richard's habeas counsel with the help of a mitigation specialist and Dr. Ricardo Weinstein in preparation for the state habeas proceeding, revealed that Richard suffers from post traumatic stress disorder, attention deficit disorder, poly-substance dependence, fetal alcohol syndrome, brain dysfunction, learning disabilities, and a borderline IQ.  *See* Exhibit B (*see also* Petitioner's Ex. 20).  Dr. Weinstein testified that Richard's brain dysfunction affects the frontal lobes of Richard's brain causing problems with impulse control, problems with abstract reasoning, problems with the ability to plan and organize his behavior in a goal-directed manner.  Consequently Richard has a tendency to act and behave before he thinks and, even when he does think, he has difficulty controlling his behavior.  (SH 4:61).  All of this evidence would have been admissible and would have informed the jury of important and compelling mitigating circumstances.  Trial counsel's failure to present this evidence deprived Richard of his right to a reliable and individualized sentencing determination in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. Moreover, had all of the available mitigation evidence been presented to the jury, there is a reasonable probability that the jury's sentence would have been different.

## V.
## CLAIM TWO: INEFFECTIVE ASSISTANCE OF COUNSEL – FAILURE TO INVESTIGATE AND COUNTER THE STATE'S EVIDENCE OF SEXUAL ASSAULT

A.   **Argument Summary**

The judgment of the Texas Court of Criminal Appeals denying Richard's claim of ineffective assistance for failure to investigate and counter the State's evidence of sexual assault is based on an unreasonable determination of the facts in light of the evidence presented in the state habeas corpus proceeding.  28 U.S.C. § 2254(d)(2).  Also, the state court's conclusion that

trial counsels' failure to investigate and counter the State's evidence of sexual assault was a reasoned strategy decision is itself objectively unreasonable.

Although Richard confessed that on March 5, 1998 he hit Miranda in the head with his hand causing her injury, he vehemently and consistently denied sexually assaulting Miranda or injecting her with drugs. (RR 37:118, 122-123, 140). The evidence presented at trial also shows that he did not intend to kill Miranda as evidenced by the fact that he called for emergency first responders to save Miranda's life and tried to resuscitate her the best he knew how by administering first aid and a crude method of CPR. (RR 34:59; 37:95-99, 102). During both the guilt and punishment phases of trial, this exculpatory and mitigating evidence was ultimately overshadowed by the State's repeated and unsubstantiated contention that Richard "brutally raped" Miranda and then cleaned her genitals to cover up the heinous act. (RR 38:15-16, 37-38, 45, 46, 51-52, 53). Although the State never indicted Richard for rape, prosecutors used circumstantial evidence of sexual assault to incite the passions of the jury against Richard and to suggest his motive and intent to kill Miranda.

Despite the fact that Richard's trial counsel was given notice before trial that the State might introduce evidence related to sexual assault, trial counsel inexplicably failed to investigate and discover this potential evidence, failed to object to its introduction, failed to scrutinize and test adversarially the evidence itself, and failed to present readily available alternate-theory evidence. Taken together, trial counsels' numerous failures are staggering. Those failures are summarized as follows:

- Failure to investigate the factual basis for the State's allegations of sexual assault, including failure to visit the Vasquez home, the scene of the alleged crime;

- Failure to discover, scrutinize and test the State's DNA evidence including the electronic files that contained the

data from the DNA Testing performed by Mr. Huy Nguyen;

- Failure to visit the crime lab where the DNA tests were performed or otherwise discover the processes and protocols used by the lab;

- Failure to investigate the audit reports of the crime lab to determine if the lab was properly accredited and following industry standards;

- Failure to object to the introduction of circumstantial evidence and expert testimony on the State's un-indicted theory of sexual assault;

- Failure to retain their own DNA expert to review and counter the conclusions of the State's forensic witnesses;

- Failure to investigate the DNA profiles for all of the individuals living in the household with Richard and Miranda to identify possible alternate sources of the State's DNA evidence;

- Failure to effectively cross-examine the State's witnesses or challenge the reliability of their methodology for diagnosing Miranda's injuries as the result of sexual assault;

- Failure to request a pretrial hearing under *State v. Kelly*, 824 S.W.2d 568 (Tex. Crim. App. 1992) to challenge the admissibility of the State's DNA evidence;

- Failure to call as a witness Dr. Henderson, the surgeon who examined Miranda before her death, who reported that injuries to Miranda's vaginal and anal area were the result of a straddle injury, and injury caused by falling with one's legs straddling an object such as a bicycle cross-bar;

- Failure to introduce in evidence the written narrative which contained Dr. Henderson's conclusion that the injuries to Miranda's vaginal and anal area were consistent with a straddle injury;

- Failure to call Dr. Randall Frost, a board certified pathologist, who was prepared to testify and who would

have corroborated Dr. Henderson's written or verbal
opinion;

- Failure to investigate and present testimony from Richard's
  family who were aware of other possible causes of a
  straddle injury to Miranda;

- Failure to introduce photos of the stationary exercise bike
  on which Miranda often played and may have fallen;

- Failure to have Richard examined by a psychologist to
  show that Petitioner does not have a psychological profile
  consistent with sexual abuse behavior; and,
- Failure to introduce testimony of Richard's family
  describing his history of appropriate conduct with children.

The state court, in evaluating Richard's application for habeas corpus relief, ignored these
failures, deemed them irrelevant, or attributed them to "reasonable trial strategy." *See* Ex. A.

However, the state court's findings and conclusions are objectively unreasonable.
Evidence presented during the state habeas evidentiary hearing demonstrates that trial counsels'
failures were significant. Specifically, the state habeas evidentiary hearing exposed the faulty
techniques and analysis of the State's DNA expert, undermining the thin evidence the State used
to link Richard to injuries found on Miranda's genitals. The State's DNA expert even admitted
that there were serious flaws in the Corpus Christi crime lab's testing methodology and that his
trial testimony misstated significant facts, calling into question forensic evidence the State used
to argue Miranda was sexually assaulted by the Petitioner. (*See generally* SH 2:131-150;
6:158-162). Because trial counsel failed to discover this evidence and failed to retain a forensics
expert to evaluate and counter it, trial counsels' failures cannot be attributed to informed trial
strategy. Moreover, had defense counsel bothered to introduce evidence of which they were
aware - - including photographs and testimony regarding the exercise equipment in the Vasquez
home; Dr. Henderson's testimony and report; and the testimony of Dr. Frost - - they would have

provided an authoritative, reasonable, and compelling explanation for the injuries to Miranda's genitals that was not otherwise established at trial.

It is likely that, but for the unproven, untrue, but alas, uncontradicted evidence of sexual assault the State introduced in the guilt phase of the trial, the jury would not have found beyond a reasonable doubt every element of capital murder nor rendered a death verdict. Additionally, but for the failure of trial counsel to effectively defend Richard, including counsels' failure to competently challenge the un-indicted rape allegation and present readily available and compelling alternate-theory evidence, the jury likely would not have returned a verdict of death. In short, the jury that rendered the verdict of guilt to the indictment and the verdict of death was mislead by faulty and incomplete evidence rendering both verdicts unreliable and unworthy of confidence. The state habeas court's conclusion to the contrary was an objectively unreasonable application of *Strickland,* 446 U.S. 668 and "an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d)(1)-(2). For these reasons, Richard Vasquez asks that this Court issue a writ of habeas corpus ordering his release from confinement or a new trial.

## B.    Relevant Facts

Despite the fact that Richard was never indicted for sexual assault,[5] the State repeatedly argued that he brutally raped Miranda. The State summarized its theory of the case during closing argument of the guilt phase contending that while Richard was alone with Miranda he beat her senseless, removed her jumper, and violently raped her while holding her from behind, ripping her genitals. (RR 38:15 16, 37-38, 45, 46, 51 52, 53). Prosecutors repeated these same arguments during the punishment phase describing their theory in the most inflammatory and graphic terms. (RR 40:13-14). The State used blood evidence found inside Miranda's clothing,

---

[5] (CR 1:2-5).

evidence that was later refuted in the state habeas proceeding,[6] to connect Richard to the injuries to Miranda's genitals. The State argued that after sexually assaulting Miranda, Richard redressed her and attempted to hide the evidence of his crimes. (RR 37:119; 38:38, 44).

The evidence the State introduced in support of its theory of sexual assault included: 1) several cuts or abrasions on Miranda's vaginal/anal area; 2) bruising on Miranda's hips; and 3) blood found in Miranda's clothing, on a burgundy bath towel, and on several pieces of toilet tissue. The cause of the bruising to Miranda's hips was speculative and inconclusive at best, and the remaining evidence was discredited or refuted by additional evidence that trial counsel failed to investigate or introduce, but which was later introduced in the state habeas corpus evidentiary hearing.

### 1. *Cuts and Abrasions.*

In regard to the cuts and abrasions, Leann Box, a sexual assault nurse examiner, testified that Miranda had four tears or abrasions on her genitals, some of them oozing. (RR 35:176, 186-88). She also identified an oozing tear on the bottom (6 o'clock) portion of the anus. (RR 35:190). Ms. Box suggested the injuries would have occurred in the twelve-hour period prior to her 7:00 p.m. examination. (RR 35:188, 209). She testified that great force would have been required to cause these injuries. (RR 35:196). She also testified that the cuts would have bled a great deal. (RR 35:213). Trial counsel failed to object to this testimony and challenge Ms. Box's expertise and qualifications to offer such "expert" opinions. (*See generally* RR 35:175-200).

Even so, Ms. Box could not say whether a penis could have caused these injuries to Miranda. Her testimony on cross examination is as follows:

> Q.    Are you suggesting this was done with a penis with great
>       force?

---

[6] *See infra* 52.

> A.    I was not there, so I don't know what caused the injury, but
>       something caused the injury.
>
> Q.    Something caused the injury?
>
> A.    Yes.
>
> Q:    And you don't have the foggiest idea what it was?
>
> A.    No, sir, I was not there.

(RR 35:204). Ms. Box testified further that Miranda's hymen was without trauma and that she could not tell whether Miranda's anus had been penetrated. (RR 35:196, 215).

Dr. James Lukefahr, a pediatrician who did not personally examine Miranda but reviewed her medical records, also testified on behalf of the State regarding the injuries to Miranda's perineal area. (RR 35:219, 221). He indicated the wounds were fresh, deep, and consistent with anal rape. (RR 35:224, 231, 236). However, he testified that there is no way of knowing whether the injuries were caused by a man's penis or by some other foreign object. (RR 35:236). He also agreed that the report of the examining physician, Dr. Henderson, stated that Miranda's hymen was intact and that there were no internal injuries to the vagina or within the anus. (RR 35:232).

Dr. Lloyd White, the Nueces County medical examiner who performed the autopsy on Miranda observed the injuries to Miranda's external genitalia and described them as abrasions and lacerations or tears of the membranes and mucosa. (RR 35:26-27). He stated that there was no way of knowing how the damage was caused, but he suggested that the injuries were typical of some kind of blunt trauma. Dr. White stated that Miranda's injuries could have been caused by someone hitting or kicking her. He also agreed it was possible that Miranda was poked with an object including a penis. (RR 35:39-40, 53).

**2.    *Hip Bruises.***

Ms. Box and Dr. Lukefahr each testified that Miranda had bruises on her each of her hip bones. They hypothesized that the bruises were caused by someone holding Miranda's hips from behind while attempting to rape her. (RR 35:183, 197; 225-28). However, Ms. Box observed that Miranda had numerous bruises all over her body, which were in various stages of healing. (RR 35:180-85). Moreover, she admitted that the exact time period when the bruising was inflicted is unknown. (RR 35:184-85). Dr. White confirmed that Miranda had bruises of variable intensity and variable color on many parts of her body, and concluded that they were not all inflicted at the same time. (RR 35:27).

**3.    *Blood Evidence.***

Finally, the State introduced in evidence several blood-stained items that were tested for DNA at the Department of Public Safety. crime lab in Corpus Christi. Unlike the previous two categories of evidence that were used to prove Miranda's injuries and to infer the occurrence of sexual assault, the State used the DNA evidence from the blood-stained items to overcome the problem of the absence of semen and to connect Richard to the injuries to Miranda's vaginal/anal area. The particular blood evidence found on items the State used to advance its sexual assault theory include blood found on the inside of Miranda's clothing, on a burgundy bath towel, and on discarded toilet tissue.

**a.    Blood Inside Miranda's Clothing.**

Mr. Huy Nguyen, the State's forensic scientist and DNA expert from the Texas Department of Public Safety Crime Lab (TDPSCL) in Corpus Christi testified that he found blood stains on the front, the back, and inside of Miranda's jumper. (RR 35:147). He stated that he performed two different types of DNA tests on the blood stains he took from the clothing, a D.Q. Alpha test and a Short Tandem Repeat test ("STR test"). (*Id.*). He stated he performed the