STR test on the stains taken from the front and rear of the clothing; however, he testified he only performed the D.Q. Alpha test on the stain taken from the inside of Miranda's jumper. Based on this D.Q. Alpa test, Mr. Nguyen alleged that the blood he found inside Miranda's jumper "matched" Richard and contained a "definite" mixture of Miranda's and his blood type. Mr. Nguyen testified as follows:

> A.    . . . The stains on the inside was (sic) the D.Q. Alpha type that <u>matches</u> Vasquez, but a possibility of Lopez in there. . . . So here, I could tell that his type was in there, but also a little bit of hers; there was a little mixture. Here was a <u>definite mixture</u> of both Vasquez's type and Lopez's type.
>
> Q.    When you say "here'" were you talking about the inside of the jumper?
>
> A.    Oh, yes, excuse me, the inside of the jumper.

(RR 35:148) (emphasis added).

Richard, who testified in his own defense during the guilt phase of the trial, had no explanation for why this blood was found inside the jumper. (RR 37:119). Richard testified that when he tried to open Miranda's mouth to keep her from swallowing her tongue, Miranda bit him causing him to bleed from his finger. (RR 37:95-99, 102). He said that Miranda was bleeding from her mouth and nose and some of the blood got on his finger when he tried to open her mouth. He said he later cleaned the blood off his finger on a towel from his room and on some toilet paper. (RR 37:114, 132). Investigating police officers noticed that Richard was bleeding from his thumb and forefinger. (RR 34:21, 34). They also observed blood on Miranda's nose and mouth. (RR 34:19).

As the following transcript excerpt illustrates, the State argued that the presence of Richard's blood inside the jumper indicated that Richard had removed Miranda's clothing and then dressed her again:

Q. When did you take her clothes off?

A. Whose clothes off?

Q. Miranda's.

A. I never took her clothes off.

Q. Well, there was blood on the inside of her jumper, which makes it look like she was dressed back up, doesn't it?

A. I never dressed her up.

Q. How did blood get on the inside of her jumper?

A. Like I said, she bit my thumb, and I had blood on my finger.

Q. How did her blood get on the inside of her jumper?

A. I don't know about that, ma'am.

(RR 37:119). Without a DNA expert to counter the State's evidence and point out that contrary to the testimony of Mr. Nguyen the blood inside Miranda's clothing could not be attributed to Richard,[7] Richard was unable to offer any alternative explanation to the State's sexual assault theory.

### b. Blood on the Burgundy Bath Towel.

Mr. Nguyen also testified he performed DNA testing on a burgundy bath towel recovered from the hall bathroom. Based on his testing Mr. Nguyen concluded the towel contained a mixture of Richard's and Miranda's blood. (RR 35:137-38).

> When I did my initial D.N.A. analysis on the burgundy bath towel,
> I got none on the D.Q. Alpha. And that towel, I just kept it aside
> and later on I went back and did STR on the same stain and the
> profile I got was Vasquez and a little bit of Lopez.

(RR 35:138). The prosecutor suggested that the presence of both Richard's and Miranda's blood on the towel was evidence that Vasquez cleaned up Miranda's bloody genitals after the sexual

---

[7] *See infra* 52.

assault. (RR 37:132-33). As explained more fully below, upon closer examination at the state habeas evidentiary hearing, it became apparent that Mr. Nguyen's own data shows that Miranda's DNA is excluded from the towel because her profile does not match the profile taken from the towel stain on four of the test markers. (SH 5:58-63).

### c. Blood on the Toilet Tissue.

Finally, Mr. Nguyen testified that he found blood on 16 pieces of toilet tissue. He testified that his D.Q. Alpha testing on the blood stains revealed Richard's DNA and possibly some of Miranda's. (RR 35:150). He testified that he performed STR. testing on the same stain and the only type that came up was Miranda's blood. (RR 35:150-51). Mr. Nguyen explained the apparent discrepancy in the tests by stating that STR. is the more sensitive of the two tests so when there is a large amount of one type of DNA "it will mask something else that might be there." (RR 35:151). Thus, even though the STR. test did not show Richard's DNA, Mr. Nguyen concluded based on the D.Q. Alpha test result that the discarded toilet tissue contained mostly Miranda's blood and "a little bit of his." (Id.).

Again, the State used this evidence to advance its theory that Richard cleaned Miranda's genitals after he sexually assaulted her. (RR 37:132). Again, this uncontroverted evidence from the trial was later discredited by Dr. Libby in the state habeas corpus proceeding.[8] Trial counsel did not request a pretrial hearing under *Kelly*, 824 S.W.2d at 573-574 to challenge the reliability or admissibility of the State's DNA evidence and failed to retain a DNA expert to analyze and refute it.[9]

---

[8] *See infra* 54.

[9]     [T]he trial court's first task is to determine whether the testimony is sufficiently reliable and relevant to help the jury in reaching accurate results. Unreliable...scientific evidence simply will not assist the [jury] to understand the evidence or accurately determine

**C.    Argument and Authorities**

Much like the evidence Richard presented in state court regarding trial counsels' deficient performance during the penalty phase of the trial, clear and convincing evidence from the state court proceeding also demonstrates that trial counsels' representation of Richard during the guilt phase of the trial "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88.

---

a fact in issue; such evidence obfuscates rather than leads to an intelligent evaluation of the facts ...

As a matter of common sense, evidence derived from a scientific theory, to be considered reliable, must satisfy three criteria in any particular case:

(a) the underlying scientific theory must be valid;

(b) the technique applying the theory must be valid; and

(c) the technique must have been properly applied on the occasion in question.

Factors that could affect a trial court's determination of reliability include, *but are not limited to,* the following:

(1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained;

(2) the qualification of the expert(s) testifying;

(3) the existence of literature supporting or rejecting the underlying scientific theory and technique;

(4) the potential rate of error of the technique;

(5) the availability of other experts to test and evaluate the technique;

(6) the clarity with which the underlying scientific theory and technique can be explained to the court; and

(7) the experience and skill of the person(s) who applied the technique on the occasion in question.

...

To summarize, under Rule 702 the proponent of novel scientific evidence must prove to the trial court, by clear and convincing evidence and outside the presence of the jury, that the proffered evidence is relevant. If the trial court is so persuaded, then the evidence should be admitted for the jury's consideration, unless the trial court determines that the probative value of the evidence is outweighed by some factor identified in Rule 403.

*Kelly*, 824 S.W.2d at 573-574

## 1.    *Failure to Investigate the State's Evidence of Sexual Assault.*

Trial counsels' failures were legion. Chief among them were counsels' failures to investigate the State's case and possible exculpatory and mitigating evidence. Counsel did not perform even the most basic investigation of the State's evidence. For example, trial counsel did not go inside the Vasquez home where the alleged crime took place to determine whether there might be anything in the home that would cast doubt on the State's theory of the case. (SH 3:24). This failure ultimately proved prejudicial to Richard because defense counsel was unable to observe and photograph exercise equipment in the home that might have been the cause of a straddle injury to Miranda's genitals.[10]

Trial counsel also failed to discover, scrutinize, and test the State's DNA evidence including the electronic Genescan files that contained the data from the DNA testing performed by Mr. Nguyen. (SH 2:25-26; 3:49). Trial counsel was obviously aware that the State was likely to rely on this evidence, at least in part, to make its case for murder and also to support its allegation of sexual assault; however, trial counsel made absolutely no effort to discover the full extent of the State's evidence.[11] Trial counsel never interviewed Mr. Nguyen or asked him to

---

[10] *See infra* 59.

[11] Richard's trial counsel testified during the state habeas proceeding as follows:

> Q:    Did you request any pretrial discovery regarding DNA?
> A:    No. I was satisfied with the results.
> Q:    That's fine. Did you request any pretrial discovery?
> A:    No. We got – yes, we did request discovery. But are you talking about additional discovery? I mean, we had –
> Q:    Additional from the couple of page report that you received from Mr. Nguyen.
> A.    We were satisfied with the couple of page report because we didn't want to stir up a hornets' nest. Sometimes if you ask for too much, you might get something you don't like.

(SH 3:49).

produce a copy of his file, which contained his notes on what kinds of DNA profiles were obtained from the samples he tested. (SH 2:25-26). Trial counsel did not visit the crime lab where the DNA tests were performed to find out the processes and protocols used by the lab. Trial counsel made no effort to investigate the audit reports or inspections of the crime lab to determine if the lab was properly accredited and following industry standards. (SH 2:26-27). They also did not ask to review validation studies or quality control documents from the lab. (SH 2:26).

The TDPSCL is a state government forensic laboratory (SH 9: State's Ex 8; *see* also SH 5: 149-50). Therefore, it must comply with government guidelines which include validation of new systems before using the systems in casework. (SH 2:11-13). Both D.Q. Alpha testing and STR testing using Perkin Elmer kits were used in this case. (RR 35:125-26, 132). These two types of forensic DNA tests utilize Polymerase Chain Reaction procedures (PCR). (RR 35:127-28, 132). Trial counsel received two Supplemental Reports from the State dated December 21, 1998 and May 21, 1999. (SH Petitioner's Exs. 58 & 59). These reports written by Mr. Nguyen, give conclusions for two types of testing: D.Q. Alpha testing using the Perkin Elmer kit, and STR testing using the Perkin Elmer Profiler Plus Kit (*Id.*). While the December 21, 1998 report provides profiles for the D.Q. Alpha tests performed, it does not list the profiles for the STR tests performed (SH Petitioner's Ex. 58). The report calculates a statistical frequency for how common or rare the DNA profiles of Richard and Miranda Lopez are as 1 in 5.7 billion. (*Id.*). No information is provided as to how these statistics were generated. (*Id.*).

Discovery of the complete case file and supporting documents was necessary for the defense to evaluate the reliability of the testing. Evaluation of the testing includes investigation of the following:

1. whether the system used was validated in general and followed in the instant case;
2. whether the analyst has a history of committing errors either in casework or in proficiency testing;
3. whether the laboratory was accredited;
4. whether the laboratory followed scientifically accepted protocols;
5. whether the lab recorded the chain of custody of evidence samples and reference samples;
6. whether there was mislabeling of critical samples, mishandling of critical samples, and/or contamination of critical samples;
7. whether proper controls (negative controls, positive controls, substance controls) were utilized;
8. whether quality control procedures are adequate for use of laboratory equipment and chemicals;
9. whether the analyst interpreted the data correctly;
10. the types of cells in the evidence samples (*i.e.*, blood, skin, etc.);
11. how the statistics were calculated; and
12. what alleles were declared for each sample.

(SH 5:27-32). Without this discovery, trial counsel could not possibly have known whether chain of custody was broken by the TDPSCL, whether the TDPSCL was accredited for forensic DNA testing, whether samples were switched or mislabeled, whether evidence was contaminated, whether Mr. Nguyen had made errors in other casework or in his proficiency tests, whether controls were used, whether the equipment and chemicals were working correctly, what procedures were followed, and if the new STR Profiler Plus system had been validated both externally by Perkin Elmer and internally by the TDPSCL. In short, trial counsel could not effectively scrutinize the State's forensic evidence without this discovery.

Proper discovery would have allowed trial counsel to identify the numerous flaws in the Corpus Christi crime lab's protocols and practices and call into question the testing and conclusions of the State's forensic scientists. Discovery obtained during the course of the state habeas proceeding included an August 30, 1996 inspection report from the American Society of

Crime Laboratory Directors/Laboratory Accreditation Board ("ASCLD/LAB"), the board charged with inspecting and accrediting forensic laboratories. (SH 2:131). That report concludes that the Corpus Christi crime lab should not be accredited in the area of DNA and should not be re-accredited in the areas of controlled substances/blood alcohol, trace evidence, and serology. (SH 2:137). The practices identified by the ASCLS/LAB to be substandard include the following:

1. The lab's failure to specify appropriate controls and standards in the lab's procedures and failure to use such controls and standards to insure the validity of examination results. The comment to this finding states that "[p]ositive and negative regent controls for presumptive blood and semen tests are not documented in the case file prior to use." (SH 2:131-32).

2. The lab's failure to routinely check the reliability of its regents. Mr. Nguyen conceded during the state habeas hearing that when a reagent used in a presumptive test is not reliable, the information from the test is not scientifically sound. Mr. Ngueyen also admitted that regents were used to perform presumptive tests of the evidence in this case. (SH 2:132).

3. The lab's failure to properly calibrate its instruments and equipment. Specifically, the thermalcycler was found beyond its calibration due date, two adjustable volume pipettes used for analysis of DNA were found to be out of calibration but still in use, the temperature verification system for calibrating the thermalcycler was beyond its calibration due date, and there was no program in place for the annual maintenance of the lab's microscopes. Mr. Nguyen admitted that the thermalcycler was used to perform the testing in this case. (SH 2:132-33).

4. The examiner's failure to generate and the lab's failure to maintain in a case record all the notes, worksheets, photographs, spectra, printouts, charts, and other data and records used by examiners to support their conclusions. (SH 2:134).

5.      The lab's failure to review the examiner's reports to insure that their conclusions are reasonable and within the constraints of scientific knowledge. (*Id.*).

6.      The lab's failure to independently submit for evaluation individual DNA examiner's proficiency test results to an approved external test provider rather than pooling all of the examiners' results together for submission. (SH 2:135).

7.      The lab's failure to control and limit access to the operational area of the laboratory. Inspectors were able to gain access to the operational area of the lab without detection by opening an unmonitored, unalarmed half-door located near the evidence intake area. They also found that the evidence intake window was not lockable and that there was no monitoring device located near that work space to identify unauthorized intrusion into the lab. Mr. Nguyen admitted that one of the reasons to control and limit access to the operational area of the lab is to prevent evidence contamination. (SH 2:136).

8.      The lab's failure to install an intrusion alarm or security personnel to secure the evidence in the lab during the hours that the lab is vacant. (*Id.*).

Mr. Nguyen admitted that many of these problems identified by the ASCLD/LAB were violations of the quality assurance standards for forensic DNA testing laboratories promulgated by the DNA Advisory Board before his testing, reporting and testimony in this case. (SH 2:141-42, 144). Mr. Nguyen also admitted during the state habeas hearing that at the time of his DNA testing in this case, the Corpus Christi lab had no definitive criteria or protocols in place for when an examiner should call something a DNA match or an exclusion. (SH 6:150).

Post-trial discovery also uncovered letters from an inspection team from the Harris County Medical Examiner's Office which criticized the Corpus Christi lab for storing evidence in plastic bags at room temperature and failing to seal all evidence for storage. (SH 2:138-39). The Harris County inspectors observed:

        Sexual assault kits were sealed with only a pair of tape strips on opposite sides of the rectangular box while the other two sides of

> the box were not sealed. One could easily add or remove items
> from this box without disturbing the evidence tape. The sealing of
> the evidence was matter of concern in view of the large number of
> personnel (drug section) other than serology/DNA analysts who
> have access to this storage area.

(SH 2:139; *see also* SH Petitioner's Ex. 6). Inspectors also noted that the amount of space for the

analysis of Serology and DNA evidence was limited and recommended that the evidence

screening table be moved to a location away from the main entrance door to avoid traffic near

that screening area. (*Id.*). These problems were communicated to the manager of the Corpus

Christi lab on or about July 16, 1998, within months of the March 5, 1998 date evidence was first

collected in this case. (SH 2:140).

Discovery of the FBI's subsequent inspection of the Corpus Christi lab demonstrates that

as late as August 29, 2001 the lab still had not corrected many of the same substandard practices

identified by the ASCLS/LAB and the Harris County inspectors. (SH 2:146). The FBI's quality

assurance audit determined that the Corpus Christi laboratory failed to follow documented

procedures that minimize loss, contamination, and/or deleterious change of evidence; failed to

label reagents with the identity of the reagent, the date of preparation or expiration, and the name

of the individual preparing the regent; failed to identify and evaluate the reagents critical to the

analysis process prior to use in casework; and failed to verify that all control results are within

established tolerance ranges. (SH 2:145).

This substantial evidence of substandard practices at the Corpus Christi crime lab, if

discovered and presented by trial counsel, would likely have undermined the jury's confidence in

the forensic evidence against Mr. Vasquez generally. It also is likely to have specifically raised a

reasonable doubt in the mind of the jurors as to the validity of the State's DNA evidence from the

blood samples, the hair sample evidence, and the other evidence analyzed by Huy Nguyen.

Counsel's failure to perform this most basic discovery falls well below the standard of reasonable and effective representation and prejudiced Mr. Vasquez's defense.

## 2. *Failure to Object to the State's Un-Indicted Allegation of Sexual Assault.*

Even though none of the State's allegations of sexual assault were made in the indictments, Richard's trial counsels' failure to timely object to these allegations and the evidence the State introduced in support of them also constitutes ineffective assistance of counsel.[12] Defense counsels' failure to object to this evidence is particularly disturbing in light of the fact that the State gave defense counsel advance notice of the possibility that sexual assault evidence might be introduced at trial. On March 3, 1999, the State filed its Notice of Possible "Extraneous" Offenses Which May Or May Not Be Offered At Trial. (CR II:659). That Notice included the following allegation:

> (18) **AGGRAVATED SEXUAL ASSAULT OF A CHILD**: On or about March 5, 1998, in Nueces County, Texas, RICHARD VASQUEZ did then and there intentionally or knowingly cause his sexual organ, or an unknown object to contact or penetrate the sexual organ of Miranda Lopez, a child then under the age of fourteen.

(*Id.*). Because the trial on the merits did not begin until more than three months after this notice was filed by the State on June 14, 1999, trial counsel had ample opportunity to investigate and prepare for the State's potential allegations regarding sexual assault. Consequently, trial counsels' failure to prepare for and object to this evidence fell below the objective standard of reasonableness.

---

[12] Trial counsel did file a Motion in Limine on May 17, 1999 seeking to exclude evidence of "Other Offenses." (CR II:690). However, when the State presented its witnesses discussing the unindicted allegations of sexual assault, counsel failed to timely object. (*See e.g.*, RR 35:175-200, 218-231).

**3.** *Failure to Challenge the Reliability of the State's Experts' Theories and Testing Methodologies.*

A significant setback for the State's sexual assault theory at trial was the fact that vaginal and rectal swabs performed on Miranda confirm that there was no semen in or on Miranda's body. (RR 35:163). No semen was detected on Miranda's underpants either. (*Id.*). As the above-quoted argument illustrates, to account for this problem, the State speculated that, before calling 911, Richard tried to clean Miranda's bloody vaginal/anal area with rubbing alcohol, towels, and toilet tissue. (RR 35:213-214; 38:38, 53). Prosecutors suggested that because semen is water soluble, Richard may have successfully washed his semen off Miranda, leaving no trace anywhere. (RR 38:51). Mr. Nguyen testified during the guilt phase of the trial that if there had been semen on the towels and bedspread recovered from the scene and those items were subsequently washed with water, "you won't be able to detect it after that." (RR 35:141).

Trial counsel failed to object to this testimony or question the basis for Mr. Nguyen's "semen cleaning" theory. Trial counsel never asked Mr. Nguyen to explain his expertise in this particular area of forensics, never asked Mr. Nguyen to produce a single peer review or other scientific study that might corroborate his theory, and failed to ask the court for a *Kelly* hearing to scrutinize the reliability of Mr. Nguyen's scientific methodology, if indeed he had one.

Mr. Nguyen's theory was ultimately called into serious question after trial by Dr. Randall Libby, the DNA expert who was presented by Richard's state habeas counsel at the state habeas corpus evidentiary hearing. Dr. Libby testified that if there had been sexual penetration of the anus as the State suggested, he would expect to find some DNA (from skin cells) on the rectal swab. However, Richard's DNA was completely excluded from the swab of Miranda's anus. (SH 5:82-84). Dr. Libby also contradicted the suggestion that evidence of semen can be easily eradicated by merely washing it with water. Dr. Libby testified that even if clothing or bedding

containing semen is washed in a washing machine, its presence can still be detected by DNA tests. (SH 5:82). Nevertheless, because Richard's trial counsel did not consider it necessary to object to this evidence or present a single expert witness during the guilt phase of the trial, the State's sexual assault theory, including Mr. Nguyen's testimony, was essentially uncontroverted by the defense.

### 4. *Failure to Competently Rebut the State's Sexual Assault Evidence.*

During the guilt/innocence phase of the trial, defense counsel did not call a forensics expert, or any other expert for that matter, to counter the evidence the State alleged proved sexual assault and which linked Richard to that crime. Pretrial motions and orders in the record reveal that trial counsel requested and received funding from the court to hire a forensic pathologist, however, no such expert was retained by defense counsel. (*See* CR II: 560, 568, 671). Mr. Collina, one of Richard's three trial attorneys, stated in response to questioning during the state habeas hearing that it was his opinion that the trial judge "would have approved any expert we asked for if we needed it, but it wasn't necessary. In our professional opinion, we didn't need any extra experts." (SH 3:113-14).

### a. Failure to Call a Forensics Expert.[13]

Pursuant to a court order in the state habeas corpus proceeding, Mr. Collina also submitted his own affidavit testimony in which he explained his decision not to call an independent DNA expert as follows:

---

[13] Instead of hiring a forensic investigator to evaluate and defend the State's sexual assault allegations, trial counsel relied on Jan Davis, the semi-retired former probation officer, mentioned above, to do witness interviews. (SH 3:21). Mr. Davis was not asked to perform any tasks to establish that Miranda's injuries may have been caused by a straddle injury. (SH 3:24). Mr. Davis never went inside the Vasquez home. (*Id.*). He never visited the Corpus Christi crime lab or performed any other functions of a forensics investigator. (*See* SH Petitioner's Ex. 13).

> An independent DNA expert could not, and would not, have helped us one iota.
>
> There was no DNA evidence that Richard Vasquez had penetrated the child sexually. There was DNA evidence that the child's blood, and the defendant's blood, from a cut on his finger, had been found in the home. However, this was consistent with the defendant's testimony and confessions – where he stated that the child fell and that she bit his finger when he was trying to administer first aid. The only evidence of sexual penetration was circumstantial, to wit: the unexplained, tear in her vaginal area.

(*See* State's Answer to Post-Conviction 11.071 Application for Writ of Habeas Corpus, Appendix #1, Affidavit of Joseph v. Collina ¶ 14). However, because trial counsel failed to do the necessary investigation of the State's evidence and failed to retain a forensics expert to help identify and explain the potential flaws in the State's evidence, Mr. Collina's explanation is uninformed and unpersuasive.

As explained already, a forensics expert could have refuted the State's "semen cleaning" theory and explained the significance of the fact that the State did not find any of Richard's DNA in or on Miranda's genitals. A forensics expert would also have been able to investigate the DNA profiles for all of the individuals living in the household with Richard and Miranda to identify possible alternate sources of the DNA evidence the State used to argue sexual assault -- evidence that Richard's testimony and confessions could not explain, including the blood inside Miranda's clothing and the mixture of Miranda's and Richard's blood on the burgundy towel and on the toilet paper. The State failed to inform its DNA expert of all the individuals living in the home where the evidence was recovered and never obtained reference samples from the other individuals living in the home. Mr. Nguyen admitted during the state habeas corpus hearing that he had no idea Miranda's half-sister Megan, Richard's sister Brenda, and his aunt and uncle lived in the home. (SH 2:30). He also admitted that he did not obtain reference samples from those individuals. (SH 2:39).

This failure is a significant oversight on the part of trial counsel and the State because the other individuals in the home were close relatives of both Richard and Miranda and likely had similar DNA profiles, creating the opportunity for misleading test results. (SH: 2:31-36).[14] At the state habeas hearing, Mr. Nguyen testified that it is likely in a family setting where many people touch objects and share towels, that epithelial cells from multiple individuals could slough off and be deposited on those objects, causing a mixture of DNA. (SH 2:37-38). He also admitted that it is possible that close relatives will share alleles at certain loci along a DNA strand, and it will be impossible to make a positive identification of who contributed certain DNA without taking reference DNA samples from all of the individuals in the household. (SH 2:36-37; 42). At a minimum, trial counsel should have pointed out that the State's failure to obtain these additional DNA profiles renders the conclusions of the State's DNA expert scientifically unreliable and casts serious doubt on the State's theory of sexual assault. A forensics expert would have assisted trial counsel in identifying this significant failure as Dr. Libby was able to do during the state habeas hearing. (*See* SH 6:36-37, 42).

Retaining a forensics expert would also have helped counsel identify and obtain the required pretrial discovery to effectively contest the State's evidence. Had trial counsel retained a DNA expert, the DNA scientist would have advised trial counsel as to what materials were needed to evaluate the reliability of the TDPSCL testing in this case. The DNA expert could have assisted in the formulation of a discovery request for the DNA casefile and the other necessary supporting documents. Once that essential discovery was obtained, a DNA expert could have identified testing flaws and possible sources of contamination as evidenced in the

---

[14] Richard's aunt is his mother's sister and his uncle is his father's brother. (SH 2:33). Therefore, everyone in the household shared some common DNA with either Richard or Miranda.

lab's records. Dr. Libby did exactly that during the state habeas proceeding pointing out several errors in testing protocol that could have caused evidence contamination in this case. (*See, e.g.*, SH 6:37-50). Based on his review of the lab reports, Dr. Libby concluded that Mr. Nguyen's conclusions are generally not reliable or accurate and are outside of generally accepted guidelines in the scientific community. (SH 6:55).

Additionally, as Dr. Libby demonstrated in the state habeas evidentiary hearing, a forensics expert would have been able to specifically refute the State's conclusions related to the blood found inside Miranda's clothing, on the burgundy towel, and on the toilet paper. At trial Mr. Nguyen testified on behalf of the State that the stains on the inside of Miranda's jumper were a "definite mixture of both Vasquez's type and Lopez's type." (RR 35:148). What the State did not disclose and what trial counsel did not know because they did not do the required discovery, is that Mr. Nguyen's notes show that the stain is contaminated with additional DNA inside the jumper that does not match either Mr. Vasquez or Miranda. Dr. Libby testified that the blood inside Miranda's jumper was actually a mixture of several blood types and the actual sources of the blood could not be identified without looking at the DNA profile for all of the individuals in the household. (SH 5:75-77). As noted already, none of the DNA profiles of the other household members were investigated by trial counsel or tested by the State. Because the blood evidence found inside Miranda's clothing is contaminated, Mr. Nguyen's conclusion that Richard's blood was inside Miranda's clothing is unreliable, and thus cannot support the State's sexual assault theory.

Mr. Nguyen's conclusions related to the blood found on the burgundy bath towel would also have been refuted by proper discovery and adversarial scrutiny by a defense expert. Mr. Nguyen testified that the D.Q. Alpha testing revealed nothing. But, when he went back and did

additional STR testing on the same stain, "the profile [he] got was Vasquez and a little bit of Lopez." (RR 35:138). The actual data from Mr. Nguyen's testing reveal a different story. The electronic Genescan data, which trial counsel failed to obtain from the crime lab in pretrial discovery, show that Miranda's DNA is excluded from the towel because her profile does not match the profile taken from the towel stain on four of the test markers. (SH 5:58-63). Dr. Libby interpreted this data to mean that Miranda's DNA is not on the bath towel. (SH 5:63). Obviously, this evidence would have been important to corroborate Richard's testimony that he used the towel to clean the blood from his fingers and to refute the State's suggestion that he used the towel to clean Miranda's genitals. Trial counsel's failure to discover this evidence and failure to retain a forensic expert to interpret and present it to the jury is inexcusable and cannot be attributed to strategic decision making.

The remaining piece of evidence the State used to connect Richard to the injuries to Miranda's genitals, blood found on the toilet tissue, was also called into question by Dr. Libby. Mr. Nguyen testified that his D.Q. Alpha testing on the toilet tissue revealed Richard's DNA and possibly some of Miranda's DNA. (RR 35:150). Although Mr. Nguyen's subsequent STR test revealed only Miranda's DNA on the toilet tissue, Mr. Nguyen continued to assert that Mr. Vasquez's DNA was likely "masked" by the large amount of Miranda's DNA. (RR 35:150-51). Mr. Nguyen concluded that the discarded toilet tissue contained mostly Miranda's blood and "a little bit of his." (RR 35:151). This testimony was not contradicted at trial.

However, under persistent cross examination at the state habeas proceeding, Mr. Nguyen admitted that none of Richard's alleles appear on any of the nine sites examined by the STR test. (SH 2:85-87). Dr. Libby testified that in light of this evidence, Mr. Nguyen's opinion that Richard's DNA was on the tissue was *not* scientifically acceptable. (SH 5:57). Dr. Libby stated

that only scientific conclusion to be reached from the results of the DNA testing is that Richard's DNA was not on the toilet tissue. (SH 5:56-58). Had this information been elicited at trial it obviously would have cast additional doubt on the reliability of Mr. Nguyen's opinions and conclusions generally. The fact that Richard's DNA was not found on the toilet tissue would also have blown a huge hole in the State's theory that Richard used the toilet tissue to wipe his semen off Miranda. Because trial counsel failed to retain a forensics expert, Mr. Nguyen's faulty conclusions went unchallenged.

### b. Failure to Call Expert on Sexual Assault.

Mr. Collina admitted during the state habeas corpus proceeding that he had evidence that Dr. Bruce Henderson, the surgeon who actually treated Miranda before she died, specifically stated that he did not believe Miranda's injuries resulted from sexual abuse and that the injuries were in fact the result of a straddle injury, (SH 3:17-18). Despite his knowledge of this evidence, Mr. Collina stated he never even met Dr. Henderson and did not attempt to interview him. (SH 3:18-19). Defense counsel never called Dr. Henderson to testify as a witness and the evidence of Dr. Henderson's opinion, which Mr. Collina suggested at trial was contained in Dr. Henderson's hand-written report, was never introduced into evidence at trial. (SH 3:18; *see also* RR 35:54-55). At the state habeas evidentiary hearing, Mr. Collina conceded that what he referred to at trial as Dr. Henderson's "handwritten report" was actually the Log of Contact Narratives from the Texas Department of Protective and Regulatory Services case file on Brenda Lopez. (SH 3:31-32) That log contained the following report:

> Dr. Henderson stated Miranda had severe lacerations which did need to be repaired to her anus but that he was not confirming sexual abuse. Dr. Henderson stated the lacerations could have occurred by a severe punch to Miranda causing her to fall on something straddling it causing the same injuries. Dr. Henderson ended by saying there was no internal damage to Miranda. He called her injury a "straddle injury."

(SH RR 8: tab 14). Obviously, if trial counsel had done its duty to follow up on this evidence, of which counsel was aware, and at least interviewed Dr. Henderson to find out if he would repeat these same opinions at trial, Richard's alternate straddle injury theory and in turn his overall defense of the sexual assault would have been significantly strengthened. Even if trial counsel had done nothing more than introduce in evidence the Log of Contact Narratives during the guilt phase of the trial, Mr. Vasquez's defense would have been appreciably advanced.

Defense counsel did meet with Dr. Randall Frost, the assistant medical examiner in San Antonio, Bexar County. (SH 3:17). Dr. Frost was prepared to testify that Miranda's injuries could have been caused by a straddle injury; however, trial counsel never called Dr. Frost as a witness. (*Id.*).

Mr. Collina attempted to justify his failure to call Dr. Frost by saying that Dr. Frost's testimony was unnecessary because it would have been redundant of testimony from the State's medical examiner, Dr. White. (*Id.*). However, as discussed more fully in the next section, the trial court record demonstrates that Dr. White never expressed any of his own opinions regarding the straddle injury theory. Instead, Dr. White merely confirmed that he remembered seeing Dr. Henderson's Statement calling the injuries a straddle injury. (RR 35:39-55). Because Dr. White did not himself endorse the straddle injury theory as a plausible explanation for Miranda's injuries, Dr. Frost's opinion would not have been redundant of Dr. White's testimony. To the contrary, Dr. Frost would have been the only expert witness at trial offering an opinion that Miranda's injuries might have been the result of a straddle injury. Furthermore, in the face of opinions from Ms. Box and Dr. Lukefahr, who both expressly rejected the straddle injury

theory,[15] even redundant testimony from a single defense expert would have significantly bolstered the argument.

### c.    Ineffective Cross Examination.

Instead of calling any of their own expert witnesses during the guilt/innocence phase of the trial, trial counsel attempted to rely on cross examination of the State's witnesses to advance the defense theory that the injuries to Miranda's genitals were straddle injuries. As noted above, both Ms. Box and Dr. Lukefahr rejected the suggestion and Dr. White's testimony was inconclusive, suggesting that the injuries might have been caused by a number of things including a man's penis. (RR 35:39-40, 53,198, 225). Dr. White was never asked to offer his own opinion as to whether the injuries might have been the result of a straddle-type fall. Instead, he was asked if he recalled seeing a handwritten report of Dr. Henderson, in which *Dr. Henderson* stated that the injuries were consistent with a straddle injury.

> Q.    Okay. Oh, do you remember when I came to your office on the 28th of April about 2:00 in the afternoon?
>
> A.    Yes.
>
> Q.    We were sitting at the table therein the conference room. Do you remember looking at a handwritten report of Dr. Henderson at that time?
>
> A.    Yes.
>
> Q.    Can you find that report?
>
> A.    We probably – was this his operative report or admissions?
>
> Q.    Well, I didn't have it. I had the benefit of yours, but I remember you and I looking at it. And do you recall it mentioning a straddle injury?
>
> A.    Yes, I do, yes.

---

[15] (RR 35:198, 225).

Q. Dr. Henderson felt these injuries were consistent with a straddle injury?

A. Yes, I do recall that statement in the --

Q. That's okay. If you recall it, then we don't need to look.

(RR 35:54-55).

Obviously, the introduction of the actual narrative of Dr. Henderson would be far more credible and persuasive to the jury than Dr. White's vague recollection of having seen the "report" sometime in the past. Contrary to the suggestion of counsel, the jury did "need to look" to see the full context of Dr. Henderson's opinion to fully assess its credibility. It is also probable that the manner in which the document was discussed but not shown to the jury created some doubt in the mind of the jurors as to whether Dr. Henderson did in fact discuss a straddle injury, whether Dr. Henderson's statement was definitive or merely a preliminary opinion, whether the report contained other damaging information that would make the defendant not want to produce it, etc. Because, by trial counsels' own admission, they never obtained a copy of Dr. Henderson's narrative, the defense was unable to present to the jury the best evidence of the document's existence, the document itself.

Additionally, if as trial counsel said they did,[16] they knew that Dr. White was willing to testify that Miranda's injuries could have been caused by a straddle injury, they should have asked him to offer that opinion. Their failure to ask Dr. White for his own opinion on this crucial defense theory, particularly when they failed to present any other expert who shared that opinion, was itself ineffective assistance of counsel.

---

[16] Mr. Collina testified that he spoke with Dr. White before the trial and that he was aware of Dr. White's opinion. (SH 3:16-17) ("He said it could have been a straddle injury or it could have been sexual penetration.").

### d.    Failure to Present Available Alternate-Theory Evidence.

Richard's trial counsel called a grand total of four witnesses, including Richard's uncle and Richard himself, to make Richard's case during the guilt/innocence portion of the trial.[17] *See generally* (RR 37).  However, none of the witnesses were asked to explain potential causes for the injuries to Miranda's genitals or to introduce alternate-theory evidence that was known to trial counsel.   Mr. Collina admitted in his affidavit submitted in the state habeas corpus proceeding that defense counsel failed to introduce evidence that would have provided plausible support for Richard's straddle injury theory.

> When Bujanos, one of defendant's attorneys, had the defendant's uncle on the stand, he should have introduced the several photos of a stationary bike that was located in or near the family home.  I had, prior to trial, asked the uncle to take these photos.  The child was known to have ridden the bike without permission.  The uncle would not have been able to testify that he had seen the child fall; but, the photos and the uncle's testimony would have provided some plausible explanation – as to how the child victim had suffered her vaginal injury.

(State's Answer to Post-Conviction 11.071 Application for Writ of Habeas Corpus, Appendix #1, Affidavit of Joseph v. Collina ¶ 16).  Richard's uncle, Juan Vasquez, also submitted an affidavit in the state habeas proceeding further describing the information he would have presented if defense counsel had given him the opportunity to do so.

> At the time of the incident, I was teaching Alicia to ride a two-wheeler.  I had taken the training wheels off her bike.  Miranda wanted to learn too so I was teaching her too.  She was learning on Alicia's bike.  Alicia and Miranda always played together.  Alicia was about one year older than Miranda.  Whatever Alicia would do, Miranda wanted to do.  Miranda would also like to play on my wife Olivia's exercise stepper, power rider and exercise bicycle.  They were much too big for her and she would fall.  I do not

---

[17] The first witness called by the defense, Officer William Edge, testified regarding a conversation he had with Richard's girlfriend, Brenda, regarding the location of a footstool found at the crime scene.  The transcript of Officer Edge's testimony is a page-and-a-half in length. *See* (RR 37:1-2).

> believe that Richard Raped Miranda. I understand that Richard hit
> Miranda. I understand that she fell down off a stool sometime
> after Richard hit her. I told the lawyers about this equipment and
> they told us to take a picture of them and bring it to court. We did
> this, and we brought the picture but they never asked me about it.

(SH Petitioner's Ex. 21). Juan testified during both the guilt and punishment phases of the trial

but was never asked to present information regarding Miranda's attempts to ride a two-wheel

bike or play on the adult exercise equipment. No other witness or evidence was presented in

support of the straddle injury theory.

Mr. Collina himself explained the significance of this alternate-theory evidence as

follows:

> It was important to give the jury an alternate theory for how that
> child suffered that injury. The State's theory was that it was sexual
> assault. It was very important for us to establish an alternate
> theory, which we did not. Well, we did it, but in a less effective
> way.
>
> . . .
>
> But it would have been embellished if the jury had something to
> carry around in their hand. Jurors like to touch things, too, not just
> hear testimony. They like to see things. So I wanted to appeal to
> all the senses of the jury, not just the verbal. Photos would have
> been nice.

(SH 3:30-31). Had defense counsel done what they should have to introduce all of the available

alternate-theory evidence, including the photographs and testimony from Juan Vasquez

establishing the existence of the oversized exercise equipment in the Vasquez home; testimony

regarding Miranda's tendency to play on that equipment; Dr. Henderson's testimony and

narrative calling Miranda's wounds a straddle injury; and/or the testimony of Dr. Frost and Dr.

White affirming the possibility that the injuries were caused by a straddle injury, they would

have provided an authoritative, reasonable, and compelling explanation for the injuries to

Miranda's genitals.

### e. Failure to Present Other Available Evidence to Refute the State's Unindicted Sexual Assault Allegation.

Trial counsel also failed during the punishment phase of the trial to introduce evidence regarding Richard's psychological profile, which is inconsistent with sexually abusive behavior. Although trial counsel retained a psychiatrist, Dr. Carlos Estrada, to testify regarding Richard's drug addiction and lack of future dangerousness if he is kept free of narcotic drugs, Dr. Estrada was never asked whether Richard's psychological characteristics are consistent with child molestation or sexual deviance. (RR 39:95-107).

Richard's state habeas counsel retained a psychologist with experience evaluating sex offenders, Dr. Ricardo Weinstein, to evaluate Richard's psychological characteristics. The relevant portion of Dr. Weinstein's evaluation is as follows:

> I have evaluated over 1000 individuals charged with sexual misconduct, most of them accused of molesting minors. The evaluations have served the purpose of assisting at trial or sentencing. My clinical experience and knowledge of the literature have allowed me to conclude that sexual abuse occurs for the most part in a contextual environment, the context is always related to the perpetrator. The following descriptions cover the great majority of cases:
>
> 1. Psychopaths. These individuals molest minors without rhyme or reason and in no specific context. Richard is not a psychopath, therefore this is not applicable.
>
> 2. Pedophiles. These individuals have sexual arousal to children and/or young adolescents. This is often their exclusive source of arousal. Richard has a long history of arousal to age appropriate females. He has been sexually active since he was in his early teens. He has been exposed to children and has had many opportunities to engage in sexual behaviors with children and has no history of doing so.

3.  Shy/withdrawn individuals that are socially inadequate and feel threatened pursuing adults. They adultmorphize children to satisfy their sexual desires. Richard has no problems socializing or meeting age appropriate females.

4.  Family dynamics where the child becomes the substitute "partner," eventually leading to a sexualized relationship. There is no evidence that this dynamic existed in Richard's relationships.

5.  Sexual acts performed under the influence of alcohol or drugs due to disinhibition. Richard's heroin addiction does not fall into this category. Heroin does not disinhibit behavior.

. . . It is my opinion that he does not present any characteristics of a pedophile and that the dynamics of his relationship with the mother of the victim were such that it is very unlikely that he would have acted in a sexually violent or inappropriate way against the child.

(SH Petitioner's Ex. 20 at 15). All of Richard's family members submitted affidavits in the state habeas proceeding confirming that there has never been a question of Richard acting sexually inappropriately with children. They also testified that Richard was frequently trusted with the care of young girls. For example, Juan reports: "I have seen Richard many times with my nieces. Brenda has three daughters: Alicia (10/11/92), Briana (01/23/96) and Dominic (02/23/99). He has always been appropriate with them. Richard was always appropriate with Miranda too." (SH Petitioner's Ex. 21 ¶ 30). The Petitioner's sister, Brenda, states: "I have three daughters: Alicia (10/11/92), Briana (01/23/96) and Dominic (02/23/99). I have seen Richard with my daughters often. He has always been appropriate with them. Whenever I saw Richard with Miranda, he was always appropriate with her too. I never saw Richard hit Miranda. I do not believe Richard raped Miranda." (SH Petitioner's Ex. 25 ¶ 26). Trial counsel failed to investigate and present this important mitigating evidence, which would have aided Richard's

attempt to cultivate the juror's residual doubt on the issue of sexual assault during the punishment phase of the trial.

Other than Richard himself, the only witness called by the defense during either phase of the trial to address the State's allegations and evidence of sexual assault was Magada Hinojosa, an investigator for the Robstown office of Child Protective Services. (RR. 37:3). Ms. Hinojosa testified regarding a visit she made to Richard's home in January 1998 where she interviewed Miranda, observed her demeanor, and had the opportunity to remove her clothing and examine Miranda physically. (RR. 37:5-7). She stated that her investigation did not reveal any bruising on Miranda's body or any evidence of sexual abuse. (RR. 37:7). Neither Ms. Hinojosa nor any other witness called by the defense attempted to counter the evidence in support of the state's sexual assault theory detailed above. In the end, the only evidence trial counsel presented in support of Richard's straddle injury theory was Dr. White's brief mention on cross examination of having seen Dr. Henderson's "handwritten report." Trial counsels' failure to discover and present the wealth of available evidence that was both known to and readily discoverable by trial counsel cannot be justified as reasonable trial strategy. Put simply, trial counsel did not meet the objective standard for reasonable defense counsel.

> **5.** *Trial Counsel's Multiple Failures to Investigate, Refute, and Counter the State's Sexual Assault Evidence Prejudiced Mr. Vasquez During both the Guilt and Punishment Phases of Trial.*

As described above, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. If the Court can conclude that a juror could have reasonably concluded that the death penalty was not an appropriate penalty in this

case based on the mitigating evidence, prejudice will have been established." *Lockett*, 230 F.3d at 716.

That standard has been met in this case. The significance of the State's un-indicted allegation of rape to both Richard's conviction for murder and his death sentence cannot be overstated. The State itself argued its significance in its closing argument to the jury during the guilt phase of the trial as follows:

> The rape – yes, the rape is not on the documents either, and why is the rape so important? Because it shows his intent at the time of the killing. It shows the anger he had because rape is a crime of anger. That is what sexual assault is. So it shows – the importance of the rape is that it shows his state [of] mind, his intent. It shows the circumstances of the offense, and it shows what he did not want to admit to.

(RR 38:50). This quote makes clear that the State used the allegation of rape to establish many of the elements of capital murder including his motive and intent to kill Miranda. It also confirms that the State used the rape allegation to prove aggravating circumstances and to incite the jury's hatred against Richard. Finally, it demonstrates the State's use of the rape allegation to otherwise impeach Richard's credibility with the jury. Because the evidence of sexual assault was not effectively refuted by trial counsel, Richard's claims that he did not intend to kill Miranda and evidence that Richard called for medical attention and performed CPR to save her life were disregarded by the jury.

At the punishment phase of the trial, the State's allegations of sexual assault once again played a prominent role. Prosecutors used the salacious allegations to great effect to inflame the passions of the jurors. Prosecutors repeated their theory using the most inflammatory rhetoric and graphic detail as illustrated by the following excerpts:

> This defendant forcibly restrained and raped Miranda. This defendant ripped her privates open. Ladies and Gentlemen, I really don't know how else to say this. This defendant made a hole in

Miranda that wasn't supposed to be there. He mutilated her privates. . . .

. . .

This defendant cleaned her up with rubbing alcohol. Imagine the torment, the excruciating pain Miranda must have felt as he cleaned her privates, her open wounds up with rubbing alcohol. He used rubbing alcohol to clean up all of that blood. Imagine the pain she must have suffered, that is, if she was conscious at the time. . . . Think about it. He couldn't have done anything worse to Miranda. He tortured her.

(RR 40:13-14).

If trial counsel had done the appropriate investigation and retained the necessary experts they could have called into question the State's DNA evidence linking Richard to the injuries to Miranda's genitals as Dr. Libby was able to do in the state habeas proceeding. They also would have been able to refute with authority Huy Nguyen's "semen washing" hypothesis and explained more completely the significance of the fact that none of Mr. Vasquez's DNA was found in or on Miranda's genitals. Additionally, if trial counsel had taken action to investigate and present readily available alternate-theory evidence suggesting Miranda's genital cuts were straddle injuries, including expert and lay testimony, photographs, and medical reports, that evidence would likely have created reasonable doubt in the mind of the jury and taken away much of the persuasive impact of the sexual assault allegation at both the guilt and punishment phases of the trial. This evidence alone is sufficient to undermine confidence in the jury's verdict and call into question the reasonableness of the Texas Court of Criminal Appeal's factual review.

**CLAIM THREE: INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL –
CONFLICT OF INTEREST**

**A.     Argument Summary**

Richard Vasquez's right to the effective assistance of appellate counsel was violated because Grant Jones, the attorney representing Richard in his direct appeal of his conviction for capital murder and subsequent death sentence, was laboring under an undisclosed conflict of interest.  At the time he was representing Richard in his appeal, Mr. Jones also owed a duty of loyalty as a prosecutor to the same jurisdiction of the State of Texas that was the prosecuting authority against Richard.  Significantly, Richard was never informed that his right to appeal was so fundamentally compromised.  As a result, Richard was denied his constitutional rights guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution.  Moreover, because Mr. Jones' contemporaneous representation of the State is an actual conflict of interest, harm to Richard's appeal is presumed.

**B.     Relevant Facts**

Grant Jones represented the State on two capital cases at the same time he represented Richard on his direct appeal.  Mr. Jones represented the State of Texas as a Special Prosecutor for the Nueces County Prosecutor's Office in *State v. Richard Cartwright*, Case No. 96-CR-2397-F, 214th District Court, Nueces County, Texas.  (SH App. Ex. 25).  Mr. Jones also represented the State of Texas as a Special Prosecutor for the Nueces County Prosecutor's Office in *State v. Jermarr Arnold,* Case No. 90001446-A, 28th District Court, Nueces County, Texas, as evidenced by the Requisition and Purchase Order for Nueces County for "legal services rendered . . . as special prosecutor." *Id.*  In addition, the invoice registry indicates that Mr. Jones received checks from the State of Texas for his services as the District Attorney in the *Arnold* case on January 12, 2000 ($1,162.50) and in the *Cartwright* case on February 24, 2000 ($1,237.50). *Id.*

Mr. Jones represented the State of Texas in opposition to Mr. Arnold's post-conviction application challenging his capital murder conviction and death sentenced from July 15, 1996 through December 15, 1999. *Id.* The same exhibit reveals that Mr. Jones also defended the State's capital conviction and death sentence of Mr. Cartwright from April 30, 1999 through January 14, 2000. The fee application from Mr. Jones to the Nueces County court demonstrates that Mr. Jones represented Mr. Vasquez on appeal from June 22, 1999 through September 13, 2000. *Id.* Therefore, from June 22, 1999 through December 15, 1999, Mr. Jones had all three cases simultaneously.

## C.    Argument and Authorities

### 1.    *Richard's Right to Conflict-Free Appellate Counsel.*

The United States Supreme Court has long held that where a state affords a convicted prisoner the right to appeal his conviction, the Due Process Clause of the Fourteenth Amendment guarantees the right to effective assistance of appellate counsel. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985) ("A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney.").

Integral to the Sixth Amendment right to effective assistance of counsel is the right to counsel that is free of conflicts of interest. *Cuyler v. Sullivan*, 446 U.S. 335, 351 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 481-82 (1978). If a defendant's counsel has an actual conflict of interest that adversely affected his performance, prejudice is presumed and no proof of prejudice is required. *Strickland,* 466 U.S. at 692 (citing *Cuyler*, 446 U.S. at 345-350). *Cuyler*'s adverse effect standard is intentionally lower than the normal "actual prejudice" standard from *Strickland*, which requires a petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under *Cuyler*, the test is whether the actual conflict

burdening counsel's performance had adverse effect on counsel's performance.[18]   *Mickens v. Taylor*, 535 U.S. 162, 172-73 (2002).   Ordinarily, to meet this test the defendant need only establish that there was a plausible alternative defensive strategy that could have been pursued, but was not because of the actual conflict of interest.   *Perillo v. Johnson*, 205 F.3d 775, 808 (5th Cir. 2000).   However, when the conflict of interest involves a defendant's appellate counsel, even this low threshold becomes insurmountable.   Because there is no record of appellate counsel's performance other than the appellate briefs themselves, an appellant is left speculate about what arguments might have been included in the briefing but were not because of the conflict of interest.   Even if an appellant can identify arguments that might have been made on appeal but were omitted by appellate counsel, there is no way, absent a more substantial record, to demonstrate that the arguments were omitted because of the conflict of interest.   A better rule, limited to conflicts that affect an appellant's right to conflict-free appellate counsel, is to assume the appeal has been detrimentally affected upon a showing of an actual conflict of interest.

An actual conflict of interest occurs when counsel actively represents conflicting interests.   *Strickland*, 466 U.S. at 692; *see also Zuck v. State of Alabama*, 588 F.2d 436, 439 (5th Cir. 1979)   ("If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists.").   An actual conflict may also exist when an attorney represents two clients whose interests in the outcome of a matter are different.   *Perillo*, 205 F.3d at 804.   In such cases, counsel breaches the most basic of counsel's duties, the duty of loyalty, and the resulting harm is difficult to measure.   *Strickland*, 466 U.S. at 692.

---

[18] *Cuyler* involved a conflict of interest of the defendant's trial counsel.   At trial there is a substantial record of counsel's performance from which to determine the adverse effects of a conflict of interest.   When appellate counsel labors under a conflict of interest the record is limited to the appellate briefs and thus the adverse effect of a conflict of interest on counsel's performance is virtually undetectable.

The Fifth Circuit has on several occasions reviewed facts very similar to the present case and found the existence of actual conflict of interest justifying habeas corpus relief. In *Castillo v. Estelle*, 504 F.2d 1243 (5th Cir. 1974), for example, the defendant's trial counsel was simultaneously representing one of the principal witnesses for the State in an unrelated matter. Although the trial judge and the prosecutor were informed, the defendant was not aware of and did not consent to the conflicting representation. *Id.* at 1244-45. The Fifth Circuit expressed its concerns regarding defense counsel's conflict of interest as follows:

> When there is a conflict of interest such as exists in this case, the prejudice may be subtle, even unconscious. It may elude detection on review. A reviewing court deals with a cold record, capable, perhaps, of exposing gross instances of incompetence but often giving no clue to the erosion of zeal which may ensue from divided loyalty. Accordingly, where the conflict is real, as it is here, a denial of the right to effective representation exists, without a showing of specific prejudice.

*Id.* at 1245. The Fifth Circuit held that, as a matter of law, the conflict denied the defendant effective representation. *Id.*; *see also United States v. Martinez*, 630 F.2d 361, 363 (5th Cir. 1980), *cert denied*, 450 U.S. 922 (1981) (actual conflict where defense counsel previously represented witness for prosecution); *Stephens v. United States*, 595 F.2d 1066 (5th Cir. 1979) (actual conflict where defense counsel concurrently represented prosecution witness).

Similar concerns over the reduced zeal and vigor of a conflicted defense attorney motivated the Fifth Circuit in *Zuck v. State of Alabama* to reverse the district court's denial of habeas corpus relief. In that case, the law firm that represented the defendant in his murder trial was also representing the prosecutor in an unrelated civil matter. *Zuck*, 588 F.2d at 438. The State argued that this dual representation did not create an actual conflict because the real party in interest in *Zuck* was the people of the State of Alabama and the prosecutor's only interest was

in achieving justice, not in convicting Zuck. *Id.* at 439. The Fifth Circuit rejected these arguments reasoning as follows:

> [T]he sixth amendment requires that a defendant may not be represented by counsel who might be tempted to dampen the ardor of his defense in order to placate his other client. The fact that a particular lawyer may actually resist that temptation is of no moment. The right to effective assistance of counsel is so vital to a fair trial that courts are compelled to examine every potential infringement of that right with the most exacting scrutiny.

*Id.* at 440. The Fifth Circuit concluded that the potential prejudice arising from the conflict in *Zuck* was even greater than that found in *Castillo* because the danger of ineffective representation was not limited to the cross-examination of a single witness but rather could affect the entire trial. *Id.* at 339. These same concerns are amplified when a capital defendant's appellate counsel also works as a prosecutor for the State because of the high stakes associated with an appeal of a capital conviction, the fact that the attorney has responsibility for the defendant's entire direct appeal, and the sparse appellate record from which to identify the adverse effects caused by appellate counsel's conflicts of interest.

The Fifth Circuit's distinction between the facts in *Zuck* those in *Mitchell v. Maggio*, 679 F.2d 77, 79-80 (5th Cir. 1982) also gives important insights on the conflicts of interest at issue in the present case. *Mitchell* involved a defense attorney who represented a defendant charged with aggravated and forcible rape in state court. At the same time the attorney was representing the defendant he was also an assistant city attorney assigned as a prosecutor in city traffic court. Because the jurisdiction of the city traffic court and the state court differed, the court concluded that there was no opportunity for divided loyalty as there was in *Zuck*.

> We stress that the prosecutorial positions at issue were as city employees prosecuting in city courts only. It is clear that the representation of a defendant charged in a state court with aggravated rape does not conflict with the official duties of an assistant city attorney assigned to a New Orleans city court. Even

if the city is considered as a sometime client of its city court prosecutors, such a prosecutor is nevertheless not in a "divided loyalty" situation when he represents a defendant in a state court prosecution.

*Id.* at 80.

The same cannot be said of a criminal defense attorney who works simultaneously as a prosecutor for the State in the same jurisdiction as the defendant's trial. When a criminal defense attorney also represents the State as a prosecutor in criminal cases in the same jurisdiction, the interests of his clients are clearly adverse to one another such that an actual conflict of interest exists. *See, e.g., People v. Cooper*, 156 Misc.2d 483, 487, 93 N.Y.S.2d 733, 736 (1992) (holding that an attorney who worked as a prosecutor and as a criminal defense attorney at the same time in the same jurisdiction undermined the confidence of both of his clients, the defendant and the community, because the dual representation "constituted an obvious and actual conflict of interest"). To avoid such conflicts of interest, the American Bar Association directed that "[d]efense counsel should not represent a criminal defendant in a jurisdiction in which he or she is also a prosecutor." *American Bar Association Standards for Criminal Justice*, "Defense Function Standards," Standard 4-3.5(g). Nevertheless, case law suggests that for an actual conflict to exist when a defense attorney works as a prosecutor in the same jurisdiction, the attorney must represent the State and the accused at the same time. *See, e.g., Cooper*, 156 Misc.2d at 487; *cf. Moreland v. Scott*, 175 F.3d 347, 348 (5th Cir. 1999) (no actual conflict when an criminal defense attorney ran for district attorney and anticipated future employment for the State); *Hernandez v. Johnson*, 1997 U.S. App. Lexis 12686, *15 (5th Cir 1997) (no actual conflict for defense attorney who nine years prior to trial worked as a prosecutor in the same jurisdiction that convicted defendant for prior felonies).

**2.** *Richard's Appellate Counsel had an Actual Conflict of Interest.*

In the instant case, Richard's appellate counsel, Grant Jones, was actively struggling to "serve two masters" – the inherently contradictory masters of a capitally-sentenced prisoner and the State of Texas – *at the same time. See Glasser v. United States*, 315 U.S. 60, 75 (1942). Mr. Jones was simultaneously representing Richard and the State as a part-time prosecutor <u>within the same jurisdiction</u>. Mr. Jones represented the State on two capital cases at the same time he represented Richard on his direct appeal. Mr. Jones represented the State of Texas as a Special Prosecutor for the Nueces County Prosecutor's Office in *State v. Richard Cartwright*, Case No. 96-CR-2397-F. (SH App. Ex. 25). Mr. Jones also represented the State of Texas as a Special Prosecutor for the Nueces County Prosecutor's Office on the habeas corpus proceeding of death-sentenced Jermarr Arnold, as evidenced by the Requisition and Purchase Order for Nueces County for "legal services rendered . . . as special prosecutor." *Id.* In addition, the invoice registry indicates that Mr. Jones received checks from the State of Texas for his services as the District Attorney in the *Arnold* case on January 12, 2000 ($1,162.50) and in the *Cartwright* case on February 24, 2000 ($1,237.50). *Id.*

Mr. Jones represented the State of Texas in opposition to Mr. Arnold's post-conviction application challenging his capital murder conviction and death sentenced from July 15, 1996 through December 15, 1999. *Id.* The same exhibit reveals that Mr. Jones also defended the State's capital conviction and death sentence of Mr. Cartwright from April 30, 1999 through January 14, 2000. *Id.* The fee application from Mr. Jones to the Nueces County court demonstrates that Mr. Jones represented Mr. Vasquez on appeal from June 22, 1999 through September 13, 2000. *Id.* Therefore, from June 22, 1999 through December 15, 1999, Mr. Jones had all three cases simultaneously. This scenario presents more than just and "appearance of impropriety," rather it represents an actual conflict of interest. *See Cuyler*, 446 U.S. at 350.

### 3.   *Prejudice to Richard is Presumed.*

In the instant case, appellate counsel never disclosed either to the appointing Court or to Richard that he had an actual conflict of interests while he was working on Richard's appeal. The conflict was only discovered through the investigation of post-conviction habeas counsel. Therefore, it is impossible to discern with any accurate specificity how this actual conflict prejudiced Richard's appeal. The appellate record is so short that it is also difficult to determine how the conflict may have affected counsel's performance. A review of the briefing is also not particularly illuminating. Although it is easy to identify things that might have been argued but were not, or arguments that could have been written more persuasively and with greater factual and legal support, it is impossible to attribute any of these deficiencies in appellate briefing to appellate counsel's conflict of interest. For these reasons the *Cuyler* requirement of showing an adverse affect on counsel's performance should not be extended to cases involving an undisclosed conflict affecting appellate counsel.

In *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978), a case involving joint representation of co-defendants, the Supreme Court recognized that in some instances "a rule requiring a defendant to show that a conflict of interests . . . prejudiced him in some specific fashion would not be susceptible of intelligent, even-handed application." The Supreme Court acknowledged that a defendant cannot prove the negative; that is, what counsel did not do that should have been done but for the conflict of interest, particularly when there is little record available for review. The high court observed as follows:

> In the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury. But in a case of joint representation of conflicting interests the evil – it bears repeating – is in what the advocate finds himself compelled to

> *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interest on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation.

*Id.* at 490-91 (emphasis in original) (internal citations omitted). The same is true of an inquiry into the detrimental affect of a conflict of interest on appellate counsel's performance. Consequently, this Court should do as the *Holloway* court did, presume prejudice based on the existence of counsel's actual conflict of interest and reverse Richard's conviction for ineffective assistance of counsel. *See id.* at 489-91.

Alternatively, to the extent Richard is required to identify evidence of how the actual conflict affected appellate counsel's performance, Richard would show the Court that a review of the appellate briefing filed by Mr. Jones in this case reveals a definite pro-state bias in the statement of facts and in the presentation of the argument. Indeed, the statement of the facts reads like a summary of the State's case. Many of the facts argued by the State but disputed by Richard at trial and to this day, were recited by counsel without qualification or equivocation. For example, Mr. Jones wrote "[a] bruising pattern on [Miranda's] hips and fresh tearing in the perineum area indicated that someone had made a forcible attempt to penetrate either her vagina or rectum." (Brief of Appellant at 3). This statement is contrary to the facts presented at trial, which did not show any evidence of penetration of either Miranda's vagina or her rectum. As noted above, Ms. Box testified that Miranda's hymen was without trauma and that she could not tell whether Miranda's anus had been penetrated. (RR 35:196, 215). Dr. Lukefahr agreed that the report of the examining physician, Dr. Henderson stated that Miranda's hymen was intact and

-73-

that there were no internal injuries to the vagina or within the anus. (RR 35:232). Counsel not only neglected to mention these facts and accepted the State's theory as true, he also failed to make any mention of the alternative straddle injury theory.

The cursory arguments made in the ten total pages of argument that follow the statement of facts appear to be little more than "straw men" to be easily refuted by the State. The brief itself only raises three points of error, two of which have been repeatedly rejected by the Texas Court of Criminal Appeals. Appellate counsel raised the following points of error in the direct appeal:

1. Whether infliction of death in this case is cruel and unusual punishment prohibited by the eighth Amendment to the United States Constitution, when the jury was not provided material information about parole law as it applies to persons convicted of capital murder;

2. Whether the Due Process Clause of the Fourteenth Amendment was violated in this case by the refusal of the trial court to instruct the jury in the penalty phase of a capital trial that, under State law, the defendant was ineligible for parole for a period of 40 calendar years under a capital murder life sentence; and,

3. Whether the evidence is sufficient to support the jury's affirmative finding of future dangerousness.

Appellate counsel conceded that the first two of these claims, related to instructions to the jury regarding the application of parole law, have been rejected by Texas' highest criminal court. (*See* Brief of Appellant at 12 (citing *Smith v. State*, 898 S.W.2d 838 (Tex. Crim. App. 1995) and asking the Court of Criminal Appeals to reconsider its decision in that case). *Smith* reiterated the longstanding rule in Texas that parole is not a matter for a jury's consideration in a capital murder trial. *Smith*, 898 S.W.2d at 846; *see also Jones v. State*, 843 S.W.2d 487, 495 (Tex. Crim. App. 1992); *Ellason v. State*, 815 S.W.2d 656, 665, n.5 (Tex. Crim. App. 1991) ("The matter of parole is not a proper consideration for jury deliberation on punishment in a capital murder trial."); *Stoker v. State*, 788 S.W.2d 1, 16 (Tex. Crim. App. 1989), *cert. denied*, 498 U.S.

951 (1990) (testimony regarding parole is "an impermissible area of inquiry for the jury"). In the face of such established precedent, appellate counsel's first two points of error were certainly doomed, and perhaps designed, to fail. Consequently, Richard's entire direct appeal was based on one viable point of error presented in a total of five and a half pages of briefing. (*See* Brief of Appellant at 16-21).

This review of the appellate briefing, if such a review is required at all, demonstrates that Richard's appeal was adversely affected by Mr. Jones' conflict of interest. Therefore, prejudice is presumed and habeas corpus relief is justified.

## VII.
### PRAYER FOR RELIEF

Wherefore, Petitioner Richard Vasquez requests that this Court grant this petition and issue a writ of habeas corpus ordering Richard Vasquez to be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional death sentence. Petitioner further requests that Richard Vasquez be ordered to provide this Court with a record of all state court proceedings and grant such other relief as law and justice require.

Respectfully submitted,

BRACEWELL & GIULIANI LLP

By: _Eric B. Storm_ _____

    Andrew M. Edison
    State Bar No. 00790029

    Eric B. Storm
    State Bar No. 24033244

    711 Louisiana Street, Suite 2300
    Houston, Texas 77002
    (713) 221-1371 (Telephone)
    (713) 221-2144 (Facsimile)

    ATTORNEYS FOR PETITIONER RICHARD
    VASQUEZ

## VERIFICATION

Under penalty of perjury, I hereby certify that all factual allegations made herein are true and correct except for those allegations made upon information and belief.

_Eric B. Storm_ _____
Eric B. Storm

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing petition was served on the Attorney General for the State of Texas, Counsel for Respondent, by mailing the Petition via first class mail RRR on 26th day of January, 2006 to the following address:

Mr. Tom Jones
Office of the Attorney General
Post Conviction Litigation
P.O. Box 12548
Austin, TX 78711-2548

_Eric B. Storm_ _____
Eric B. Storm