NO. C-05-59
(Death Penalty Case)

_____

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

_____

RICHARD VASQUEZ,

*Petitioner*,

V.

NATHANIEL QUARTERMAN, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent.*

_____

**PETITIONER'S RESPONSE TO RESPONDENT
QUARTERMAN'S MOTION FOR
SUMMARY JUDGMENT**

_____

Andrew M. Edison
State Bar No. 00790029

Eric B. Storm
State Bar No. 24033244

BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
(713) 221-1371 (Telephone)
(713) 221-2144 (Facsimile)

ATTORNEYS FOR PETITIONER
RICHARD VASQUEZ

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 2

SUMMARY OF PETITIONER'S POSITION ...................................................... 3

ARGUMENT ..................................................................................................... 10

I.     The Legal Standard for Granting Habeas Corpus Relief Based on Claims of Ineffective Assistance of Trial Counsel ......................................................... 10

        A.    Unreasonable determination of the facts in light of the record evidence ........................................................................ 10

        B.    Unreasonable application of clearly established federal law ................... 10

                1.    Prevailing professional norms as indicated by American Bar Association Standards require trial counsel to discover all reasonably available mitigating and aggravating evidence .................................................................... 11

                2.    Clearly established federal law requires a discerning review of trial counsel's "strategic" decisions not to investigate all reasonably available evidence ......................................... 12

                3.    The Petitioner is entitled to relief when, but for trial counsel's deficient performance, a reasonable juror could have concluded that the death penalty was not an appropriate punishment .......................................... 15

II.    The State Court's Decision to Deny The Claim that Trial Counsel Were Ineffective Because They Did Not Conduct a Reasonable Investigation of Mitigating Evidence of Richard's Family Background, Social History, And Mental Deficiencies Was Based on Clearly Erroneous Findings of Fact, Involved Unreasonable Factual Determinations in Light of Evidence at Trial, and Involved an Unreasonable Application of Clearly Established Federal Law ..................................................................................... 16

        A.    Trial counsel's failure to investigate mitigation evidence from Petitioner's family and social history ........................................ 17

                1.    Trial counsel were not aware of Richard's horrific social and family history and their failure to investigate that history fell below prevailing professional norms ......................... 18

                2.    Trial counsel's failure to investigate Richard's family and social history was not an informed strategic decision ................. 24

                3.    Trial counsel's failure to investigate Richard's family and social history was prejudicial to Richard's defense .................... 29

        B.    Trial counsel's failure to investigate mitigation evidence of Richard's mental deficiencies ....................................................... 30

# TABLE OF CONTENTS
(continued)

Page

    1.    The state court findings and conclusions are objectively unreasonable due to trial counsel's failure to provide sufficient information to their retained experts and their failure to follow the experts' advice ............................................. 31

        a.    Trial counsel's failure to provide background information to their retained experts ................................. 31

        b.    Trial counsel's failure to heed their experts' advice to conduct additional tests on Richard's brain ................ 34

    2.    Trial counsel's failure to investigate Richard's mental and psychological impairments was prejudicial to Richard .............. 39

III.    The State Court's Decision to Deny The Claim that Trial Counsel Were Ineffective Because They Did Not Conduct a Reasonable Investigation of Aggravating and Mitigating Evidence Related to The State's Un-indicted Allegation of Sexual Assault Was Based on Clearly Erroneous Findings of Fact, Involved Unreasonable Factual Determinations in Light of Evidence at Trial, and Involved an Unreasonable Application of Clearly Established Federal Law. ....................................................................................... 40

    A.    Trial Counsel's duty to investigate and counter the State's aggravating evidence .................................................................... 41

    B.    Trial counsel's failure to investigate and counter the State's evidence of sexual assault ....................................................... 42

        1.    Trial counsel's failure to object to the State's un-indicted allegation of sexual assault ........................................... 43

        2.    Trial counsel's failure to investigate the State's forensic DNA evidence ........................................................................... 44

        3.    Trial counsel's failure to call a forensic expert to competently rebut the State's sexual assault evidence ................ 50

            a.    The State's DNA evidence was far from "neutral" and counsel's failure to challenge it harmed Richard's defense ............................................. 51

        4.    Trial Counsel's failure to retain a forensic expert to investigate and counter the state's DNA evidence fell below the objective standard of reasonableness .................................... 55

            a.    Retaining a forensic expert would have helped counter the State's evidence ............................................. 55

## TABLE OF CONTENTS
(continued)

**Page**

b.    Retaining a forensic expert would have helped counsel to identify and explain the significance of exculpating evidence.................................................... 59

C.    Failure to present available alternate-theory evidence that Miranda suffered a straddle injury ...................................................... 60

1.    Trial counsel's failure to call expert on sexual assault to testify regarding the straddle injury theory................................. 60

2.    Trial counsel's failure to present circumstantial evidence indicating Miranda suffered a straddle injury............................. 65

D.    Failure to present other available evidence to refute the state's un-indicted sexual assault allegation............................................ 67

E.    Trial counsel's multiple failures to investigate, refute and counter the State's sexual assault evidence prejudiced Richard during both the guilt and punishment phases of trial ................................ 70

CONCLUSION...................................................................................................... 72

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Atkins v. Virginia,*
    536 U.S. 304 (2002) ........................................................................... 39, 40

*Baxter v. Thomas,*
    45 F.3d 1501 (11th Cir. 1995) ........................................................... 13

*Ex Parte Richard Vasquez,*
    WR 59,201-01 and -02 (Tex. Crim. App. 2004), Slip Op. at 2 ............................. 31

*Ladd v. Cockrell,*
    311 F.3d 349 (5th Cir. 2002) ............................................................. 10

*Lockett v. Anderson,*
    230 F.3d 695 (5th Cir. 2000) ........................................................ 16, 24, 70

*Rompilla v. Beard,*
    545 U.S. 374 (2005) ................................................ 12, 13, 16, 41, 42, 44

*Skipper v. South Carolina,*
    476 U.S. 1 (1986) ......................................................................... 40

*Smith v. Texas,*
    547 U.S. 37 (2004) ........................................................................ 40

*State v. Kelly,*
    824 S.W.2d 568 (Tex. Crim. App. 1992) ..................................... 7, 53, 54

*Strickland v. Washington,*
    466 U.S. 668 (1984) ........................ 3, 9, 11, 12, 13, 15, 16, 38, 41, 70

*Tennard v. Dretke,*
    542 U.S. 274 (2004) .................................................................. 37, 40

*Wiggins v. Smith,*
    539 U.S. 510 (2003) ............................ 10, 11, 12, 13, 14, 15, 16, 23, 24, 28, 33, 40

*Williams v. Taylor,*
    529 U.S. 362 (2000) ............................................................ 10, 11, 16

**Statutes**

28 U.S.C. § 2254(d)(1) ............................................................... 9, 10

28 U.S.C. § 2254(d)(2) ............................................................... 9, 10

28 U.S.C. § 2254(e) ...................................................................... 3

28 U.S.C. § 2254(e)(1) ................................................................ 5, 10

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**Other Authorities**

ABA Guidelines for the Appointment and Performance
of Counsel in Death Penalty Cases (1989) ........................................ 12, 23, 33, 37, 43, 45, 50

ABA Standards for Criminal Justice, Prosecution Function
and Defense Function 4-4.1 (3d ed. 1993)........................................................................ 11, 12

American Psychiatric Association, Diagnostic
and Statistical Manual of Mental Disorders 42-43 (4th ed. 2000)........................................ 40

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **RICHARD VASQUEZ,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | |
| | § | **NO. C-05-59** |
| **NATHANIEL QUARTERMAN,** | § | **(Death Penalty Case)** |
| **DIRECTOR,** | § | |
| **TEXAS DEPARTMENT OF CRIMINAL** | § | |
| **JUSTICE, CORRECTIONAL** | § | |
| **INSTITUTIONS DIVISION,** | | |
| | | |
| **Respondent.** | | |

**PETITIONER'S RESPONSE TO RESPONDENT QUARTERMAN'S
MOTION FOR SUMMARY JUDGMENT**

Petitioner Richard Vasquez[1] files this Response to Respondent Quarterman's Motion for Summary Judgment. Petitioner will demonstrate that (1) he was denied his Sixth Amendment right to effective assistance of counsel due to trial counsel's failure to investigate and present available mitigation evidence during the sentencing phase of his trial; and (2) he was denied his right to effective assistance of counsel due to trial counsel's failure to investigate and counter the state's evidence of sexual assault during the trial's guilt and sentencing phases.[2]

---

[1] To avoid name confusion with Petitioner's father, Ricardo Vasquez, and Petitioner's paternal uncle, Juan Vasquez, who are each mentioned frequently, this Response will refer to the Petitioner by his title or by his first name.

[2] Petitioner has fully presented in his federal habeas petition his arguments concerning his third claim—that he was denied the effective assistance of counsel due to appellate counsel's conflict of interest. Because the federal habeas petition fully rebuts the Respondent's contentions on this point, Petitioner simply incorporates the arguments and authorities on this issue as set forth in the habeas petition.

## INTRODUCTION

Richard Vasquez had a horrible and traumatic childhood.  His father, a drug addict who was in and out of prison, taught him to use heroin and deal drugs by the time he was 11 or 12 years old.  His mother drank heavily during her pregnancy, causing Richard to suffer fetal alcohol syndrome.  Various close relatives abused drugs, dealt drugs, spent time in prison, died of drug overdoses and/or were murdered in drug-related killings.

Needless to say, this family history was of critical importance for purposes of mitigation in the punishment phase of Richard's capital murder trial.  But, incredibly, the jury never heard any of this important testimony.  Why?  Because Richard's counsel were completely unaware of this compelling mitigation evidence.  Inexplicably, Richard's trial counsel failed to follow professional norms and common sense to conduct even a basic investigation of Richard's family, social and medical history.

But this was not the full extent of counsel's failures.  Richard's counsel also failed to perform the most fundamental investigation of the State's aggravating allegations of sexual assault.  As a result, the jury was deprived of compelling and authoritative evidence that would have refuted the States's inflammatory sexual assault theory.  Again, Richard's counsel did not present readily available mitigating and exculpatory evidence because they simply failed to discover it or failed to sponsor witnesses to present it.

The right of a defendant in a criminal trial to have the effective assistance of counsel is a fundamental right essential to a fair trial.  The failure of Richard's trial counsel to investigate his family background in the context of a capital murder case was inexcusable.  This is a classic case of ineffective assistance of counsel.  This Court should not put its stamp of approval on Richard's counsel's complete failure to investigate and present mitigation evidence during the sentencing phase of his capital murder trial.  A writ of habeas corpus should be issued.

## SUMMARY OF PETITIONER'S POSITION

Richard's defense was severely prejudiced by trial counsel's failure to investigate and present mitigation evidence in the punishment phase <u>and</u> to investigate and counter the State's aggravating evidence of sexual assault in the guilt and punishment phases.  Richard should be granted habeas corpus relief because the Texas Court of Criminal Appeals failed to conduct a rigorous analysis of these failures as required by clearly established federal law, including *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny.  As this Response makes clear, the Texas Court of Criminal Appeals merely adopted the trial court's clearly erroneous findings of fact and conclusions of law after a cursory review of the record.

**Failure to Investigate and Present Mitigation Evidence During the Sentencing Phase:**

Respondent contends that the state court reasonably rejected Richard's first ineffective assistance of counsel claim (relating to trial counsel's failure to investigate and present mitigation evidence during the sentencing phase) because the state court determined that trial counsel's failure to investigate Richard's biological parents and other family background "resulted from reasoned strategic judgment."  (*See* Respondent's Motion at 14-15 (quoting the trial court's findings of fact 3-6 & 8 and assuming that those findings are entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e))).

Respondent's position is without merit.  Trial counsel in the instant case did not conduct even a basic investigation of Richard's family, social and medical history as required by the American Bar Association standards and other professional standards of practice.  Because of trial counsel's deficient investigation, they were completely unaware of the following compelling mitigating evidence:

> •    That Richard's mother, Marta Vasquez, drank heavily during her pregnancy with Richard causing him to suffer

fetal alcohol syndrome. She was also despondent, depressed and neglectful;

- That Richard's father, Ricardo Vasquez, was a drug addict who had been in and out of prison most of his life for drug abuse and drug-related crimes. From the time Richard was a child, Richard saw his father using and dealing heroin, which Ricardo Vasquez sold off the front porch of his home;

- That when Richard was still an infant, Ricardo Vasquez took Richard to places to buy and use heavy drugs;

- That Ricardo taught Richard how to prepare and use heroin, which Richard began using when he was approximately 11 or 12 years old. Ricardo also taught Richard how to deal drugs;

- That Richard was traumatized after witnessing his father's arrest for heroin possession;

- That Richard's paternal uncle, Arnulfo Vasquez, died of a heroin overdose; his paternal uncle, Cleto Vasquez, also abused drugs and was shot in the head by drug dealers; and his paternal aunt's husband was shot and his body set on fire in a drug-related killing;

- That Richard's maternal uncle, Arturo Ramirez, is a drug addict and also has served time in jail;

- That both of Richard's grandfathers were alcoholics and one abused drugs;

- That Richard's sister's live-in boyfriend, Steve Velasquez, often used hard drugs with Richard; and

- That Richard's natural mother's live-in boyfriend, Joe Lopez, was a drug dealer and provided Richard with heroin.

Trial counsel likewise failed to ask their retained psychiatrist to evaluate Richard for mental deficiencies or provide their medical experts with other medical or social history which might have been used for purposes of mitigation. Trial counsel completely disregarded the opinion of those experts who suggested that further testing was required to rule out damage to

-4-

Richard's brain.  As a result, trial counsel failed to learn the full extent of Richard's learning disabilities and mental deficiencies.  The appropriate testing and discovery, which was performed in preparation for the state habeas proceeding, revealed that Richard suffers from post traumatic stress disorder, attention deficit disorder, poly-substance dependence, fetal alcohol syndrome, brain dysfunction, learning disabilities and a borderline IQ.

Not only did trial counsel lack sufficient information to make a reasoned strategic decision to disregard this mitigating evidence, but based on the information that trial counsel did have in their possession, they were compelled by prevailing standards of practice to investigate further.  Accordingly, the state court's factual and legal determinations that trial counsel acted reasonably or employed a reasonable trial strategy in failing to investigate this evidence are clearly erroneous and are not entitled to a presumption of correctness.  *See* 28 U.S.C. 2254(e)(1).  All of this evidence would have been admissible and would have informed the jury of important and compelling mitigating circumstances.  This was important evidence.  Had this available mitigation evidence been presented to the jury, there is a reasonable probability that the jury's sentence would have been different.

**Failure to Investigate and Counter the State's Evidence of Sexual Assault:**

Regarding Richard's second claim that he was denied effective assistance of counsel due to trial counsel's failure to investigate and counter the state's sexual assault evidence, Respondent asserts that had trial counsel taken any steps to discover and counter the state's DNA evidence, Richard's defense would have been harmed more than helped.  (Respondent's Motion at 27-29).  The basis for this incredible assertion is Respondent's contention that the DNA evidence presented at trial "was not a central issue to the case and to some extent benefited [Richard]."  (*Id*. at 29).

Respondent misses the mark completely.  Richard was clearly prejudiced by trial counsel's failure to investigate and counter the State's aggravating evidence of sexual assault. Although Richard confessed that on March 5, 1998 he hit Miranda in the head with his hand causing her injury, he vehemently and consistently denied sexually assaulting Miranda or injecting her with drugs.  (RR 37:118, 122-123, 140).[3]  The evidence presented at trial also shows that he did not intend to kill Miranda as evidenced by the fact that he called for emergency first responders to save Miranda's life and tried to resuscitate her the best he knew how by administering first aid and a crude method of CPR.  (RR 34:59; 37:95-99, 102).  During both the guilt and punishment phases of trial, this exculpatory and mitigating evidence was ultimately overshadowed by the State's repeated and unsubstantiated contention that Richard "brutally raped" Miranda and then cleaned her genitals to cover up the heinous act.  (RR 38:15-16, 37-38, 45, 46, 51-52, 53).  Although the State never indicted Richard for rape, prosecutors used circumstantial evidence of sexual assault to incite the passions of the jury against Richard and to suggest his motive and intent to kill Miranda.

Despite the fact that Richard's trial counsel was given notice before trial that the State might introduce evidence related to sexual assault, trial counsel inexplicably failed to investigate and discover this potential evidence, failed to object to its introduction, failed to scrutinize and test the evidence itself, and failed to present readily available alternate-theory evidence.  Taken

---

[3] Throughout this Response references to the Reporter's Record from the trial court will be cited in the following format: (RR Volume #: Page #).  References to the exhibits from the trial court will be cited as (RR Volume #: State's/Defendant's Ex. #).  References to the Clerk's Record from the trial court will be cited as (CR Volume #: Page #).  References to the Reporter's Record from the state habeas corpus evidentiary hearing will be cited as (SH Volume #: Page #). References to the exhibits from the state habeas evidentiary hearing will be cited as (SH Petitioner's/State's Ex. #).  Exhibits attached to the state habeas application will be cited as (SH App. Ex. #).  Exhibits to the federal habeas Petition will be cited as (FH Pet. Ex. #).

together, trial counsel's numerous failures on this issue are staggering.    Those failures are

summarized as follows:

- Failure to investigate the factual basis for the State's allegations of sexual assault, including failure to visit the Vasquez home, the scene of the alleged crime;

- Failure to discover, scrutinize and test the State's DNA evidence including the electronic files that contained the data from the DNA testing performed by Mr. Huy Nguyen;

- Failure to visit the crime lab where the DNA tests were performed or otherwise discover the processes and protocols used by the lab;

- Failure to investigate the audit reports of the crime lab to determine if the lab was properly accredited and following industry standards;

- Failure to object to the introduction of circumstantial evidence and expert testimony on the State's un-indicted theory of sexual assault;

- Failure to retain their own DNA expert to review and counter the conclusions of the State's forensic witnesses;

- Failure to investigate the DNA profiles for all of the individuals living in the household with Richard and Miranda to identify possible alternate sources of the State's DNA evidence;

- Failure to effectively cross-examine the State's witnesses or challenge the reliability of their methodology for diagnosing Miranda's injuries as the result of sexual assault;

- Failure to request a pretrial hearing under *State v. Kelly*, 824 S.W.2d 568 (Tex. Crim. App. 1992) to challenge the admissibility of the State's DNA evidence;

- Failure to call as a witness Dr. Bruce Henderson, the surgeon who examined Miranda before her death, who reported that injuries to Miranda's vaginal and anal area were the result of a straddle injury (an injury caused by falling with one's legs straddling an object such as a bicycle cross-bar);

- Failure to introduce in evidence the written narrative which contained Dr. Henderson's conclusion that the injuries to Miranda's vaginal and anal area were consistent with a straddle injury;

- Failure to call Dr. Randall Frost, a board certified pathologist, who was prepared to testify and who would have corroborated Dr. Henderson's written or verbal opinion;

- Failure to investigate and present testimony from Richard's family who were aware of other possible causes of a straddle injury to Miranda;

- Failure to introduce photos of the stationary exercise bike on which Miranda often played and may have fallen;

- Failure to have Richard examined by a psychologist to show that Petitioner does not have a psychological profile consistent with sexual abuse behavior; and,

- Failure to introduce testimony of Richard's family describing his history of appropriate conduct with children.

The state court, in evaluating Richard's application for habeas corpus relief, ignored these failures, deemed them irrelevant, or attributed them to "reasonable trial strategy."

The state court's findings and conclusions are objectively unreasonable. Evidence presented during the state habeas evidentiary hearing demonstrates that trial counsel's failures were significant. Specifically, the state habeas evidentiary hearing exposed the faulty techniques and analysis of the State's DNA expert, undermining the thin evidence the State used to link Richard to injuries found on Miranda's genitals. The State's DNA expert even admitted that there were serious flaws in the Corpus Christi crime lab's testing methodology and that his trial testimony misstated significant facts, calling into question forensic evidence the State used to argue Miranda was sexually assaulted by Richard. (*See generally* SH 2:131-150; 6:158-162). Because trial counsel failed to discover this evidence and failed to retain a forensics expert to evaluate and counter it, trial counsel's failures cannot be attributed to informed trial strategy.

Moreover, had defense counsel bothered to introduce evidence of which they were aware -- including photographs and testimony regarding the exercise equipment in the Vasquez home; Dr. Henderson's testimony and report; and the testimony of Dr. Frost -- they would have provided an authoritative, reasonable and compelling explanation for the injuries to Miranda's genitals that was not otherwise established at trial.   It is likely that because of trial counsel's failure to effectively defend Richard, including counsel's failure to competently challenge the un-indicted rape allegation and present readily available and compelling alternate-theory evidence, the jury returned a verdict of death.

In short, the jury that rendered the verdict of guilt to the indictment and the verdict of death was misled by faulty and incomplete evidence rendering both verdicts unreliable and unworthy of confidence.   The state court's attempt to label trial counsel's failure to discover and present this available mitigation evidence a "strategic decision" when trial counsel lacked sufficient information to rationally formulate and follow such a strategy is an objectively unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984) and subsequent United States Supreme Court precedent.   Additionally, the state habeas court's factual findings contradict the clear and convincing record evidence and thus amount to "an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."   28 U.S.C. § 2254(d)(1)-(2).   For these reasons, Richard Vasquez asks that this Court issue a writ of habeas corpus ordering his release from confinement or a new trial.

ARGUMENT[4]

I.    **The Legal Standard for Granting Habeas Corpus Relief Based on Claims of Ineffective Assistance of Trial Counsel**

   A.    **Unreasonable determination of the facts in light of the record evidence.**

Habeas corpus relief is justified when a petitioner demonstrates that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2).  When a petitioner demonstrates the unreasonableness of the state court's factual determinations by clear and convincing evidence the state court factual determinations are not entitled to a presumption of correctness.  *See* 28 U.S.C. § 2254(e)(1); *Ladd v. Cockrell*, 311 F.3d 349, 352 (5th Cir. 2002).

   B.    **Unreasonable application of clearly established federal law.**

Habeas corpus relief is also justified "if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts" of the petitioner's case.  *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).  *See also* 28 U.S.C. § 2254(d)(1).  To find that a state court's application of United States Supreme Court precedent was

---

[4] Because the state courts' fact findings are actually mixed findings of fact and conclusions of law, it is particularly difficult to separate the analysis of the court's clearly erroneous factual findings from the court's objectively unreasonable application of United States Supreme Court precedent.  Accordingly, this Response will address both the "unreasonable determination" and the "unreasonable application" prongs of the Antiterrorism and Effective Death Penalty Act ("AEDPA") together in the context of Richard's first two claims for habeas corpus relief.  Specifically, after setting out the applicable legal standards, this Response addresses the Texas Court of Criminal Appeals' clearly erroneous factual findings and objectively unreasonable application of federal law related to Richard's claims that trial counsel failed to investigate and present evidence of mitigation during the sentencing phase of trial.  After addressing those deficiencies, Richard details the state court's deficient findings and conclusions regarding Richard's claim that trial counsel failed to investigate and counter the state's aggravating evidence of sexual assault during both the trial's liability and sentencing phases.

"unreasonable," a federal court must determine that the state court's decision was "objectively unreasonable" and not merely incorrect or erroneous.  *Wiggins*, 539 U.S. at 520-21.

The controlling legal principles the Supreme Court established for ineffective assistance of counsel claims are set out in *Strickland*, 466 U.S. 668.    *Strickland* makes clear that to establish a claim for ineffective assistance, a petitioner must demonstrate (1) that counsel's performance was deficient, and (2) that the deficiency prejudiced petitioner's defense.  *Id*. at 687. *Strickland* also requires that, in reviewing these elements, a court conduct its own thorough assessment of the reasonableness of trial counsel's investigation.  A reviewing federal court should grant the writ when the state court fails to correctly apply these clearly established precedents and consequently fails to grant habeas corpus relief.

> **1.    Prevailing professional norms as indicated by American Bar Association Standards require trial counsel to discover all reasonably available mitigating and aggravating evidence.**

A petitioner establishes the deficiency of trial counsel's performance by comparing it to "an objective standard of reasonableness" as set by prevailing professional norms and demonstrating that trial counsel's performance fell below that objective standard.  *Id.* at 688. When evaluating claims of ineffective assistance stemming from trial counsel's decision to limit the scope of their investigation into potential mitigating evidence, the Supreme Court has repeatedly referred to the American Bar Association Standards for Criminal Justice as guides to determine prevailing professional norms.  *See, e.g.*, *Wiggins*, 539 U.S. at 524 (holding that counsel's investigation "fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long have referred as 'guides to determining what is reasonable'"); *Williams*, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p 4-55 (2d ed. 1980)); *Strickland*, 466 U.S. at 688-89 ("prevailing norms of practice as reflected in American Bar Association standards and the

like . . . are guides to determine what is reasonable").  Specifically, *Wiggins* observes that "[t]he

ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to

discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating

evidence that may be introduced by the prosecutor."  *Wiggins*, 539 U.S. at 524 (emphasis in

original) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death

Penalty Cases ("ABA Guidelines") 11.4.1(C), p 93 (1989)).[5]  The defendant's family and social

history are prominent among the topics counsel should consider.  *See id.* (citing ABA Guidelines

11.8.6, p 133).  The recent case of *Rompilla v. Beard*, 545 U.S. 374, 377, 387 (2005) also refers

to the ABA standards as the basis for counsel's duty to make reasonable efforts to obtain and

review aggravating evidence that counsel knows the prosecutor will probably rely on at trial.

(citing ABA Standards for Criminal Justice, Prosecution Function and Defense Function 4-4.1

(3d ed. 1993)).

> **2.    Clearly established federal law requires a discerning review of trial counsel's "strategic" decisions not to investigate all reasonably available evidence.**

Defining the limits of this duty to investigate, *Strickland* instructs that trial counsel's

*strategic decisions* to limit the scope of their investigation of potential mitigating or aggravating

evidence must be supported by a reasonable professional judgment.  The *Strickland* Court stated

as follows:

> Strategic choices made after thorough investigation of law and
> facts relevant to plausible options are virtually unchallengeable;
> and strategic choices made after less than complete investigation
> are reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation.  In other words,
> counsel has a duty to make reasonable investigations or to make a
> reasonable   decision   that   makes   particular   investigations

---

[5] The 1989 version of the ABA Guidelines was not superseded until February, 2003 and thus constituted the "prevailing professional norm" during the period leading up to and including the trial in the instant case.

> unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.  However, an attorney's decision to limit his investigation must flow from an informed judgment.  *Baxter v. Thomas*, 45 F.3d 1501, 1514 (11th Cir. 1995).  Thus, federal courts reject the notion that a "strategic" decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.  *Id*.  Additionally, the United States Supreme Court instructs that in assessing the reasonableness of an attorney's investigation, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.  *Wiggins*, 539 U.S. at 527; *see also Rompilla*, 545 U.S. at 383 (holding that defense counsel acted unreasonably in failing to investigate the defendant's prior conviction file when counsel knew that the prosecution intended to seek the death penalty based on aggravating evidence of the defendant's prior convictions).

The Supreme Court's decision in *Wiggins* mandates that the death sentence issued against Richard be set aside.  In *Wiggins*, a 77 year old victim was found drowned in the bathtub of her apartment.  The apartment was ransacked and the defendant Wiggins was indicted and convicted of first degree murder, robbery, and two counts of theft.  *Id*. at 514.  During the sentencing phase of the trial, Wiggins' two public defenders promised the jury in their opening statement, "[y]ou're going to hear that Kevin Wiggins has had a difficult life.  It has not been easy for him."  *Id*. at 515.  However, during the proceedings counsel did not introduce any evidence of Wiggins' life history or family background.  *Id*.

In the post-conviction proceedings Wiggins challenged the adequacy of his representation at sentencing and introduced the social history report of a mitigation expert.  *Id*. at 516.  That

-13-

report contained evidence of severe physical and sexual abuse Wiggins suffered at the hands of his mother and while in the care of foster parents. *Id*. at 516-17. It also detailed Wiggins' mother's chronic alcoholism and frequent neglect and abuse of her children. *Id*. Trial counsel attempted to justify their failure to introduce this evidence by claiming that they made a tactical decision to focus their efforts on "retrying the factual case" and disputing Wiggins' direct responsibility for the murder. *Id*. at 517. Additionally, the state court found that counsel knew some details of Wiggins' unfortunate childhood from Wiggins' parole records and social service records that recorded incidences of physical and sexual abuse, an alcoholic mother, placements in foster care, and borderline retardation. *Id*. at 518. Based on these facts, the state court concluded that counsel *did* investigate and *were aware* of Wiggins background but "made a reasoned choice to proceed with what they thought was their best defense." *Id*.

However, the Supreme Court was much more discerning than the state court in its review of trial counsel's investigation and purported trial tactics.[6] The Supreme Court observed that although funds were available to retain a forensic social worker, counsel failed to take advantage of those funds and expand their investigation beyond the parole records and social service records counsel had available to them. *Id*. at 524. The Supreme Court stated that trial counsel's decision to limit their investigation to these documents was unreasonable particularly in light of the fact that these records contained information that would have led a reasonable attorney to investigate further. *Id*. at 525. The Supreme Court also scrutinized trial counsel's claim that they made a strategic decision to limit their investigation calling this argument "more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to

---

[6] As *Wiggins* makes clear, the Supreme Court is well aware that state courts and respondents all invoke the "strategic decision" rationale "to justify counsel's limited pursuit of mitigating evidence." *Wiggins*, 539 U.S at 526-27. The Supreme Court expressly held that federal courts are not to accept this justification at face value.

sentencing." *Id*. at 526-27.  The Supreme Court based this assessment on the fact that counsel did not uncover any evidence to suggest that a mitigation case would have been counterproductive or that further investigation would have been fruitless.  *Id*. at 525.  The Supreme Court also observed, based in part on counsel's promise to the jury that they would show Wiggins had a difficult life, that counsel did not in fact follow the rigid trial "strategy" they claimed justified their limited investigation.  *Id*. at 526.

Accordingly, clearly established Supreme Court precedent requires courts to conduct a rigorous analysis of the reasonableness of trial counsel's investigation of mitigating evidence.  *Id*. at 523.  Even when counsel claims to limit their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to trial or sentencing strategy.  *See id*. at 527.  To the contrary, a reviewing court must consider the reasonableness of the investigation which trial counsel claims supports that strategy. *Id*.

> **3.  The Petitioner is entitled to relief when, but for trial counsel's deficient performance, a reasonable juror could have concluded that the death penalty was not an appropriate punishment.**

Once a petitioner establishes that his trial counsel's performance fell below the objective standard of reasonableness, the second prong of *Strickland* requires a petitioner to demonstrate that his counsel's deficient representation prejudiced the defense.  *Strickland*, 466 U.S. at 692. When considering prejudice, the test a court should employ is not whether it may be possible that a jury could have heard all of the evidence and still have decided on the death penalty.[7]

---

[7] Nevertheless, this is precisely the standard that Respondent would have this Court apply.  Respondent contends as follows:

> Even if the strategy now advanced had been followed at trial, the jury would have still heard all this evidence and still been free to conclude that Vasquez sexually assaulted Miranda in addition to

*Rompilla,* 545 U.S. at 393.  Instead, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.  In assessing prejudice, a court must reweigh the aggravating evidence against the totality of available mitigating evidence and consider whether the "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [the defendant's] moral culpability." *Wiggins,* 539 U.S. at 538 (quoting *Williams* 529 U.S. at 398).  If the reviewing court can conclude "that a juror could have *reasonably* concluded that the death penalty was not an appropriate penalty in this case based on the mitigating evidence, prejudice will have been established." *Lockett v. Anderson*, 230 F.3d 695, 716 (5th Cir. 2000) (emphasis added).

**II.   The State Court's Decision to Deny The Claim that Trial Counsel Were Ineffective Because They Did Not Conduct a Reasonable Investigation of Mitigating Evidence of Richard's Family Background, Social History, And Mental Deficiencies Was Based on Clearly Erroneous Findings of Fact, Involved Unreasonable Factual Determinations in Light of Evidence at Trial, and Involved an Unreasonable Application of Clearly Established Federal Law.**

Clear and convincing evidence of trial counsel's failure to investigate Richard's horrific family background, social history, and serious mental deficiencies (evidence Richard's state habeas counsel presented during the state evidentiary hearing) rebuts the state court's findings of fact supporting the Texas Court of Criminal Appeals' decision to deny habeas relief.  This record evidence also demonstrates that the state court's application of United States Supreme Court precedent was objectively unreasonable because, had the state court conducted the thorough analysis of trial counsel's decisions to limit their investigation of mitigating evidence that

> beating her to death. . . . some facts are too brutal for any additional mitigating evidence to overcome.

Respondent's Motion at 31-32.

*Strickland* requires, the court would have concluded that trial counsel's decisions cannot be justified as reasoned trial strategy.  Ultimately, Richard's defense was prejudiced by trial counsel's failures to investigate because the jury was unaware of Richard's very early introduction and repeated exposure to crime, hard drugs, abuse, and violent death by his natural parents and extended family.  The jury was also deprived of important mitigating information concerning Richard's mental deficiencies including his fetal alcohol syndrome, brain dysfunction, and low IQ -- information clearly affecting his moral culpability.  This available but uninvestigated evidence of Richard's troubled family background and mental impairment relates directly to the motivation and influences that affected Richard's conduct on the day Miranda Lopez was killed and would likely have persuaded at least one juror to reasonably vote against the death penalty in this case.

### A.   Trial counsel's failure to investigate mitigation evidence from Petitioner's family and social history.

The state court's somewhat redundant findings three, four, five and six each relate to trial counsel's failure to investigate mitigation evidence of Richard's family and social history and state as follows:

> 3.   The Court finds that, Vasquez's trial attorneys reasonably determined that pursuing further evidence of Vasquez's social history was unnecessary to make an informed choice among possible defenses, and their failure to investigate further the negative influence that Vasquez's biological parents played in his early years resulted from a reasoned strategic judgment and not from inattention.

> 4.   The court [sic] finds that all of Vasquez's trial attorneys were aware of his biological parents and his family history involving drug abuse and violence, but that they made a reasonable strategic decision to portray Vasquez as coming from a good home, as far as his adoptive parents, and that it would have been inconsistent with that strategy to present evidence concerning Vasquez's exposure to drugs and violence at an early age.

5.      The Court finds that Vasquez's trial attorney Joseph Collina gathered sufficient information about Vasquez's social background through meetings with Vasquez and his adoptive parents, that his decision not to interview the biological parents because they could not provide additional information and would not have been good witnesses was reasonable under the circumstances, and that his decision not to hire an independent mitigation expert was reasonable because he already had sufficient evidence.

6.      The Court finds that Vasquez's trial attorney Joseph Collina was aware that Vasquez's biological parents had an influence on him at a very young age, but made a reasonable strategic decision to portray Vasquez as coming from a good home without adverse influences and to bring out all that his adoptive parents had done for him, and not to say much about the biological parents at trial for fear of "throw[ing] mud" at the good impression Vasquez's adoptive family made.

(FH Pet. Ex. A).

These factual and legal findings are clearly erroneous and objectively unreasonable because they contradict the undisputed evidence presented during the state evidentiary hearing.

> **1.      Trial counsel were not aware of Richard's horrific social and family history and their failure to investigate that history fell below prevailing professional norms.**

Trial counsel did very little to investigate Richard's family and social history.  Trial counsel admitted during the state habeas evidentiary hearing that they did not even hire a mitigation specialist to assist them in their mitigation investigation.  (SH 3:54; 7:11).  Instead, they hired Jan Davis, a semi-retired former probation officer, purportedly to conduct some witness interviews.  (SH 3:21).  Counsel conceded that Mr. Davis had absolutely no prior experience investigating mitigation in a capital murder case.  (SH 3:34).  He spent a total of 8.5 hours working on the case, including time spent traveling a total of 110 miles.  (*See* SH App. Ex.

13).  The trial court approved a $1000 allotment for the services of Mr. Davis, but defense

counsel only used $448.22 of that amount for his time and expenses.  (*Id.).*

       As a result, trial counsel were clearly not "aware of [Richard's] biological parents and his

family history involving drug abuse and violence," as finding four concludes.  They could not

have been because they failed to interview anyone concerning this family history.  Olivia

Vasquez, Richard's aunt and adoptive mother, testified during the state habeas proceeding that

"[n]one of Richard's lawyers at the trial ever talked to me about any of the information about our

family's and Richard's dealings with his [biological] father."  (SH Petitioner's Ex. 22 ¶ 32).

Richard's uncle and adoptive father, Juan Vasquez, likewise filed an affidavit stating that

Richard's trial attorneys did not ask him any information about his family's history.  (SH

Petitioner's Ex. 21 ¶ 33).

       Trial counsel's recollections of investigating Richard's family history are sketchy at best.

Regarding Olivia's statement that she was never interviewed about Richard's relationship with

his natural father, Mr. Bujanos, the lawyer who questioned both Olivia and Juan during the

sentencing phase of the trial, answered as follows:

> I don't know.  I was aware that there was some strife with the
> father, that there was a tumultuous relationship.  And it's very, very
> difficult to recall.  I want to be honest here and truthful, but it's
> very difficult to recall exactly what was said.  And if that's her
> recollection, then I believe she is telling the truth.  I just don't
> know for certain.

(SH 7:13).  When asked later if he knew that Richard's father was in and out of prison most of

Richard's life he stated that he heard that Richard's father "had some problems" but conceded that

he didn't know if he "ran across" that fact until after the trial was over.  (SH 7:16).  He freely

admitted that he did not know that Richard's father taught Richard to shoot heroin at age 12.

(*Id*.).  He said he did not know that Richard's father taught Richard to steal and rob and sell

drugs.  (*Id.*).  He also was not informed that when Richard was 11 years old he witnessed his father's arrest at his grandmother's house or that the event had a serious emotional impact on Richard.  (SH 7:17).  He stated that he did not know that three of Richard's uncles died violent deaths.  (SH 7:18).

Mr. Bujanos also admitted he was not aware of the fact that Richard's mother drank beer and hard liquor during her pregnancy with Richard.  (SH 7:14).  He acknowledged that he never met Richard's mother and that he did not even know her name.  (SH 7:14).  He stated that he did not know about her drinking habit and that such information would have been "extremely helpful" mitigation evidence.  (*Id.*).  Speaking generally regarding the preparation of witnesses for the penalty phase of the trial, Mr. Bujanos said: "it didn't seem to me that there was enough advance preparation, in my mind."[8]  (SH 7:11).

Mr. Gilmore, another one of Richard's trial lawyers, likewise could not remember most of the specific details regarding his investigation of Richard's social history.  (*See* SH 2:217-20, 226-27).  He stated that he did not recall what he did personally to investigate mitigation in Richard's case and he did not recall speaking with Richard's mother or father.  (SH 2:219-20).

The third and final member of Richard's trial counsel, Joseph Collina, testified that counsel did not attempt to interview Richard's biological father, Ricardo Vasquez, or Richard's

---

[8] When asked about what the trial attorneys did after each day of trial during the case in chief and penalty phase, Mr. Bujanos answered as follows:

> . . . during the case in chief, very little outside of adjourning for court for the day.  Very little planning that I was aware of happened.  A stark recollection I have is that the Spurs were in the playoffs.  And I asked Mr. Gilmore if we were going to do anything to get ready, and he laughed and told me he was going to watch the Spurs.

(SH 7:20).

biological mother, Marta Vasquez, to find out their roles in Richard's life.  (SH 3:37-38).  Likewise, they failed to interview Richard's sister, Brenda Vasquez, Richard's cousins, and Richard's childhood caretaker, each of whom were available and willing to testify regarding Richard's social history.  (*See* Petitioner's Exs. 25-29; SH 3:35).  Trial counsel also failed to interview Miranda's mother and Richard's girlfriend, Brenda Lopez, even though she indicated she was willing to talk to defense counsel if prosecutors and legal aid representatives could be present.  (SH 3:36-37).

Trial counsel acknowledged that because they did not do the necessary investigation, there were many things in Richard's background that they never knew, and thus could not convey to the jury.  (SH 3:55).  Among the information trial counsel did not know was that Richard's mother drank beer and hard liquor during her pregnancy with Richard, causing Richard to suffer from fetal alcohol syndrome.  (SH 3:40, 127; 4:136-37; Petitioner's Exs. 20, 21, 22, 23).  They were not aware that Richard's family had a long history of drug abuse and depression.  (SH 4:43; SH Petitioner's Exs. 21, 22, 23, 24).  They had no idea that Richard's natural father often interacted with Richard during Richard's childhood and early teenage years and had a profound negative and corrupting impact on Richard's life.  (SH 3:120-28).

Richard's father, Ricardo Vasquez, was a drug addict.  Ricardo testified at the state habeas evidentiary hearing that he began using heroin and cocaine when he was approximately 14 years old and has been addicted for about 25 years.  (SH 3:116-17).  He stated that he has been in and out of prison most of his life for drug abuse and drug-related crimes.  (SH 3:117, SH Petitioner's Ex. 24).  From the time Richard was an infant, Ricardo took Richard places to buy and use drugs.  (SH 3:120).  From a very young age, Richard saw his father using and dealing heroin, which Ricardo sold off the front porch of his home.  (SH 3:121).  Even after Richard

moved in with Juan and Olivia, Ricardo frequently visited Richard and took him with him whenever he wanted to.  (SH 3:127).  Richard liked to be with his father and frequently hung out with Ricardo when Ricardo was out of prison.  (SH 3:124, 127).  As Richard grew older, Ricardo took him with him when he would rob houses to fund his drug habit.  (SH 3:121-22; SH Petitioner's Ex. 24 ¶ 13).  Ricardo taught Richard how to prepare and use heroin, which Richard began using when he was approximately 11 or 12 years old.  (RR 39:100; SH 3:124).  Ricardo also taught Richard how to deal drugs.  (SH 3:125).  About that same time when Richard was visiting his grandmother's house, Richard witnessed his father's arrest for heroin possession.  (SH Petitioner's Ex. 22 ¶ 17).  The event upset Richard so much he cried for days afterward.  (*Id.*).

Trial counsel was also not aware of the many other bad influences in Richard's family life.  Both of Richard's grandfathers were alcoholics and one abused drugs.  (SH Petitioner's Ex. 22 ¶ 19).  Richard's sister's live-in boyfriend, Steve Velasquez, often used hard drugs with Richard.  (SH Petitioner's Ex. 22 ¶ 22).  Richard's natural mother's live-in boyfriend, Joe Lopez, was a drug dealer and provided Richard with heroin.  (SH Petitioner's Ex. 23 ¶ 22).  Richard's paternal uncle, Arnulfo Vasquez, died of a heroin overdose; his paternal uncle, Cleto Vasquez, also abused drugs and was shot in the head by drug dealers; and his paternal aunt's husband was shot and his body set on fire in a drug-related killing.  (SH Petitioner's Exs. 22, 23, 24).  Richard's maternal uncle, Arturo Ramirez, is a drug addict and also has served time in jail.  (SH Petitioner's Ex. 23 ¶ 19).  Richard's cousins, Robert Mungia and Chris Ramirez, are also drug addicts who used to hang around with Richard.  (*Id.*).

This clear and convincing evidence of trial counsel's failure to investigate important and readily available mitigating evidence of Richard's family background demonstrates that trial counsel's investigation fell below the "objective standard of reasonableness."  Based on their own

admissions, it is apparent that trial counsel failed to "discover all reasonably available mitigating evidence" as required by prevailing professional norms as articulated in the ABA Guidelines and Supreme Court precedent.  *See Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p 93 (1989)).  *Wiggins* makes clear that the defendant's family and social history are prominent among the topics counsel should consider in any mitigation investigation.  *See id.* (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6, p 133).  However, as noted above, Mr. Bujanos testified that defense counsel did little advance preparation for the punishment phase of the trial, merely interviewing the Vasquez family members for mitigation purposes in the hallway outside the courtroom.  (SH 7:11, 13).  A last-minute interview conducted in such a public setting simply could not have been sufficient to inform trial counsel of Richard's extensive and horrific family history.

Nevertheless, even if we assume, as Mr. Bujanos suggested, that trial counsel had some awareness of a "tumultuous relationship" with Richard's father, such an awareness does not justify trial counsel's failure to investigate further.  To the contrary, viewed from trial counsel's perspective at the time, if they did have some idea that there was "strife" and "tumult" related to Richard's natural parents, they had all the more reason to conduct a thorough investigation to find out if that conflict might have affected Richard.  As was the case in *Wiggins*, there is nothing in the record here to suggest that trial counsel uncovered any evidence during their investigation to suggest that further investigation would have been counterproductive.  *Cf.*, *Wiggins*, 539 U.S. at 525.  As *Wiggins* makes clear, "[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to

investigate further." *Wiggins*, 539 U.S. at 527.  The state court failed to make this assessment and thus its finding that "Vasquez's trial attorneys reasonably determined that pursuing further evidence of Vasquez's social history was unnecessary to make an informed choice among possible defenses"[9] was based on an objectively unreasonable application of clearly established federal law.

### 2. Trial counsel's failure to investigate Richard's family and social history was not an informed strategic decision.

The conclusion of the state court -- either implicit or expressed in each of the above-listed findings (three through six) -- that trial counsel's failure to investigate Richard's background was somehow the product of a strategic decision is also unreasonable.  This is true because *Strickland* demands more than the mere decision of a strategic choice by counsel.  It requires "informed strategic choices."  *Lockett*, 230 F.3d at 714.  As noted above, trial counsel here was not in possession of sufficient information to make an informed strategic decision.  Because trial attorney Joseph Collina never met Richard's biological parents and did not know anything about the information they might possess, he had no idea that they "could not provide additional information and would not have been good witnesses" as finding number five concludes.  For this same reason it is unreasonable to assume that trial counsel made a strategic decision to portray Richard as "coming from a good home" instead of presenting evidence concerning Richard's natural parents as findings four and six assert.  Trial counsel could not have made such a "strategic" choice because they simply were not aware of one of the strategic alternatives -- namely the option of presenting evidence that Richard's natural parents exposed him to drugs and violence at an early age.

---

[9] *See* Finding no. 3, *supra*.

Incredibly, Mr. Collina suggested that "[Richard's] adoptive parents, who were closely related, brother and sister to the natural parents, were to testify <u>and did testify</u> that he was maltreated, ignored, and even -- his natural parents even contributed to his delinquency. And the jury was made aware of that." (SH 3:37) (emphasis added). This is simply not true. A thorough review of the trial record demonstrates that no such testimony was introduced at trial. (*See* RR 39:77-92). However, Mr. Collina's testimony underscores two important points. First, we see clearly that by the time of the state habeas evidentiary hearing, Mr. Collina's memory of the mitigation investigation and the sentencing hearing was not reliable. We also see that at least one trial attorney believed that the defense actually did not follow a rigid "good home" strategy at the expense of evidence of Richard's troubled family history as the state court assumed they did.

Trial counsel clearly did try to generate sympathy for Richard's family (*See* RR 40:27-28). However, trial counsel acknowledged to the jury that Richard's family was aware of problems in their home. Mr. Bujanos conceded as follows:

> They may have understood that there was something wrong in their household. I know they had to have, we all know that. But who imagines something like this would happen. Certainly there has been no indication with thefts, juvenile misconduct, drug use, that a tragedy of this proportion would happen.

(RR 40:27). Mr. Collina went farther suggesting that Richard's adoptive parents had some culpability for Richard's predicament saying, "I suppose they were negligent in maybe when he was 12, they should have said 'Look, you little son of a gun, we're going to lock you up until you stop using drugs.' They too are going to pay for that mistake . . . ." (RR 40:20).

More importantly, the state court's premise that an argument that Richard's adoptive parents tried to provide Richard with a good home was somehow mutually exclusive of an

argument showing that Richard is the victim of negative influences from Richard's natural parents and extended family is fundamentally flawed.  It is not hard to see how counsel could argue that Richard's adoptive parents, his aunt and uncle, did their best to provide a loving home and thus deserve the jury's sympathy and, at the same time, argue that Richard was victimized by influences outside that loving home, including his biological mother and father.  Mr. Bujanos tried to make this very point in response to the State's questioning in the state habeas proceeding.

> Q.  A little bit ago you said "Richard is a redeemable human being, how nice the family was might sway the jury."  So I'm going to ask you a question about that now, about that comment.  Wouldn't it be -- wouldn't it not be inconsistent with sound trial strategy to present both evidence of a good family and bad family environment?  Would those not be mutually exclusive trial strategies?
>
> A.  To show that --
>
> Q.  Good family versus bad family environment.
>
> A   Yeah. You'd have to do one or the other.
>
>           MS. GLEIMER:      That's all I have.
>
>           THE WITNESS:      Wait, wait.
>
> Q.  (By Ms. Gleimer)      Excuse me?
>
> A.  Now, let me -- there may be -- in families there's different members of families. Some may be good and some may be bad.  And I think that's a part of an entire family.  So I'd have to say that saying that they're mutually exclusive might be an oversimplification.  I mean, for example, with Richard's father, that was a bad family situation; whereas –
>
> Q.  The aunt and uncle would be good?
>
> A.  -- Juan and Olivia Vasquez, from what I saw, that would have been -- you know, they were trying to be good parents. . . .

(SH 7:39-40).  Mr. Bujanos correctly stated that it is an oversimplification to assume that counsel could not generate sympathy for Richard's adoptive parents *and*, simultaneously, show the jury how negative influences outside their home, including influences from Richard's natural parents and extended family, affected Richard's attitudes and behavior.

In fact, a review of defense counsel's closing argument in the sentencing phase of this case reveals that trial counsel was not consistent in advancing their purported "good home" theory.  Like the argument of trial counsel in *Wiggins*, the record here demonstrates that Richard's counsel put on a half-hearted mitigation case touching briefly on multiple unrelated topics including, among other things, that Richard is a victim of "the dark underside of our society," that a life sentence is not "a kiss on the cheek," that Richard will not be a danger in captivity, that Richard sacrificed his own interests in an attempt to save the victim by calling 911, that Richard's infant daughter Megan deserved sympathy, etc.  (*See, e.g*., RR 40:17, 18, 23, 24).  Employing this "shotgun" approach, trial counsel attempted, among other things, to advance the argument that Richard came from a good home and at the same time argue that Richard was the victim of a bad environment.

Trial counsel repeatedly argued that Richard was exposed to corrupting influences and became a victim of individuals from the "dark underside of our society."  Mr. Collina argued:

> The dark underside of our society is the society of drugs, particularly when it impacts on children.  Richard Vasquez, as you have determined, is a criminal.  He is also a crime victim.
>
>  . . .
>
> It is also mitigating that he has to grow up in a society where we have this dark side to our society and where he got involved in drugs and crime.

(RR 40:17, 24).    Investigation of Richard's family background, including his troubled relationship with his natural parents (who did not have custody of Richard for most of his life), and investigation of his natural parents' and extended family's history of drug abuse and violence, is completely consistent with Mr. Collina's closing argument in which he blames outside influences for Richard's involvement in drugs and crime.  It is also consistent with the argument made throughout the trial that despite Richard's "good home" with his adoptive parents, he became entangled in the wrong crowd and could not free himself of the influence of drugs.  (*See, e.g.*, RR 37:21-22, 70-78).  Focusing on the pervasive and corrupting influence of Richard's natural parents' and his extended family's addictions to liquor and hard drugs from before he was even born provides additional explanation for Richard's own addictions, and reinforces the idea that Richard had little or no chance to escape that destructive influence.

Because trial counsel's purported "good home" strategy does not contradict a mitigation strategy emphasizing Richard's early introduction to drugs by his natural parents and extended family, the state court's justification of trial counsel's failure to investigate this mitigation evidence closely resembles the "*post-hoc* rationalization of counsel's conduct" rejected by *Wiggins*.  *See Wiggins*, 539 U.S. at 526-27.  As the Supreme Court did in *Wiggins*, this Court should determine that the state court's decision here was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Additionally, the Court should determine that the state court's application of *Strickland* was objectively unreasonable because trial counsel's failure to investigate and present mitigating evidence of Richard's family and social history cannot be justified as an informed strategic decision.

### 3. Trial counsel's failure to investigate Richard's family and social history was prejudicial to Richard's defense.

As a result of trial counsel's failure to perform the necessary investigation regarding Richard's family and social history, the jury never knew about Richard's family's disturbing legacy of hard drug abuse, crime, depression and violent death discussed above. The jury was also not informed that Richard was exposed to these profoundly negative influences and experiences at a very young age by multiple individuals he cared about and looked up to in his life. This available, but uninvestigated history, relates directly to the cause of Richard's own heroin addiction, criminal behavior and depression -- the very things that contributed to Richard's attitude and behavior on the day Miranda Lopez was killed.

If these mitigating facts had been investigated and presented to the jury during the sentencing phase of the trial it is probable that the result of that trial phase would have been different. This is true because the uninvestigated evidence presents a far more compelling picture of Richard than the one the jury was shown. The jury was told how Richard ran with a bad crowd in Robstown, Texas and eventually became addicted to drugs. (*See, e.g.*, RR 39:79-80, 87, 89). Although regrettable, the jury may not have been particularly sympathetic to this narrow view of the facts because they may have assumed that Richard had a choice in deciding the type of friends he allowed to influence him. Assuming that Richard's drug addiction was essentially self-induced, the jury may not have considered his drug addiction to be particularly mitigating. They may even have assumed that Richard brought upon himself the consequences that followed from his addiction and resulting depression, including Miranda's death.

On the other hand, had the jury been provided the readily available additional information regarding the pervasive alcoholism and drug abuse in Richard's family, including the fact that Richard's father actually introduced him to hard drugs and crime as a very young child and

taught him to inject heroin when he was only 11 or 12 years old, the jury would have been far more inclined to see Richard as a victim of unusual and horribly unfortunate circumstances that were beyond his own control.  Richard's trial counsel's failure to do the necessary investigation of Richard's family and social history, and their resulting failure to show the jury the compelling mitigating evidence that such an investigation would have produced, prejudiced Richard's defense and undermines all confidence in the jury's verdict.

**B.      Trial counsel's failure to investigate mitigation evidence of Richard's mental deficiencies.**

In addition to making findings related to trial counsel's failure to investigate Richard's family and social history, at the conclusion of the state habeas evidentiary hearing the state court also made several findings related to trial counsel's investigation of Richard's cognitive and learning disabilities.  For example, among others, the court made the following findings:

> 7.     The Court finds that Vasquez's trial attorneys reasonably hired and relied upon the advice of psychiatrist Dr. Carlos Estrada, as their expert to examine Vasquez's mental status, explore mitigating circumstances, and determine what psychological testing needed to be done.

> . . .

> 9.     The Court finds that Vasquez's trial attorneys complied with Dr. Estrada's suggestion that Dr. Bonikowski perform a neurological study on Vasquez's brain to determine if it had been damaged by a prior automobile accident, but that Dr. Bonikowski's further recommendation for a QEEG and neuropsychological testing was for treatment of Vasquez's headaches and was irrelevant to possible mitigation defenses or to explain his violent behavior, such that it was reasonable for Vasquez's trial attorneys not to seek further testing.

> . . .

> 11.     The Court finds that known evidence concerning Vasquez's mental status, as gathered and reported by Dr. Estrada, would not have led a reasonable attorney to investigate

> further, and that Vasquez's trial attorneys reasonably
> determined that pursuing further evidence of brain
> dysfunction was unnecessary to make an informed choice
> among possible defenses.
>
> . . .
>
> 13.    The Court finds that Vasquez's trial attorneys exercised
> reasonable trial strategy in declining to portray him as
> learning disabled, for fear that this might lead the jury to
> believe that he could not control himself and would be a
> future danger.

(FH Pet. Ex. A).

The Court of Criminal Appeals adopted each of these factual and legal conclusions

without any discussion.  The sum total of the Court's analysis is as follows:

> This Court has reviewed the record with respect to the allegations
> made by applicant.  We adopt the trial judge's findings and
> conclusions.  Based upon the trial court's findings and conclusions
> and our own review, the relief sought is denied.

*Ex Parte Richard Vasquez*, WR 59,201-01 and -02 (Tex. Crim. App. 2004), Slip Op. at 2.

> **1.    The state court findings and conclusions are objectively unreasonable
> due to trial counsel's failure to provide sufficient information to their
> retained experts and their failure to follow the experts' advice.**

> a.    *Trial counsel's failure to provide background information to their
> retained experts.*

Contrary to the state court findings, the record demonstrates that trial counsel did almost

nothing to investigate Richard's mental and learning disabilities.  The only medical experts trial

counsel retained were a psychiatrist, Dr. Carlos Estrada, and at Dr. Estrada's recommendation, a

neurologist, Dr. Frank Bonikowski.  However, counsel did not provide either of these experts

with sufficient background information on Richard's medical, educational, and social history to

sufficiently inform their evaluation of Richard.  (SH 7:66, 71, 79).  As noted above, the record

shows that counsel retained an "absolutely" inexperienced investigator, Jan Davis, ostensibly to

-31-

conduct witness interviews, but then they only utilized him for 8.5 hours, much of which was consumed in meetings with counsel and travel time.  (SH 3:34; SH Petitioner's Ex. 13).  Trial counsel admitted that they did not request any of Mr. Vasquez's medical records despite their knowledge that Richard had suffered a closed head injury in an auto-train accident.  (SH 3:34-35; 7:70).  Trial counsel also admitted that they did not independently request Richard's school records, but instead relied on the limited records provided to them by the State.  (SH 3:33-34).  As noted above, they failed to interview Richard's natural parents and most of Richard's family.  (SH 3:35-38).  To the extent they interviewed anyone, they did it hastily in the courtroom hallway during the trial.  (SH 7:11, 13).

Because trial counsel failed to do the necessary investigation of Richard's medical and social history, Dr. Estrada was never given any medical records, school records or interviews with family members to assist him in his evaluation of Mr. Vasquez.  (SH 7:66, 71, 79).   In fact, Dr. Estrada testified that he was not even provided the few school records trial counsel did obtain from the State in discovery.  (*Id.*).  Consequently, he had insufficient information to evaluate Mr. Vasquez for learning disabilities or to detect symptoms of attention deficit hyperactivity disorder.  (SH 7:79-80).

Defense counsel also did not provide Dr. Estrada with any information about Mr. Vasquez's natural mother or ask him to explore the possibility that Mr. Vasquez suffered from fetal alcohol syndrome.  (SH 7:81-82).  Dr. Estrada testified that all of this information would have been helpful to his evaluation and would have been important mitigation evidence.  (SH 7: 71, 79, 82-84).  Dr. Estrada was basically limited to the information he could glean on his own during two face-to-face interviews with Richard.  (SH 7:72).  He testified that this arrangement

was less than ideal because obtaining information from the defendant himself does not always produce the most accurate medical and social history.  (SH 7:71).

Overlooking all of this record evidence demonstrating that trial counsel's failure to present their experts with sufficient background information to conduct an informed analysis of Richard's mental status, the state court's finding number seven concludes that "trial attorneys reasonably hired and relied upon the advice of psychiatrist Dr. Carlos Estrada, as their expert to examine Vasquez's mental status, explore mitigating circumstances, and determine what psychological testing needed to be done."  Effectively, the state court concluded that trial counsel did not need to conduct any independent investigation of mitigation evidence concerning Richard's mental status and counsel were reasonable to hand their duty to investigate evidence of mitigation over to their retained expert psychologist.  This conclusion defies Supreme Court and Fifth Circuit precedent and established standards of practice for capital defense practitioners.

ABA Guideline 11.4.1 makes clear that "*Counsel* should conduct *independent* investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1, p 93 (1989) (emphasis added).  Counsel is required to among other things present evidence of medical history, educational history, employment, family and social history, including physical, sexual or emotional abuse, neighborhood surroundings and peer influence, professional intervention (by medical personnel, social workers, law enforcement personnel, clergy or others) or lack thereof.  *Id*. at 11.8.6.  Moreover the Supreme Court criticized counsel who in light of the ABA's "well-defined norms . . . abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources."  *Wiggins*, 539 U.S. at 524.  Trial counsel performance is subject to this very same

critique.   Because trial counsel failed to perform more than a rudimentary investigation of Richard's background to assist and inform Dr. Estrada's evaluation, the state court's conclusion is objectively unreasonable and misapplies established federal law.

Furthermore, the state court's conclusion is also unreasonable in light of the clear and convincing facts concerning Dr. Estrada's limited engagement that were established in the state habeas proceeding.   It is apparent from the record of that proceeding that trial counsel retained Dr. Estrada in only a limited role to analyze Richard related to three distinct issues.   The referral questions to Dr. Estrada were limited to the following:   (1) whether Richard was capable to waive his Miranda rights; (2) whether Richard was competent to stand trial; and (3) whether Richard was insane at the time of the offense.   (SH 7:94).   Dr. Estrada stated that he was not trained to perform neuropsychological testing on Mr. Vasquez and that he was not asked to measure Mr. Vasquez's IQ.   (SH 7:81-82).   Dr. Estrada was simply not given the task of serving as trial counsel's general mitigation specialist and they were unreasonable to rely on him as such.

Trial counsel had no misconceptions about Dr. Estrada's limited role.   Joseph Collina admitted that because of his experience with other death penalty cases, he was aware that psychiatrists typically do not perform neuropsychological testing and that neuropsychological tests are usually performed by a clinical psychologist.   (SH 3:48).   Nevertheless, defense counsel failed to retain a clinical psychologist to evaluate Mr. Vasquez for possible brain damage.   (SH 2:249-50).

> b.   *Trial counsel's failure to heed their experts' advice to conduct additional tests on Richard's brain.*

In spite of his limited information from trial counsel, Dr. Estrada did learn that Richard had been involved in an auto-train accident during which he suffered a head injury.   Based on this information, Dr. Estrada referred Richard to Dr. Bonikowski, a neurologist.   (SH 7:76).   Dr.

Bonikowski recommended that Mr. Vasquez undergo an MRI of his brain, neuropsychological testing, and a Quantitative Electroencephalogram (QEEG).  (SH 7:77; SH Petitioner's Ex. 12).  Dr. Estrada concurred with Dr. Bonikowski and recommended those tests in order to rule out the possibility of brain damage.  (SH 7:95).  Dr. Estrada wrote the following on Dr. Bonikowski's report: "Impression:  Further testing as recommended needed to rule out brain damage, quantity and quality."  (SH Petitioner's Ex. 61).  Dr. Estrada also wrote a note to Dr. Bonikowski stating, "To Dr. Bonikowski, regarding Richard Vasquez.   Prescription, neuropsychological and electroencephalogram to rule out organicity.[10]  I agree with further tests."  (SH Petitioner's Ex. 62).  Dr. Estrada testified that neuropsychological testing can assist in determining the type and severity of brain damage.   (SH 7:78).   Despite trial counsel's knowledge of these recommendations from their retained experts, trial counsel failed to have Richard undergo the prescribed testing.  (SH 3:45-48).

State court finding number nine again attempts to excuse trial counsel's failure.  That finding suggests that "Dr. Bonikowski's further recommendation for a QEEG and neuropsychological testing was for treatment of Vasquez's headaches and was irrelevant to possible mitigation defenses or to explain his violent behavior, such that it was reasonable for Vasquez's trial attorneys not to seek further testing."  That finding contradicts the plain language of Dr. Bonikowski's written report, which states as follows:

> Diagnostic impressions are that the patient has a history of cerebral concussion and possible contusion associated with motor vehicle accident in 1994.  The patient should have an MRI scan of the brain, a quantitative EEG, and neuropsychological testing *in order to determine the severity and pattern of his deficits*.

---

[10] "Organicity" means impaired function of an organ, in this setting the brain.  Dr. Estrada was suggesting further evaluation to determine if the function of Richard's brain was impaired.

(SH Petitioner's Ex. 61) (emphasis added).  These recommendations were for further *diagnostic* testing to determine the severity of Richard's mental deficits and are clearly not a prescription for *treatment* of anything.  Nowhere in the report does Dr. Bonikowski state that the recommended QEEG and neuropsychological testing was for treatment of headaches.  If this recommendation was not clear enough for trial counsel, the handwritten recommendation from Dr. Estrada on the bottom of the same report should have removed any confusion.  As pointed out above, Dr. Estrada wrote, "Further testing as recommended needed *to rule out brain damage*, quantity and quality."  (*Id.*) (emphasis added).  Dr. Estrada followed that recommendation with an additional note agreeing that neuropsychological and electroencephalogram tests were needed "to rule out organicity."  (SH Petitioner's Ex. 62).

The only suggestion in the record that Dr. Bonikowski recommended these tests as treatment for Richard's headaches came from the obviously uninformed testimony of trial counsel, Joseph Collina.  The relevant portion of Mr. Collina's testimony during the state habeas proceeding is as follows:

> Q.    At the end of the consultation report, does Dr. Bonikowski recommend an MRI, a QEEG, and neuropsychological testing be performed?
>
> A.    Yes.  But my understanding is that that was for any possible treatment for the headaches.
>
> Q.    How do you understand that?
>
> A.    From my conversations with Dr. Estrada.
>
> Q.    Dr. Estrada told you that Dr. Bonikowski requests a QEEG and Neuropsychological testing –
>
> A.    Oh I don't remember.  I remember that these two people talked to each other in addition to this report.
>
> Q.    Okay.

> A.    I remember that they're friends, Bonikowski and Estrada, or at least working associates.   And they talked on the telephone without me present also.

(SH 3:42-43).  In this testimony Mr. Collina admits that he does not remember the substance of his conversation with Dr. Estrada and reveals that any knowledge he had to contradict the plain written recommendation in Dr. Bonikowski's report comes from a hearsay conversation to which he was not a party.  The state court's reliance on this unreliable testimony to contradict the clear and convincing written recommendations of both of Richard's medical experts is unreasonable.

Additionally, there is nothing in Dr. Bonikowski's or Dr. Estrada's reports or in any of the record testimony to support the state court's finding number 11 that "known evidence concerning Vasquez's mental status, as gathered and reported by Dr. Estrada, would not have led a reasonable attorney to investigate further, and that Vasquez's trial attorneys reasonably determined that pursuing further evidence of brain dysfunction was unnecessary to make an informed choice among possible defenses."   To the contrary, both Dr. Bonikowski and Dr. Estrada, the only two medical experts hired by the defense, recommended further investigation to rule out brain damage.   In the face of these recommendations, counsel was obligated to investigate further because, as any reasonable defense counsel should recognize, the prospect that Richard might have suffered brain damage could clearly mitigate, if not excuse, his criminal behavior.  *See Tennard v. Dretke*, 542 U.S. 274, 288 (2004) (holding that evidence of "significantly impaired intellectual functioning is obviously evidence that might serve as a basis for a sentence less than death.") (internal quotations omitted); *see also* ABA Guidelines 11.4.1, 11.8.6 (calling for counsel to investigate and present "all reasonably available evidence in mitigation . . . including mental and physical illness or injury").

Finally, trial counsel lacked any expertise or information to justify ignoring these recommendations from their own retained experts. Based on the information that counsel had at the time, there was nothing to suggest that further testing would have been fruitless or harmful to Richard's defense. *Cf. Strickland*, 466 U.S. at 691. Thus, there is nothing in the record to support the state court's finding number 13 that "Vasquez's trial attorneys exercised reasonable trial strategy in declining to portray him as learning disabled, for fear that this might lead the jury to believe that he could not control himself and would be a future danger."

Due to their failure to conduct the prescribed testing, Richard's counsel lacked sufficient information about Richard's mental dysfunction to know if it was even possible to portray Richard as learning disabled, much less know whether the results of that testing would show Richard could not control himself or would be a danger in the future. Any "fear" counsel might have had that such a portrayal would lead a jury question Richard's self control or future dangerousness was completely baseless. If such an uninformed *post-hoc* rationalization is permitted to masquerade as reasoned strategy, the failure to conduct an examination of the defendant's mental health would be justified in virtually any case. In almost any case, *before* the results of a mental examination are known, there may be some fear that the testing will turn up evidence harmful to the defendant. However, only *after* those tests were conducted and the results were known could counsel make an informed tactical decision regarding whether to present the evidence. For this reason, the state court's finding 13 is unreasonable.

Based on the clear and convincing evidence presented during the state habeas proceeding, the findings of fact and conclusions of law regarding trial counsel's investigation of Richard's mental deficiencies, which were each adopted by the Texas Court of Criminal Appeals, are objectively unreasonable and should be disregarded.

### 2. Trial counsel's failure to investigate Richard's mental and psychological impairments was prejudicial to Richard.

Trial counsel's failure to provide Dr. Estrada with accurate medical, educational, and social history information proved to be prejudicial to Richard's defense. After the trial, the appropriate testing and discovery was performed by Richard's habeas counsel with the help of a mitigation specialist and Dr. Ricardo Weinstein, a neurophysiologist hired to evaluate Richard during the state habeas proceeding. Armed with the necessary background information, Dr. Weinstein was able to determine that Richard suffers from post traumatic stress disorder, attention deficit disorder, poly-substance dependence, fetal alcohol syndrome, brain dysfunction, learning disabilities and a borderline IQ. (*See* FH Pet. Ex. B; *see also* SH Petitioner's Ex. 20). Dr. Weinstein also testified that Richard's brain dysfunction affects the frontal lobes of Richard's brain causing problems with impulse control, problems with abstract reasoning and problems with the ability to plan and organize his behavior in a goal-directed manner. Consequently Richard has a tendency to act and behave before he thinks and, even when he does think, he has difficulty controlling his behavior. (SH 4:61).

All of this evidence would have been admissible and would have informed the jury of important and compelling mitigating circumstances. The Supreme Court has repeatedly recognized the significance of mental impairments in determining the appropriate sentence for a capital defendant. In the extreme case, when a defendant's mental deficiency is substantial enough for the defendant to be diagnosed with mental retardation, the Supreme Court has drawn a bright line and declared the death penalty unconstitutional. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). However, even when a defendant's mental impairment is above the level of mental

retardation,[11] the Supreme Court has held that impaired intellectual functioning has a mitigating dimension beyond the impact it has on the defendant's ability to act deliberately, especially when considering the imposition of the death penalty.  *Tennard*, 542 U.S. at 288.  Consequently, a defendant's low IQ or otherwise impaired intellectual functioning is relevant mitigating evidence which "might serve 'as a basis for a sentence less than death.'"  *Id.* (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)); *see also Wiggins*, 539 U.S. at 535 (evidence that the defendant had an IQ of 79 is relevant to and augmented his mitigation case); *Smith v. Texas*, 547 U.S. 37, 44 (2004) ("There is no question that a jury might well have considered petitioner's IQ scores and history of participation in special-education classes as a reason to impose a sentence more lenient than death.").  Trial counsel's failure to investigate the evidence of Richard's borderline IQ and other mental impairments deprived the jury of this highly relevant basis to impose a sentence less than death.  Therefore, as the United States Supreme Court has repeatedly recognized, had all of the available mitigation evidence of Richard's mental impairments been presented to the jury, there is a reasonable probability that the jury's sentence would have been different.

**III.    The State Court's Decision to Deny The Claim that Trial Counsel Were Ineffective Because They Did Not Conduct a Reasonable Investigation of Aggravating and Mitigating Evidence Related to The State's Un-indicted Allegation of Sexual Assault Was Based on Clearly Erroneous Findings of Fact, Involved Unreasonable Factual Determinations in Light of Evidence at Trial, and Involved an Unreasonable Application of Clearly Established Federal Law.**

Clear and convincing evidence from the state habeas proceeding also demonstrates that trial counsel's investigation of aggravating and mitigating evidence related to the state's

---

[11] The American Psychiatric Association reports that the term "mild" mental retardation is typically used to describe people with an IQ level from 50 to approximately 70.  *See Atkins*, 536 U.S. at 308 n.3 (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 42-43 (4th ed. 2000)).  Richard's full scale IQ score is borderline, measured at 83.  (SH 4:59).

-40-

allegation of sexual assault "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. Counsel's failure to investigate this evidence prejudiced Richard's defense both during the guilt phase and during the sentencing phase of the trial.

### A. Trial Counsel's duty to investigate and counter the State's aggravating evidence.

The Supreme Court discussed the objective standard for a reasonable investigation of the prosecution's aggravating evidence in the recent case of *Rompilla v. Beard*, 545 U.S. 374 (2005). Mr. Rompilla was found guilty of murdering a bar manager whose body had been repeatedly stabbed and set on fire. *Id.* at 377. The prosecution gave notice that it intended to seek the death penalty based on three aggravating factors: that the murder was committed during the course of another felony, that the murder was committed by torture and that Rompilla had a significant history of convictions for violent felonies. *Id.* at 377-78. Rompilla's trial counsel conducted an investigation of mitigating evidence, conducting interviews with Rompilla and five members of his family including his former wife, two brothers, a sister-in-law and his son. Counsel also examined the reports of three mental health experts who had testified during the guilt phase of the trial. However, none of these sources of information turned up anything useful. *Id.* at 381-82. Despite counsel's investigation of these sources, the Supreme Court determined that Rompilla's lawyer's investigation fell below the objective standard of reasonableness because counsel failed to examine Rompilla's publicly available prior conviction file. *Id.* at 383-84. The Supreme Court instructed:

> There is an obvious reason that the failure to examine Rompilla's prior conviction file fell below the level of reasonable performance. Counsel knew that the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla's prior conviction for rape and assault, and

> would emphasize his violent character . . . .  There is no question that defense counsel were on notice, since they acknowledge that a "plea letter," written by one of them four days prior to trial, mentioned the prosecutor's plans.  It is also undisputed that the prior conviction file was a public document, readily available for the asking . . . .

*Id*.  The Supreme Court reasoned that by failing to review the file that counsel knew the prosecutor intended to use, they had no hope of knowing whether the prosecution was distorting the aggravating evidence or whether the file might contain exculpatory evidence that might rebut the file's overall relevance.  *Id*. at 385-86.  The Supreme Court also stated that counsel's obligation to rebut aggravating evidence extended beyond arguing that it ought to be kept out. *Id*. at 386.  Additionally, the Supreme Court made clear that counsel's efforts to obtain the same information from other sources did not excuse trial counsel's failure to look at the very evidence they knew the prosecutor intended to use.  *Id*. at 388-90.  Ultimately, the Supreme Court determined that defense counsel's failure to investigate the prosecutor's file prejudiced Rompilla's defense because information contained in that file would have led a reasonable lawyer to other mitigation evidence, including evidence of Rompilla's difficult childhood, abusive parents, low IQ and brain damage.

**B.    Trial counsel's failure to investigate and counter the State's evidence of sexual assault.**

Here, Richard's trial counsel failed to investigate multiple sources of readily available information they knew the prosecutor intended to rely on to prove its case against Richard, including evidence to support their aggravating allegation that Richard sexually assaulted the four-year-old victim, Miranda Lopez.  A telling indication of the extent of counsel's neglect, the record shows that trial counsel did not so much as go inside the Vasquez home where the alleged crime took place to determine whether there might be anything in the home that would cast doubt

-42-

on the State's theory of the case.[12]  (SH 3:24).  As the evidence adduced during the state habeas proceeding demonstrates, had counsel conducted the requisite investigation and retained the necessary experts to assist them, they would have been able to dispute much of the key evidence the State relied upon to establish its sexual assault theory.  They also would have been able to present compelling alternate theory evidence.  Reaching findings and conclusions to the contrary, the state court ignored this clear and convincing evidence and unreasonably applied *Strickland*.

> ### 1.   Trial counsel's failure to object to the State's un-indicted allegation of sexual assault.

The record evidence is clear that, even though none of the State's allegations of sexual assault were made in the indictments,[13] Richard's trial counsel had advance notice of the State's intent to use evidence of sexual assault during the trial.  On March 3, 1999, the State filed its Notice of Possible "Extraneous" Offenses Which May Or May Not Be Offered At Trial. (CR II:659).  That Notice included the following allegation:

> (18)  **AGGRAVATED SEXUAL ASSAULT OF A CHILD**: On or about March 5, 1998, in Nueces County, Texas, RICHARD VASQUEZ did then and there intentionally or knowingly cause his sexual organ, or an unknown object to contact or penetrate the sexual organ of Miranda Lopez, a child then under the age of fourteen.

(*Id.*).  Because the trial on the merits did not begin until more than three months after this notice was filed by the State on June 14, 1999, trial counsel had ample opportunity to investigate, prepare for, and object to the State's potential allegations regarding sexual assault.  Nevertheless,

---

[12] 1989 ABA Guideline 11.4.1 6. states:

> Where appropriate, counsel should attempt to view the scene of the alleged offense.  This should be done under circumstances as similar as possible to those existing at the time of the alleged incident (e.g. weather, time of day, and lighting conditions).

[13] (CR I:2-5).

the record demonstrates that counsel failed to do so.  Trial counsel did file a Motion in Limine on May 17, 1999 seeking to exclude evidence of "Other Offenses."  (CR II:690).  Yet, when the State presented its witnesses discussing the un-indicted allegations of sexual assault during the liability phase of the trial, counsel failed to timely object.  (*See, e.g.*, RR 35:175-200, 218-231).  By itself, counsel's failure to, at the very least, timely object to these un-indicted allegations and the evidence the State introduced in support of them fell below the objective standard of reasonableness and constitutes ineffective assistance of counsel.  *See* ABA Guidelines 11.8.5 (1989); *Cf. Rompilla*, 545 U.S. at 375 ("Counsel's obligation to rebut aggravating evidence extended beyond arguing it ought to be kept out.").

> ### 2. Trial counsel's failure to investigate the State's forensic DNA evidence.

Richard's trial counsel failed to perform even the most basic investigation of the State's DNA evidence, including the electronic Genescan files that contained the data from the DNA testing performed by the State's forensic scientist from the Texas Department of Public Safety Crime Lab (TDPSCL) in Corpus Christi, Mr. Huy Nguyen.  (SH 2:25-26; 3:49).  Trial counsel was obviously aware that the State was likely to rely on this evidence, at least in part, to make its case for murder and also to support its allegation of sexual assault; however, trial counsel made absolutely no effort to discover the full extent of the State's evidence.  Richard's trial counsel testified during the state habeas proceeding as follows:

> Q: Did you request any pretrial discovery regarding DNA?
>
> A: No.  I was satisfied with the results.
>
> Q: That's fine.  Did you request any pretrial discovery?
>
> A: No.  We got – yes, we did request discovery.  But are you talking about additional discovery? I mean, we had –

Q:      Additional from the couple of page report that you received from Mr. Nguyen.

A.      We were satisfied with the couple of page report because we didn't want to stir up a hornets' nest. Sometimes if you ask for too much, you might get something you don't like.

(SH 3:49).

Significantly, trial counsel never interviewed Mr. Nguyen or asked him to produce a copy of his file, which contained his notes on what kinds of DNA profiles were obtained from the samples he tested.  (SH 2:25-26).  Trial counsel did not visit the crime lab where the DNA tests were performed to find out the processes and protocols used by the lab.  Trial counsel made no effort to investigate the audit reports or inspections of the crime lab to determine if the lab was properly accredited and following industry standards.  (SH 2:26-27).  They also did not ask to review validation studies or quality control documents from the lab.  (SH 2:26).  These failures fell short of the objective standard of reasonable representation as indicated by the ABA Guidelines.  *See, e.g.*, ABA Guidelines 11.4.1 4. ("Counsel should make efforts to secure information in the possession of the prosecution or law enforcement authorities, including police reports.  Where necessary, counsel should pursue such efforts through formal and informal discovery . . . .")

Evidence obtained during the state habeas proceeding established that the TDPSCL is a state government forensic laboratory (SH 9: State's Ex 8; *see* also SH 5: 149-50).  Therefore, it must comply with government guidelines which include validation of new systems before using the systems in casework.  (SH 2:11-13).  Both D.Q. Alpha testing and STR testing using Perkin Elmer kits were used in this case. (RR 35:125-26, 132).  These two types of forensic DNA tests utilize Polymerase Chain Reaction procedures (PCR). (RR 35:127-28, 132).  Trial counsel received two Supplemental Reports from the State dated December 21, 1998 and May 21, 1999.

(SH Petitioner's Exs. 58 & 59).  These reports written by Mr. Nguyen give conclusions for two

types of testing: D.Q. Alpha testing using the Perkin Elmer kit and STR testing using the Perkin

Elmer Profiler Plus Kit  (*Id.*).  While the December 21, 1998 report provides profiles for the D.Q.

Alpha tests performed, it does not list the profiles for the STR tests performed (SH Petitioner's

Ex. 58).  The report calculates a statistical frequency for how common or rare the DNA profiles

of Richard and Miranda Lopez are as 1 in 5.7 billion.  (*Id.*).  No information is provided as to

how these statistics were generated.  (*Id.*).

Discovery of the complete case file and supporting documents was necessary for the

defense to evaluate the reliability of the testing.  Evaluation of the testing includes investigation

of the following:

1.    whether the system used was validated in general and
      followed in the instant case;
2.    whether the analyst has a history of committing errors
      either in casework or in proficiency testing;
3.    whether the laboratory was accredited;
4.    whether the laboratory followed scientifically accepted
      protocols;
5.    whether the lab recorded the chain of custody of evidence
      samples and reference samples;
6.    whether there was mislabeling of critical samples,
      mishandling of critical samples, and/or contamination of
      critical samples;
7.    whether proper controls (negative controls, positive
      controls, substance controls) were utilized;
8.    whether quality control procedures are adequate for use of
      laboratory equipment and chemicals;
9.    whether the analyst interpreted the data correctly;
10.   the types of cells in the evidence samples (*i.e.*, blood, skin,
      etc.);
11.   how the statistics were calculated; and
12.   what alleles were declared for each sample.

(SH 5:27-32).  Without this discovery, trial counsel could not possibly have known whether

chain of custody was broken by the TDPSCL, whether the TDPSCL was accredited for forensic

DNA testing, whether samples were switched or mislabeled, whether evidence was contaminated, whether Mr. Nguyen had made errors in other casework or in his proficiency tests, whether controls were used, whether the equipment and chemicals were working correctly, what procedures were followed and if the new STR Profiler Plus system had been validated both externally by Perkin Elmer and internally by the TDPSCL. In short, trial counsel could not effectively scrutinize the State's forensic evidence without this discovery.

Proper discovery would have allowed trial counsel to identify the numerous flaws in the Corpus Christi crime lab's protocols and practices and call into question the testing and conclusions of the State's forensic scientists. Discovery obtained during the course of the state habeas proceeding included an August 30, 1996 inspection report from the American Society of Crime Laboratory Directors/Laboratory Accreditation Board ("ASCLD/LAB"), the board charged with inspecting and accrediting forensic laboratories. (SH 2:131). That report concludes that the Corpus Christi crime lab should not be accredited in the area of DNA and should not be re-accredited in the areas of controlled substances/blood alcohol, trace evidence and serology. (SH 2:137). The practices identified by the ASCLS/LAB to be substandard include the following:

1. The lab's failure to specify appropriate controls and standards in the lab's procedures and failure to use such controls and standards to insure the validity of examination results. The comment to this finding states that "[p]ositive and negative regent controls for presumptive blood and semen tests are not documented in the case file prior to use." (SH 2:131-32).

2. The lab's failure to routinely check the reliability of its reagents. Mr. Nguyen conceded during the state habeas hearing that when a reagent used in a presumptive test is not reliable, the information from the test is not scientifically sound. Mr. Nguyen also admitted that regents

were used to perform presumptive tests of the evidence in this case.  (SH 2:132).

3.  The lab's failure to properly calibrate its instruments and equipment.  Specifically, the thermalcycler was found beyond its calibration due date, two adjustable volume pipettes used for analysis of DNA were found to be out of calibration but still in use, the temperature verification system for calibrating the thermalcycler was beyond its calibration due date, and there was no program in place for the annual maintenance of the lab's microscopes.  Mr. Nguyen admitted that the thermalcycler was used to perform the testing in this case.  (SH 2:132-33).

4.  The examiner's failure to generate and the lab's failure to maintain in a case record all the notes, worksheets, photographs, spectra, printouts, charts, and other data and records used by examiners to support their conclusions. (SH 2:134).

5.  The lab's failure to review the examiner's reports to insure that their conclusions are reasonable and within the constraints of scientific knowledge.  (*Id*.).

6.  The lab's failure to independently submit for evaluation individual DNA examiner's proficiency test results to an approved external test provider rather than pooling all of the examiners' results together for submission.  (SH 2:135).

7.  The lab's failure to control and limit access to the operational area of the laboratory.  Inspectors were able to gain access to the operational area of the lab without detection by opening an unmonitored, unalarmed half-door located near the evidence intake area.  They also found that the evidence intake window was not lockable and that there was no monitoring device located near that work space to identify unauthorized intrusion into the lab.  Mr. Nguyen admitted that one of the reasons to control and limit access to the operational area of the lab is to prevent evidence contamination.  (SH 2:136).

8.  The lab's failure to install an intrusion alarm or security personnel to secure the evidence in the lab during the hours that the lab is vacant.  (*Id*.).

-48-

Mr. Nguyen admitted that many of these problems identified by the ASCLD/LAB were violations of the quality assurance standards for forensic DNA testing laboratories promulgated by the DNA Advisory Board before his testing, reporting and testimony in this case.  (SH 2:141-42, 144).  Mr. Nguyen also admitted during the state habeas hearing that at the time of his DNA testing in this case, the Corpus Christi lab had no definitive criteria or protocols in place for when an examiner should call something a DNA match or an exclusion.  (SH 6:150).

Post-trial discovery also uncovered letters from an inspection team from the Harris County Medical Examiner's Office which criticized the Corpus Christi lab for storing evidence in plastic bags at room temperature and failing to seal all evidence for storage.  (SH 2:138-39).  The Harris County inspectors observed:

> Sexual assault kits were sealed with only a pair of tape strips on opposite sides of the rectangular box while the other two sides of the box were not sealed.  One could easily add or remove items from this box without disturbing the evidence tape.  The sealing of the evidence was matter of concern in view of the large number of personnel (drug section) other than serology/DNA analysts who have access to this storage area.

(SH 2:139; *see also* SH Petitioner's Ex. 6).  Inspectors also noted that the amount of space for the analysis of Serology and DNA evidence was limited and recommended that the evidence screening table be moved to a location away from the main entrance door to avoid traffic near that screening area.  (*Id.*).  These problems were communicated to the manager of the Corpus Christi lab on or about July 16, 1998, within months of the March 5, 1998 date evidence was first collected in this case.  (SH 2:140).

Discovery of the FBI's subsequent inspection of the Corpus Christi lab demonstrates that as late as August 29, 2001 the lab still had not corrected many of the same substandard practices identified by the ASCLS/LAB and the Harris County inspectors.  (SH 2:146).  The FBI's quality

assurance audit determined that the Corpus Christi laboratory failed to follow documented procedures that minimize loss, contamination and/or deleterious change of evidence; failed to label reagents with the identity of the reagent, the date of preparation or expiration, and the name of the individual preparing the regent; failed to identify and evaluate the reagents critical to the analysis process prior to use in casework; and failed to verify that all control results are within established tolerance ranges.  (SH 2:145).

This substantial evidence of substandard practices at the Corpus Christi crime lab, if discovered and presented by trial counsel, would likely have undermined the jury's confidence in the forensic evidence against Richard generally.  It also is likely to have specifically raised a reasonable doubt in the mind of the jurors as to the validity of the State's DNA evidence from the blood samples and the other evidence analyzed by Huy Nguyen.  As noted above, counsel's failure to perform this most basic discovery falls well below the standard of reasonable and effective representation.  *See, e.g.*, ABA Guidelines 11.4.1 4.

### 3.    Trial counsel's failure to call a forensic expert to competently rebut the State's sexual assault evidence.

During the guilt/innocence phase of the trial, defense counsel did not call a forensics expert, or any other expert for that matter, to counter the evidence the State alleged proved sexual assault and which linked Richard to that crime.  Pretrial motions and orders in the record reveal that trial counsel requested and received funding from the court to hire a forensic pathologist, however, no such expert was retained by defense counsel.  (*See* CR II: 560, 568, 671).  Mr. Collina, stated in response to questioning during the state habeas hearing that it was his opinion that the trial judge "would have approved any expert we asked for if we needed it, but it wasn't necessary.  In our professional opinion, we didn't need any extra experts." (SH 3:113-14).

         a.      *The State's DNA evidence was far from "neutral" and counsel's failure to challenge it harmed Richard's defense.*

In an attempt to justify trial counsel's failures to investigate and challenge the prosecution's DNA evidence as irrelevant or as reasonable strategy, the State proposed two findings of fact related to this evidence that were summarily adopted by the state court.

> 18.    The Court finds that Vasquez admitted in his testimony at trial that he repeatedly hit the victim, that the medical evidence at trial showed the extent of the victim's injuries and resulting death, and that the DNA evidence presented by the state merely showed the presence of blood which matched both the victim and Vasquez on various items of evidence recovered from the crime scene.

> 19.    The Court finds that Vasquez's trial attorneys reasonably decided not to challenge the state's DNA evidence or hire an independent DNA expert because the DNA evidence offered by the state was generally neutral and did not tend to prove anything more than Vasquez's own admission that he had beaten the victim to death and that both he and the victim were bleeding at the time, and because the DNA evidence may even have helped the defense by showing that none of Vasquez's semen was found in the victim or on her clothes.

(FH Pet. Ex. A). However, to the extent these findings assert that the DNA evidence was neutral or that it merely confirmed Richard's own admissions, they are each clearly erroneous. These findings each overlook the fact that the State used flawed DNA evidence to support their theory that Richard removed Miranda's clothing -- something Richard denied doing but which the State repeatedly argued to the jury as part of its sexual assault theory.

Key to the State's contention, the State's expert claimed Richard's blood was found inside Miranda's jumper. (*See, e.g.*, RR 35:148). Based on this evidence the State assumed that Richard must have taken Miranda's clothes off. (RR 37:119). The State summarized its theory of the case during closing argument of the guilt phase contending that while Richard was alone with Miranda he beat her senseless, removed her clothing, and violently raped her while holding

her from behind, ripping her genitals.   (RR 38:15-16, 37-38, 45, 46, 51 52, 53).   Prosecutors repeated these same arguments during the punishment phase describing their theory in the most inflammatory and graphic terms. (RR 40:13-14).   Thus, it is clear that the DNA evidence was far from neutral.   The State used the DNA evidence to suggest that Richard sexually assaulted Miranda and to connect Richard to the injuries to Miranda's genitals.

Mr. Huy Nguyen testified that he found blood stains on the front, the back, and inside of Miranda's jumper.   (RR 35:147).   He stated that he performed two different types of DNA tests on the blood stains he took from the clothing, a D.Q. Alpha test and a Short Tandem Repeat test ("STR test").   (*Id.*).   He stated he performed the STR test on the stains taken from the front and rear of the clothing; however, he testified he only performed the D.Q. Alpha test on the stain taken from the inside of Miranda's jumper.   Based on this D.Q. Alpa test, Mr. Nguyen alleged that the blood he found inside Miranda's jumper "matched" Richard and contained a "definite" mixture of Miranda's and his blood type.   Mr. Nguyen testified as follows:

> A.      . . . The stains on the inside was [sic] the D.Q. Alpha type that <u>matches</u> Vasquez, but a possibility of Lopez in there. . . . So here, I could tell that his type was in there, but also a little bit of hers; there was a little mixture.   Here was a <u>definite mixture</u> of both Vasquez's type and Lopez's type.

> Q.      When you say "here'" were you talking about the inside of the jumper?

> A.      Oh, yes, excuse me, <u>the inside of the jumper</u>.

(RR 35:148) (emphasis added).

Richard, who testified in his own defense during the guilt phase of the trial, had no explanation for why this blood was found inside the jumper.   (RR 37:119).   Richard testified that when he tried to open Miranda's mouth to keep her from swallowing her tongue, Miranda bit him causing him to bleed from his finger.   (RR 37:95-99, 102).   He said that Miranda was bleeding

from her mouth and nose and some of the blood got on his finger when he tried to open her

mouth.  He said he later cleaned the blood off his finger on a towel from his room and on some

toilet paper.  (RR 37:114, 132).  Investigating police officers noticed that Richard was bleeding

from his thumb and forefinger.  (RR 34:21, 34).  They also observed blood on Miranda's nose

and mouth.  (RR 34:19).  Although, this description might explain the State's claim that both

Richard's and Miranda's blood was found on the towel and on the tissue paper, it does not

explain how both of their blood got *inside* Miranda's clothing.

As the following transcript excerpt illustrates, the prosecutor exploited this unexplained

evidence to suggest that the presence of Richard's blood inside the jumper indicated that Richard

had removed Miranda's clothing to sexually assault her and then later dressed her again:

> Q.    When did you take her clothes off?
>
> A.    Whose clothes off?
>
> Q.    Miranda's.
>
> A.    I never took her clothes off.
>
> Q.    Well, there was blood on the inside of her jumper, which makes it look like she was dressed back up, doesn't it?
>
> A.    I never dressed her up.
>
> Q.    How did blood get on the inside of her jumper?
>
> A.    Like I said, she bit my thumb, and I had blood on my finger.
>
> Q.    How did her blood get on the inside of her jumper?
>
> A.    I don't know about that, ma'am.

(RR 37:119).

Trial counsel did not request a pretrial hearing under *Kelly*, 824 S.W.2d at 573-574, to

challenge the reliability or admissibility of the State's DNA evidence and failed to retain a DNA

expert to analyze and refute it.[14]  Without conducting a basic investigation of the State's evidence

or hiring a DNA expert to counter that evidence and point out that contrary to the testimony of

---

[14]   [T]he trial court's first task is to determine whether the testimony is sufficiently reliable and relevant to help the jury in reaching accurate results.  Unreliable…scientific evidence simply will not assist the [jury] to understand the evidence or accurately determine a fact in issue; such evidence obfuscates rather than leads to an intelligent evaluation of the facts …

As a matter of common sense, evidence derived from a scientific theory, to be considered reliable, must satisfy three criteria in any particular case:

(a) the underlying scientific theory must be valid;

(b) the technique applying the theory must be valid; and

(c) the technique must have been properly applied on the occasion in question.

Factors that could affect a trial court's determination of reliability include, *but are not limited to,* the following:

(1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained;

(2) the qualification of the expert(s) testifying;

(3) the existence of literature supporting or rejecting the underlying scientific theory and technique;

(4) the potential rate of error of the technique;

(5) the availability of other experts to test and evaluate the technique;

(6) the clarity with which the underlying scientific theory and technique can be explained to the court; and

(7) the experience and skill of the person(s) who applied the technique on the occasion in question.

…

To summarize, under Rule 702 the proponent of novel scientific evidence must prove to the trial court, by clear and convincing evidence and outside the presence of the jury, that the proffered evidence is relevant.  If the trial court is so persuaded, then the evidence should be admitted for the jury's consideration, unless the trial court determines that the probative value of the evidence is outweighed by some factor identified in Rule 403.

*Kelly*, 824 S.W.2d at 573-574.

Mr. Nguyen the blood inside Miranda's clothing could not be attributed to Richard,[15] trial

counsel was unable to counter the state's aggravating evidence.

      **4.**      **Trial Counsel's failure to retain a forensic expert to investigate and counter the state's DNA evidence fell below the objective standard of reasonableness.**

            *a.*      *Retaining a forensic expert would have helped counter the State's evidence.*

Retaining a forensics expert would have helped counsel identify and obtain the required

pretrial discovery to effectively contest the State's evidence.[16]  Had trial counsel retained a DNA

expert, the expert would have advised trial counsel as to what materials were needed to evaluate

the reliability of the TDPSCL testing in this case.  The DNA expert could have assisted in the

formulation of a discovery request for the DNA case file and the other necessary supporting

documents.  Once that essential discovery was obtained, a DNA expert could have identified

testing flaws and possible sources of contamination as evidenced in the lab's records.  A

forensics expert would also have been able to investigate the DNA profiles for all of the

individuals living in the household with Richard and Miranda to identify possible alternate

sources of the DNA evidence the State used to argue sexual assault -- evidence that Richard's

testimony and confessions could not explain, including the blood inside Miranda's clothing.  Dr.

Randall Libby, the forensic expert hired by Richard's state habeas counsel, did all of these things

during the state habeas proceeding pointing out several errors in testing protocol that could have

caused evidence contamination or inaccurate results in this case.  (*See, e.g.*, SH 6:37-50).  Based

---

      [15] *See infra* pp. 57-58.

      [16] ABA Guideline 11.4.1 7. encourages counsel to secure the assistance of experts where it is necessary or appropriate for preparation of the defense, adequate understanding of the prosecution's case, or rebuttal of any portion of the prosecution's case at the guilt/innocence phase or the sentencing phase of the trial.

on his review of the lab reports, Dr. Libby concluded that Mr. Nguyen's conclusions are generally not reliable or accurate and are outside of generally accepted guidelines in the scientific community.  (SH 6:55).  Also, as discussed below, Dr. Libby discredited the key DNA evidence and "scientific" theories linking Richard to cuts and abrasions on Miranda's genitals.

One of the most significant errors in the State's testing methodology identified by Dr. Libby stems from the fact that the State failed to inform its DNA expert of all the individuals living in the home where the evidence was recovered and never obtained reference samples from the other individuals living in the home.  Mr. Nguyen admitted during the state habeas corpus hearing that he had no idea Miranda's half-sister Megan, Richard's sister Brenda and his aunt and uncle lived in the home.  (SH 2:30).  He also admitted that he did not obtain reference samples from those individuals.  (SH 2:39).  This failure is a significant oversight on the part of trial counsel and the State because the other individuals in the home were close relatives of both Richard and Miranda and likely had similar DNA profiles, creating the opportunity for misleading test results.  (SH: 2:31-36).[17]

At the state habeas hearing, Mr. Nguyen testified that it is likely in a family setting where many people touch objects and share towels, that epithelial cells from multiple individuals could slough off and be deposited on those objects, causing a mixture of DNA.  (SH 2:37-38).  He also admitted that it is possible that close relatives will share alleles at certain loci along a DNA strand, and it will be impossible to make a positive identification of who contributed certain DNA without taking reference DNA samples from all of the individuals in the household.  (SH 2:36-37; 42).  At a minimum, trial counsel should have pointed out that the State's failure to

_____

[17] Richard's aunt is his mother's sister and his uncle is his father's brother.  (SH 2:33).  Therefore, everyone in the household shared some common DNA with either Richard or Miranda.

-56-

obtain these additional DNA profiles renders the conclusions of the State's DNA expert scientifically unreliable and casts serious doubt on the State's theory of sexual assault.  A forensics expert would have assisted trial counsel in identifying this significant failure as Dr. Libby was able to do during the state habeas hearing.  (*See* SH 6:36-37, 42).

Additionally, as Dr. Libby demonstrated in the state habeas evidentiary hearing, a forensics expert would have been able to specifically refute the State's conclusions related to the blood found inside Miranda's clothing, on the burgundy towel and on the toilet paper.  At trial Mr. Nguyen testified on behalf of the State that the stains on the inside of Miranda's jumper were a "definite mixture of both Vasquez's type and Lopez's type."  (RR 35:148).  What the State did not disclose and what trial counsel did not know because they did not do the required discovery, is that Mr. Nguyen's notes show that the stain is contaminated with additional DNA inside the jumper that does not match either Mr. Vasquez or Miranda.  Dr. Libby testified that the blood inside Miranda's jumper was actually a mixture of several blood types and the actual sources of the blood could not be identified without looking at the DNA profile for all of the individuals in the household.  (SH 5:75-77).  As noted already, none of the DNA profiles of the other household members were investigated by trial counsel or tested by the State.  Because the blood evidence found inside Miranda's clothing is contaminated, Mr. Nguyen's conclusion that Richard's blood was inside Miranda's clothing is unreliable, and thus cannot support the State's sexual assault theory.

Mr. Nguyen's conclusions related to the blood found on the burgundy bath towel would also have been refuted by proper discovery and adversarial scrutiny by a defense expert.  Mr. Nguyen testified that the D.Q. Alpha testing revealed nothing.  But, when he went back and did additional STR testing on the same stain, "the profile [he] got was Vasquez and a little bit of

Lopez." (RR 35:138). The actual data from Mr. Nguyen's testing reveal a different story. The electronic Genescan data, which trial counsel failed to obtain from the crime lab in pretrial discovery, show that Miranda's DNA is excluded from the towel because her profile does not match the profile taken from the towel stain on four of the test markers. (SH 5:58-63). Dr. Libby interpreted this data to mean that Miranda's DNA is not on the bath towel. (SH 5:63). Obviously, this evidence would have been important to corroborate Richard's testimony that he used the towel to clean the blood from his fingers and to refute the State's suggestion that he used the towel to clean Miranda's genitals. Trial counsel's failure to discover this evidence and failure to retain a forensic expert to interpret and present it to the jury is inexcusable and cannot be attributed to strategic decision making.

The remaining piece of evidence the State used to connect Richard to the injuries to Miranda's genitals, blood found on the toilet tissue, was also called into question by Dr. Libby. Mr. Nguyen testified that his D.Q. Alpha testing on the toilet tissue revealed Richard's DNA and possibly some of Miranda's DNA. (RR 35:150). Although Mr. Nguyen's subsequent STR test revealed only Miranda's DNA on the toilet tissue, Mr. Nguyen continued to assert that Mr. Vasquez's DNA was likely "masked" by the large amount of Miranda's DNA. (RR 35:150-51). Mr. Nguyen concluded that the discarded toilet tissue contained mostly Miranda's blood and "a little bit of his." (RR 35:151). This testimony was not contradicted at trial.

However, under persistent cross examination at the state habeas proceeding, Mr. Nguyen admitted that none of Richard's alleles appear on any of the nine sites examined by the STR test. (SH 2:85-87). Dr. Libby testified that in light of this evidence, Mr. Nguyen's opinion that Richard's DNA was on the tissue was *not* scientifically acceptable. (SH 5:57). Dr. Libby stated that the only scientific conclusion to be reached from the results of the DNA testing is that

Richard's DNA was not on the toilet tissue.  (SH 5:56-58).  Had this information been elicited at trial it obviously would have cast additional doubt on the reliability of Mr. Nguyen's opinions and conclusions generally.  The fact that Richard's DNA was not found on the toilet tissue would also have blown a huge hole in the State's theory that Richard used the toilet tissue to wipe his semen off Miranda.  Because trial counsel failed to retain a forensics expert, Mr. Nguyen's faulty conclusions went unchallenged.

> b.    *Retaining a forensic expert would have helped counsel to identify and explain the significance of exculpating evidence.*

Trial counsel's failure to investigate and challenge the reliability of the State's experts' theories and testing methodologies also caused counsel to overlook important exculpating evidence.  For example, a significant setback for the State's sexual assault theory at trial was the fact that vaginal and rectal swabs performed on Miranda confirm that there was no semen in or on Miranda's body.  (RR 35:163).  No semen was detected on Miranda's underpants either.  (*Id.*).  To account for this problem, the State speculated that, before calling 911, Richard tried to clean Miranda's bloody vaginal/anal area with rubbing alcohol, towels and toilet tissue.  (RR 35:213-214; 38:38, 53).  Prosecutors also suggested that because semen is water soluble, Richard may have successfully washed his semen off Miranda, leaving no trace anywhere.  (RR 38:51). Mr. Nguyen testified during the guilt phase of the trial that if there had been semen on the towels and bedspread recovered from the scene and those items were subsequently washed with water, "you won't be able to detect it after that."  (RR 35:141).

Trial counsel failed to object to this testimony or question the basis for Mr. Nguyen's "semen cleaning" theory.  Trial counsel never asked Mr. Nguyen to explain his expertise in this particular area of forensics, never asked Mr. Nguyen to produce a single peer review or other

scientific study that might corroborate his theory, and failed to ask the court for a *Kelly* hearing to scrutinize the reliability of Mr. Nguyen's scientific methodology, if indeed he had one.

Mr. Nguyen's theory was ultimately called into serious question after trial by Dr. Libby who testified that if there had been sexual penetration of the anus as the State suggested, he would expect to find some DNA (from skin cells) on the rectal swab.  However, Richard's DNA was completely excluded from the swab of Miranda's anus.  (SH 5:82-84).  Dr. Libby also contradicted the suggestion that evidence of semen can be easily eradicated by merely washing it with water.  Dr. Libby testified that even if clothing or bedding containing semen is washed in a washing machine, its presence can still be detected by DNA tests.  (SH 5:82).  Nevertheless, because Richard's trial counsel did not consider it necessary to object to this evidence or present a single expert witness during the guilt phase of the trial, the State's sexual assault theory, including Mr. Nguyen's testimony, was essentially uncontroverted by the defense.

The testimony of Dr. Libby during the state habeas proceeding demonstrates that had trial counsel retained a DNA expert to evaluate and challenge the conclusions of the State's forensic scientist, defense counsel would have been able to discredit key parts of the State's sexual assault theory and highlight the importance of exculpating evidence that was otherwise unknown or underemphasized.    Accordingly, the state court's finding that "Vasquez's trial attorneys reasonably decided not to challenge the State's DNA evidence or hire an independent DNA expert" is unreasonable and contradicts the clear and convincing record evidence.

### C.  Failure to present available alternate-theory evidence that Miranda suffered a straddle injury.

#### 1.  Trial counsel's failure to call expert on sexual assault to testify regarding the straddle injury theory.

During the guilt/innocence phase of the trial, the State called multiple witnesses including a nurse, Ms. Leann Box, and Dr. James Lukefahr to argue that injuries found on Miranda's

genitals resulted from sexual assault.  (*See generally* RR 35:175-200, 218-31).  Instead of calling

any of their own experts to counter these witnesses, Richard's trial counsel attempted to rely on

cross examination of the State's witnesses to advance the defense theory that the injuries to

Miranda's genitals were straddle injuries (injuries caused by falling with one's legs straddling an

object such as a bicycle cross-bar).  Richard's trial counsel, Mr. Collina, admitted during the state

habeas corpus proceeding that he had evidence that Dr. Bruce Henderson, the surgeon who

actually treated Miranda at the hospital before she died,[18] specifically stated that he did not

believe Miranda's injuries resulted from sexual abuse and that the injuries were in fact the result

of a straddle injury.  (SH 3:17-18).  Despite his knowledge of this evidence, Mr. Collina stated

he never even met Dr. Henderson and did not attempt to interview him.  (SH 3:18-19).  Defense

counsel never called Dr. Henderson to testify as a witness and the evidence of Dr. Henderson's

opinion, which Mr. Collina suggested at trial was contained in Dr. Henderson's hand-written

report, was never introduced into evidence at trial.  (SH 3:18; *see also* RR 35:54-55).

At the state habeas evidentiary hearing, Mr. Collina conceded that what he referred to at

trial as Dr. Henderson's "handwritten report" was actually the Log of Contact Narratives from the

Texas Department of Protective and Regulatory Services case file on Brenda Lopez.

(SH 3:31-32)  That log contained the following report:

> Dr. Henderson stated Miranda had severe lacerations which did
> need to be repaired to her anus but that he was not confirming
> sexual abuse.  Dr. Henderson stated the lacerations could have
> occurred by a severe punch to Miranda causing her to fall on
> something straddling it causing the same injuries.  Dr. Henderson
> ended by saying there was no internal damage to Miranda.  He
> called her injury a "straddle injury."

---

[18] The Respondent's Motion incorrectly states that Richard "was the only person present with [Miranda] when she died."  Respondent's Motion at 28.  Actually, Richard called 911 and Miranda was taken to the hospital where she died the following afternoon.  (RR 34:59; CR I:14).

(SH RR 8: tab 14).  Obviously, if trial counsel had done its duty to follow up on this evidence, of which counsel was aware, and at least interviewed Dr. Henderson to find out if he would repeat these same opinions at trial, Richard's alternate straddle injury theory and in turn his overall defense of the sexual assault would have been significantly strengthened.  Even if trial counsel had done nothing more than introduce in evidence the Log of Contact Narratives during the guilt phase of the trial, Mr. Vasquez's defense would have been appreciably advanced.

In lieu of Dr. Henderson's testimony, trial counsel met with Dr. Randall Frost, the assistant medical examiner in San Antonio, Bexar County.  (SH 3:17).  Dr. Frost was also prepared to testify that Miranda's injuries could have been caused by a straddle injury.  However, incredibly, trial counsel never called Dr. Frost as a witness either.  (*Id.*).  Mr. Collina attempted to justify his failure to call Dr. Frost by saying that Dr. Frost's testimony was unnecessary because it would have been redundant of testimony from the State's medical examiner, Dr. Lloyd White.  (*Id.*).

The state court agreed with this justification and following the state habeas proceeding, entered the following two findings:

> 15.  The Court finds that Vasquez's trial attorneys reasonably relied upon the testimony of the Nueces County Medical Examiner, Dr. Lloyd White, that the victim's injuries were as consistent with a straddle injury as with sexual penetration, and that they made a reasonable decision not to bolster that opinion by calling a second medical expert who would, at most, have testified to the same opinion as Dr. White.

> 16.  The Court finds that Vasquez failed to offer any evidence to show that Dr. Randall Frost's testimony would have aided the defense in any way in its attempt to show that the victim's injuries were consistent with a straddle injury.

(FH Pet. Ex. A).

However, the trial court record demonstrates that Dr. White never expressed any of his own opinions regarding the straddle injury theory.  Instead, Dr. White merely confirmed that he remembered seeing Dr. Henderson's statement calling the injuries a straddle injury.  (RR 36:39-55).  Trial counsel's failure to elicit Dr. White's opinion on the straddle injury theory is demonstrated by the following cross examination by Mr. Collina:

> Q.     Okay.  Oh, do you remember when I came to your office on the 28th of April about 2:00 in the afternoon?
>
> A.     Yes.
>
> Q.     We were sitting at the table therein the conference room.  Do you remember looking at a handwritten report of Dr. Henderson at that time?
>
> A.     Yes.
>
> Q.     Can you find that report?
>
> A.     We probably – was this his operative report or admissions?
>
> Q.     Well, I didn't have it.  I had the benefit of yours, but I remember you and I looking at it.  And do you recall it mentioning a straddle injury?
>
> A.     Yes, I do, yes.
>
> Q.     Dr. Henderson felt these injuries were consistent with a straddle injury?
>
> A.     Yes, I do recall that statement in the  --
>
> Q.     That's okay.  If you recall it, then we don't need to look.

(RR 36:54-55).

Obviously, the introduction of the actual narrative of Dr. Henderson would be far more credible and persuasive to the jury than Dr. White's vague recollection of having seen the "report" sometime in the past.  Contrary to the suggestion of counsel, the jury did "need to look" to see the full context of Dr. Henderson's opinion to fully assess its credibility.  It is also

probable that the manner in which the document was discussed but not shown to the jury created some doubt in the mind of the jurors as to whether Dr. Henderson did in fact discuss a straddle injury, whether Dr. Henderson's statement was definitive or merely a preliminary opinion, whether the report contained other damaging information that would make the defendant not want to produce it, etc.  Because, by Richard's counsel's own admission, they never obtained a copy of Dr. Henderson's narrative, the defense was unable to present to the jury the best evidence of the document's existence, the document itself.

Additionally, if as trial counsel said they did,[19] they knew that Dr. White was willing to testify that Miranda's injuries could have been caused by a straddle injury, they should have asked him to offer that opinion.  Counsel's failure to ask Dr. White for his own opinion on this crucial defense theory, particularly when they failed to present any other expert who shared that opinion, was itself ineffective assistance of counsel.

Ultimately, Dr. White's testimony was inconclusive, suggesting that the injuries might have been caused by a number of things including a man's penis.  (RR 36:39-40, 53).  Because Dr. White did not himself endorse the straddle injury theory as a plausible explanation for Miranda's injuries, Dr. Frost's opinion would not have been redundant of Dr. White's testimony.  To the contrary, Dr. Frost would have been the only expert witness at trial offering an opinion that Miranda's injuries might have been the result of a straddle injury.  Furthermore, in the face of opinions from the prosecution's multiple medical witnesses, including Ms. Box and Dr. Lukefahr, who expressly rejected the straddle injury theory,[20] even redundant testimony from a single defense expert would have significantly bolstered the argument.  For these reasons, the

---

[19] Mr. Collina testified that he spoke with Dr. White before the trial and that he was aware of Dr. White's opinion.  (SH 3:16-17) ("He said it could have been a straddle injury or it could have been sexual penetration.").

[20] (RR 35:198, 225).

state court's conclusions that (1) trial counsel was reasonable to rely solely on the testimony of Dr. White; and (2) that Dr. Frost could not have aided the defense in any way are both unreasonable in light of the clear and convincing record evidence.

> **2.      Trial counsel's failure to present circumstantial evidence indicating Miranda suffered a straddle injury.**

The state court's finding number 17, which attempts to excuse trial counsel's failure to question family members regarding likely causes of Miranda's straddle injuries, is also unreasonable.  Finding 17 states as follows:

> The Court finds that Vasquez failed to offer any evidence from family members to show that they could have testified to anything other than speculative suggestions that the victim suffered a straddle injury rather than sexual assault, or that any of Vasquez's family members observed such an injury or heard the victim cry or complain of such an injury.

(FH Pet. Ex. A).  The premise of this finding, that the failure to present "speculative" testimony is somehow excused, is flawed because circumstantial evidence is admissible and would have been important to rebut the State's own speculative/circumstantial sexual assault theory. Richard's trial counsel called a grand total of four witnesses, including Richard's uncle and Richard himself, to make Richard's case during the guilt/innocence portion of the trial.[21]  *See generally* (RR 37).  However, none of the witnesses were asked to explain potential causes for the injuries to Miranda's genitals or to introduce circumstantial alternate-theory evidence that was known to trial counsel.  Mr. Collina admitted in his affidavit submitted in the state habeas corpus proceeding that defense counsel failed to introduce evidence that would have provided plausible support for Richard's straddle injury theory.

---

[21]  The first witness called by the defense, Officer William Edge, testified regarding a conversation he had with Richard's girlfriend, Brenda, regarding the location of a footstool found at the crime scene.  The transcript of Officer Edge's testimony is a page-and-a-half in length.  *See* (RR 37:1-2).

When Bujanos, one of defendant's attorneys, had the defendant's uncle on the stand, he should have introduced the several photos of a stationary bike that was located in or near the family home. I had, prior to trial, asked the uncle to take these photos. The child was known to have ridden the bike without permission. The uncle would not have been able to testify that he had seen the child fall; but, the photos and the uncle's testimony would have provided some plausible explanation – as to how the child victim had suffered her vaginal injury.

(State's Answer to Post-Conviction 11.071 Application for Writ of Habeas Corpus, Appendix no.1, Affidavit of Joseph v. Collina ¶ 16). Richard's uncle, Juan Vasquez, also submitted an affidavit in the state habeas proceeding further describing the information he would have presented if defense counsel had given him the opportunity to do so.

At the time of the incident, I was teaching Alicia to ride a two-wheeler. I had taken the training wheels off her bike. Miranda wanted to learn too so I was teaching her too. She was learning on Alicia's bike. Alicia and Miranda always played together. Alicia was about one year older than Miranda. Whatever Alicia would do, Miranda wanted to do. Miranda would also like to play on my wife Olivia's exercise stepper, power rider and exercise bicycle. They were much too big for her and she would fall. I do not believe that Richard raped Miranda. I understand that Richard hit Miranda. I understand that she fell down off a stool sometime after Richard hit her. I told the lawyers about this equipment and they told us to take a picture of them and bring it to court. We did this, and we brought the picture but they never asked me about it.

(SH Petitioner's Ex. 21). Juan testified during both the guilt and punishment phases of the trial but was never asked to present information regarding Miranda's attempts to ride a two-wheel bike or play on the adult exercise equipment. No other witness or evidence was presented in support of the straddle injury theory.

Mr. Collina himself explained the significance of this alternate-theory evidence as follows:

It was important to give the jury an alternate theory for how that child suffered that injury. The State's theory was that it was sexual

> assault.  It was very important for us to establish an alternate
> theory, which we did not.  Well, we did it, but in a less effective
> way.
> . . .
> But it would have been embellished if the jury had something to
> carry around in their hand.  Jurors like to touch things, too, not just
> hear testimony.  They like to see things.  So I wanted to appeal to
> all the senses of the jury, not just the verbal.  Photos would have
> been nice.

(SH 3:30-31).  Had defense counsel done what they should have to introduce all of the available

alternate-theory evidence, including the photographs and testimony from Juan Vasquez

establishing the existence of the oversized exercise equipment in the Vasquez home; testimony

regarding Miranda's tendency to play on that equipment; Dr. Henderson's testimony and

narrative calling Miranda's wounds a straddle injury and/or the testimony of Dr. Frost and Dr.

White affirming the possibility that the injuries were caused by a straddle injury, they would

have provided an authoritative, reasonable and compelling explanation for the injuries to

Miranda's genitals.   Trial counsel's failure to investigate and present this readily available

evidence fell below prevailing professional norms.[22]   The trial court's findings and conclusions

endorsing trial counsel's failures fly in the face of the clear and convincing record evidence and

are objectively unreasonable.

### D.   Failure to present other available evidence to refute the state's un-indicted sexual assault allegation.

Trial counsel also failed during the punishment phase of the trial to introduce evidence

regarding Richard's psychological profile, which is inconsistent with sexually abusive behavior.

Although trial counsel retained a psychiatrist, Dr. Estrada, to testify regarding Richard's drug

addiction and lack of future dangerousness if he is kept free of narcotic drugs, Dr. Estrada was

---

[22] 1989 ABA Guideline 11.8.2 D. states that "[c]ounsel should ensure that all reasonably available mitigating and favorable information consistent with the defense sentencing theory is presented to the sentencing entity or entities in the most effective possible way."

never asked whether Richard's psychological characteristics are consistent with child molestation or sexual deviance. (RR 39:95-107).

Richard's state habeas counsel retained a psychologist with experience evaluating sex offenders, Dr. Ricardo Weinstein, to evaluate Richard's psychological characteristics. The relevant portion of Dr. Weinstein's evaluation is as follows:

> I have evaluated over 1000 individuals charged with sexual misconduct, most of them accused of molesting minors. The evaluations have served the purpose of assisting at trial or sentencing. My clinical experience and knowledge of the literature have allowed me to conclude that sexual abuse occurs for the most part in a contextual environment, the context is always related to the perpetrator. The following descriptions cover the great majority of cases:

> 1. Psychopaths. These individuals molest minors without rhyme or reason and in no specific context. Richard is not a psychopath, therefore this is not applicable.

> 2. Pedophiles. These individuals have sexual arousal to children and/or young adolescents. This is often their exclusive source of arousal. Richard has a long history of arousal to age appropriate females. He has been sexually active since he was in his early teens. He has been exposed to children and has had many opportunities to engage in sexual behaviors with children and has no history of doing so.

> 3. Shy/withdrawn individuals that are socially inadequate and feel threatened pursuing adults. They adultmorphize children to satisfy their sexual desires. Richard has no problems socializing or meeting age appropriate females.

> 4. Family dynamics where the child becomes the substitute "partner," eventually leading to a sexualized relationship. There is no

evidence that this dynamic existed in Richard's relationships.

5.  Sexual acts performed under the influence of alcohol or drugs due to disinhibition. Richard's heroin addiction does not fall into this category. Heroin does not disinhibit behavior.

. . . It is my opinion that he does not present any characteristics of a pedophile and that the dynamics of his relationship with the mother of the victim were such that it is very unlikely that he would have acted in a sexually violent or inappropriate way against the child.

(SH Petitioner's Ex. 20 at 15). All of Richard's family members submitted affidavits in the state habeas proceeding confirming that there has never been a question of Richard acting sexually inappropriately with children. They also testified that Richard was frequently trusted with the care of young girls. For example, Juan Vasquez reported: "I have seen Richard many times with my nieces. Brenda has three daughters: Alicia (10/11/92), Briana (01/23/96) and Dominic (02/23/99). He has always been appropriate with them. Richard was always appropriate with Miranda too." (SH Petitioner's Ex. 21 ¶ 30). The Petitioner's sister, Brenda, stated:

I have three daughters: Alicia (10/11/92), Briana (01/23/96) and Dominic (02/23/99). I have seen Richard with my daughters often. He has always been appropriate with them. Whenever I saw Richard with Miranda, he was always appropriate with her too. I never saw Richard hit Miranda. I do not believe Richard raped Miranda.

(SH Petitioner's Ex. 25 ¶ 26). Trial counsel failed to investigate and present this important mitigating evidence, which would have aided Richard's attempt to cultivate the juror's residual doubt on the issue of sexual assault during the punishment phase of the trial.

> **E.** **Trial counsel's multiple failures to investigate, refute and counter the State's sexual assault evidence prejudiced Richard during both the guilt and punishment phases of trial.**

Other than Richard himself, the only witness called by the defense during either phase of the trial to address the State's allegations and evidence of sexual assault was Magada Hinojosa, an investigator for the Robstown office of Child Protective Services.  (RR. 37:3).  Ms. Hinojosa testified regarding a visit she made to Richard's home in January 1998 where she interviewed Miranda, observed her demeanor and had the opportunity to remove her clothing and examine Miranda physically.  (RR. 37:5-7).  She stated that her investigation did not reveal any bruising on Miranda's body or any evidence of sexual abuse.  (RR. 37:7).  Neither Ms. Hinojosa nor any other witness called by the defense attempted to counter the evidence in support of the state's sexual assault theory detailed above.  In the end, the only evidence trial counsel presented in support of Richard's straddle injury theory was Dr. White's brief mention on cross examination of having seen Dr. Henderson's "handwritten report."  Trial counsel's failure to discover and present the wealth of available evidence that was both known to and readily discoverable by trial counsel cannot be justified as reasonable trial strategy.  Put simply, trial counsel did not meet the objective standard for reasonable defense counsel.

As described above, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  If the Court can conclude that a juror could have reasonably concluded that the death penalty was not an appropriate penalty in this case based on the mitigating evidence, prejudice will have been established."  *Lockett*, 230 F.3d at 716.

That standard has been met in this case.  The significance of the State's un-indicted allegation of rape to both Richard's conviction for murder and his death sentence cannot be overstated.  The State itself argued its significance in its closing argument to the jury during the guilt phase of the trial as follows:

> The rape – yes, the rape is not on the documents either, and why is the rape so important?  Because it shows his intent at the time of the killing.  It shows the anger he had because rape is a crime of anger.  That is what sexual assault is.  So it shows – the importance of the rape is that it shows his state [of] mind, his intent.  It shows the circumstances of the offense, and it shows what he did not want to admit to.

(RR 38:50).  This quote makes clear that the State used the allegation of rape to establish many of the elements of capital murder including his motive and intent to kill Miranda.  It also confirms that the State used the rape allegation to prove aggravating circumstances and to incite the jury's hatred against Richard.  Finally, it demonstrates the State's use of the rape allegation to otherwise impeach Richard's credibility with the jury.  Because the evidence of sexual assault was not effectively refuted by trial counsel, Richard's claims that he did not intend to kill Miranda and evidence that Richard called for medical attention and performed CPR to save her life were disregarded by the jury.

At the punishment phase of the trial, the State's allegations of sexual assault once again played a prominent role.  Prosecutors used the salacious allegations to great effect to inflame the passions of the jurors.  Prosecutors repeated their theory using the most inflammatory rhetoric and graphic detail as illustrated by the following excerpts:

> This defendant forcibly restrained and raped Miranda.  This defendant ripped her privates open.  Ladies and Gentlemen, I really don't know how else to say this.  This defendant made a hole in Miranda that wasn't supposed to be there.  He mutilated her privates. . . .
> . . .

> This defendant cleaned her up with rubbing alcohol. Imagine the
> torment, the excruciating pain Miranda must have felt as he
> cleaned her privates, her open wounds up with rubbing alcohol.
> He used rubbing alcohol to clean up all of that blood. Imagine the
> pain she must have suffered, that is, if she was conscious at the
> time. . . . Think about it. He couldn't have done anything worse to
> Miranda. He tortured her.

(RR 40:13-14).

If trial counsel had done the appropriate investigation and retained the necessary experts,

they could have called into question the State's DNA evidence linking Richard to the injuries to

Miranda's genitals as Dr. Libby was able to do in the state habeas proceeding. They also would

have been able to refute with authority Dr. Nguyen's "semen washing" hypothesis and explained

more completely the significance of the fact that none of Mr. Vasquez's DNA was found in or on

Miranda's genitals. Additionally, if trial counsel had taken action to investigate and present

readily available alternate-theory evidence suggesting Miranda's genital cuts were straddle

injuries, (including expert and lay testimony, photographs and medical reports), that evidence

would likely have created reasonable doubt in the mind of the jury and taken away much of the

persuasive impact of the sexual assault allegation at both the guilt and punishment phases of the

trial. This evidence alone is sufficient to undermine confidence in the jury's verdict and call into

question the reasonableness of the Texas Court of Criminal Appeal's factual review.

## CONCLUSION

In the state post-conviction evidentiary hearing, the State argued that mitigating and

exculpating evidence was irrelevant based on the theory that trial counsel made strategic

decisions not to investigate or present it. However, as this Response demonstrates, the decisions

not to investigate Richard's family history, Richard's social history and the allegations of sexual

misconduct were not reasonable decisions. Nevertheless, at the conclusion of the state habeas

proceeding, the State incorporated its theory in the proposed findings they submitted to the trial

court.  Due to the state courts' failures to conduct their own discerning analysis of the evidence, without a single variation or modification, each of the prosecutor's proposed findings were adopted by the trial court and subsequently by the Texas Court of Criminal Appeals.

In this Response, Richard has not attempted to show all of trial counsel's failures, nor has Petitioner attempted to discuss all of the state courts' clearly erroneous findings.  Such an exhaustive analysis is simply not necessary to illustrate to the Court the serious inadequacies in trial counsel's representation and the objectively unreasonable nature of the state courts' findings.  As the totality of the arguments and evidence discussed above make clear, Richard Vasquez was not effectively represented by his trial counsel during both the guilt and sentencing phases of the trial, and he was therefore denied his constitutional rights under the Sixth Amendment.  The state court findings and conclusions to the contrary are not entitled to a presumption of correctness, were based on unreasonable factual determinations, and involved the objectively unreasonable application of clearly established federal law.  Consequently, Petitioner should be granted a writ of habeas corpus ordering Richard Vasquez to be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional death sentence.

Respectfully submitted,

BRACEWELL & GIULIANI LLP


By:   /s Andrew M. Edison
       Andrew M. Edison
       State Bar No. 00790029

       Eric B. Storm
       State Bar No. 24033244

       711 Louisiana Street, Suite 2300
       Houston, Texas 77002
       (713) 221-1371 (Telephone)
       (713) 221-2144 (Facsimile)

       ATTORNEYS FOR PETITIONER RICHARD
       VASQUEZ

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Petitioner's Response to Respondent Quarterman's Motion for Summary Judgment was served on the Attorney General for the State of Texas, Counsel for Respondent, by mailing the Petition via first class mail RRR on 15th day of January, 2007 to the following address:

> Mr. Baxter R. Morgan
> Office of the Attorney General
> Assistant Attorney General
> Post Conviction Litigation Division
> P.O. Box 12548
> Austin, TX 78711-2548

> /s Andrew M. Edison
> _____
> Andrew M. Edison